1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
   * * * * * * * * * * * * * *
3  JAYME GORDON,                    *
          Plaintiff,               *
4                                   *
          vs.                      *        CIVIL ACTION
5                                   *        No. 11-10255-JLT
   DREAMWORKS ANIMATION SKG,        *
6  INC., et al                     *
          Defendants.              *
7  * * * * * * * * * * * * * *

8          BEFORE THE HONORABLE JOSEPH L. TAURO
               UNITED STATES DISTRICT JUDGE
9                      **HEARING**

10 A P P E A R A N C E S

11         FISH & RICHARDSON P.C.
           One Marina Park Drive
12         Boston, Massachusetts 02210-1878
           for the plaintiff
13         By:  Juanita Brooks, Esq.
                Kristen A. McCallion, Esq.
14              Gregory A. Madera, Esq.

15
           DUANE MORRIS LLP
16         100 High Street, Suite 2400
           Boston, Massachusetts 02110-1724
17         for the plaintiff
           By:  Mark A. Fischer, Esq.
18

19

20
                          Courtroom No. 22
21                        John J. Moakley Courthouse
                          1 Courthouse Way
22                        Boston, Massachusetts 02210
                          November 17, 2011
23                        11:20 a.m.

24

25

**APPEARANCES, CONTINUED**


            LOEB & LOEB LLP
            345 Park Avenue
            New York, New York 10154
            for the defendants
            By: Jonathan Zavin, Esq.


            FOLEY HOAG LLP
            Seaport West
            155 Seaport Boulevard
            Boston, Massachusetts 02210-2600
            for the defendants
            By: Julia Huston, Esq.
                John A. Shope, Esq.


                    CAROL LYNN SCOTT, CSR, RMR
                     Official Court Reporter
                   One Courthouse Way, Suite 7204
                   Boston, Massachusetts 02210
                         (617) 330-1377

1            **P R O C E E D I N G S**

2            **THE CLERK:**  All rise for the Honorable Court.

3            **THE COURT:**  Good morning, Everybody.

4            **VOICES:**  Good morning, Your Honor.

5            **THE COURT:**  Sit down, please.

6            **THE CLERK:**  This is civil action No. 11-10255,

7    Jayme Gordon versus DreamWorks Animation.

8            Counsel please identify themselves for the record.

9            **MS. BROOKS:**  Good morning, Your Honor.  Juanita

10   Brooks, Kristen McCallion and Greg Madera from Fish &

11   Richardson and Mr. Fisher from Duane Morris on behalf of

12   Jayme Gordon, the plaintiff.

13           **THE COURT:**  Okay.

14           **MR. ZAVIN:**  Good morning, Your Honor.  Jonathan

15   Zavin of Loeb & Loeb and with me is John Shope and Julia

16   Huston of Foley Hoag for the defendant DreamWorks Animation.

17           **THE COURT:**  Let me do it, awful to have to do,

18   apologize before I even start.  Now, we can spend the next

19   ten minutes and I will tell you all about the construction

20   sites that caused me to be late.

21           (Laughter.)

22           **THE COURT:**  But probably we could spend the time

23   better by getting down to business here.

24           I want to get this case on the tracks.  I mean,

25   that is my purpose.  And I understand from looking at the

1    papers, my limited understanding I should say, from looking

2    at the papers, because you people have a much better

3    understanding of the case than I do, one obstacle we have to

4    progress is the taking of the plaintiff's deposition.  That

5    has to be done.  You all know it has to be done.  It is a

6    question of whether it is now or later.

7         And what I want to do is to make sure that in the

8    next few minutes we have a firm schedule for the setting of

9    that deposition.  Now, what impediments to that you can

10   recite to me, I think there is some concern about an

11   investigation that was done and the propriety of it and

12   whether or not it should have some effect on the deposition.

13   Those are all things that I am happy to listen to you on

14   this morning.

15        I think I understand everything that happened and I

16   think I have an appreciation for the propriety of certain

17   pretrial investigation.  But if there is something

18   extraordinary here, I want to hear you, I want to give you

19   an opportunity to be heard.

20        So who wants to go first and tell me, or shall I

21   just tell you I am going to give you a date for the taking

22   of the deposition and that is it, period, without any

23   further discussion?

24        **MS. BROOKS:**  Your Honor, we would request to be

25   heard since there are other amenities we are also seeking

1    from the Court in addition to the protective order.

2              **THE COURT:**  All right.  Go ahead.

3          **MS. BROOKS:**  Thank you.

4          Thank you very much, Your Honor.

5          The issue here isn't whether or not Mr. Gordon

6    needs to sit for his deposition.  Of course he does.  And he

7    was indeed scheduled to sit for his deposition on

8    October 19th.

9          What happened in the weeks leading up to his

10   deposition is that the defendants conducted an investigation

11   that was so heavy-handed and so extreme that it caused

12   Mr. Gordon and his family such, essentially harassment and

13   distress that when it came time to prepare Mr. Gordon for

14   his deposition, not only Mr. Gordon but frankly his entire

15   legal team were distracted by what was going on.

16         So just to quickly recap, Your Honor, what happened

17   here.  Mr. Gordon has submitted a declaration under oath

18   which remains unrebutted by the defendants.  At paragraph

19   three Mr. Gordon details how in mid to late September he

20   began noticing cars parked outside his apartment building on

21   almost a daily basis.  The defendants' response to this has

22   been nothing.

23         Paragraph four of his declaration, on September

24   26th he was pursued in his car for about 20 minutes by

25   someone.  Defendants' response to this, nothing.

1              Paragraph eight details the October 2nd encounter

2      that Mr. Gordon actually had with one of the cars that had

3      been staking out his house and following him, his wife, his

4      family.  We've submitted to the Court a videotape, I hope

5      Your Honor was able to view it.  We submitted it in an

6      electronic copy.  What it is is Mr. Gordon and it details

7      what led up to this in his declaration at paragraph eight,

8      that he saw this same silver Lexus that had been staking him

9      out, amongst other cars, at a residence where Mr. Gordon and

10     his family were moving.

11             He sees that car there and then as he's leaving the

12     car now is following him back to his apartment building.

13     Mr. Gordon slows down to let the car pass.  It doesn't pass

14     to the point with people are honking.  After that it finally

15     does pass.  And when Mr. Gordon gets back to his apartment

16     building, who is there but the gentleman in the silver Lexus

17     again.

18             Mr. Gordon, knowing that at this point his 16-year

19     old son is home alone, goes into a panic.  Calls his son to

20     make sure that he's okay, tells him to lock the door, not

21     let anyone in and then yells at the person in the silver

22     Lexus, which he now has on tape, to stop so he can talk to

23     him and find out what is going on.

24             The person doesn't stop.  Mr. Gordon follows him to

25     get his license plate number and that is all on tape.  And,

1    indeed, that license plate number came back to a JC Lane and

2    Associates, a private investigation company.

3           Now, here defendants actually have an answer.  What

4    their answer is is that Mr. Gordon attaches, quote, a brief

5    video purportedly filmed by Gordon which simply shows Gordon

6    chasing someone.

7           The defendants know exactly who it was.  It was

8    their private investigator.

9           They then go on and say, The extremely brief and

10   likely highly edited video shows what purports to be the

11   plaintiff in pursuit of an investigator.

12          They know it isn't purporting.  They know it is,

13   indeed, an investigator.

14          They then go on at page fifteen and say,

15   "Defendants' attorneys authorized an investigation to be

16   performed by a licensed investigation firm."  Mr. Shope then

17   says in his under-oath declaration at paragraph 14, "I took

18   charge of supervising the investigation.  We retained the

19   investigative division of Marcum LLP."

20          Paragraph 15 of his under-oath declaration, "I

21   specifically instructed Marcum to conduct and otherwise

22   obtain information by lawful means only."

23          He makes no mention whatsoever of JC Lane and

24   Associates.  Who are they?  Who hired them?  What

25   instructions were they given?  How can defendants make a

1    representation that the surveillance of Mr. Gordon was done

2    in a proper fashion when they never even tell us who JC Lane

3    and Associates are, who hired them and what instructions

4    they were given?

5            In fact, in their motion to dismiss, they say,

6    "This background check included minimal legal and

7    nonintrusive observation of plaintiff."

8            Again, what is their basis of that, for that, when

9    they have yet to this day to tell us who hired JC Lane and

10   Associates and what instructions they were given.

11           We submit, Your Honor, and one of the reasons why

12   we are asking the Court to order them to turn over all

13   instructions to any investigation firms that they hired and

14   all reports from those investigation firms is because we

15   believe that JC Lane and Associates was instructed to make

16   sure Mr. Gordon knew that he was being followed and to make

17   sure that he was put in fear not only for himself but for

18   his family.

19           Now, why is that the case?  Because, as we say in

20   our papers, a quick Internet search of the background of

21   Jayme Gordon will turn up two things.  One, it will turn up

22   this lawsuit.

23           Two, it will turn up something that happened back

24   in 1993 to Mr. Gordon and his family.  Mr. Gordon's sister,

25   Patricia Aquino, was brutally murdered in front of their

1    three-year old son by her husband.  Her lifeless body was

2    found the next day by her teenage daughter with her

3    three-year old son still present in the house.  Mr. Gordon

4    was there, called to the scene, allowed to hug and kiss his

5    sister's lifeless body goodbye as a butcher knife was still

6    embedded in her chest as her body was carried out of the

7    house.

8           We fast forward now to when the murderer of

9    Mr. Gordon's sister was arraigned.  And when Mr. Gordon saw

10   him, saw the picture of his sister that his mother had

11   brought to court so that she would be more than just a name

12   on a docket, and the attitude of the murderer as he was

13   brought past Mr. Gordon and his mother, Mr. Gordon snapped.

14   And that is the assault conviction, by the way, that

15   defendants talk about, is that Mr. Gordon, indeed, assaulted

16   the murderer of his sister in court.

17          The defendants know this by a quick Internet

18   search.  They know his Achilles' heel.  They know his hot

19   button and they set out to get a message to Jayme Gordon to

20   either, one, get him to snap yet again and get him on tape

21   saying, look, this guy is a crazy man, how can he have a

22   legitimate case, or get him to say I can't do this to my

23   family, I'm dropping this suit.

24          And that is exactly what was going on here.  And

25   the defendants have yet to deny it.  They have yet to even

1    admit that they hired JC Lane and Associates in the first

2    place.

3           We go to paragraph six of Mr. Gordon's declaration.

4    Investigators somehow obtained entry into Mr. Gordon's

5    locked apartment building.  Defendants do not deny that nor

6    do they explain to this Court how it is they got into that

7    locked apartment building.

8           They then questioned Mr. Gordon's neighbors.  We

9    attached the declarations from the neighbors.  One was a

10   minor child who was home alone without the presence of his

11   parents and questioned by these investigators without the

12   permission of his parents.  That is absolutely unethical and

13   against the law.

14          The others who were questioned, the other

15   neighbors, were led to believe that Mr. Gordon was being

16   investigated because he had done something wrong.  What is

17   the defendants' response to this?  That the conversations

18   with the neighbors were voluntary and that nobody was lied

19   to.

20          That is absolutely not true.  They were led to

21   believe that they were living in an apartment building where

22   there was a man present who had done something that caused

23   him to get investigated.  And there is no disclosure by

24   whoever these investigators are, what investigation company

25   they were working for and what instructions they were given.

1    What possible purpose was there behind getting investigators

2    to go into Mr. Gordon's locked apartment building and

3    question neighbors other than to make Mr. Gordon --

4            **THE COURT:**  I take it they didn't go into the

5    living quarters itself, it was the main door; is that it?

6            **MS. BROOKS:**  They went into -- actually, no, they

7    went into the apartment building, knocked on neighbors'

8    doors and talked to neighbors in their living quarters.

9            **THE COURT:**  I understand, but the "investigators"

10   didn't go into the plaintiff's residence itself?

11           **MS. BROOKS:**  Correct, Your Honor, they did not go

12   into his apartment.

13           **THE COURT:**  It is the outdoor access that you are

14   talking about?

15           **MS. BROOKS:**  Correct, Your Honor.  Yes, I'm sorry.

16   The locked door I'm talking about is the door into the

17   apartment building itself.  It is locked.  It is in

18   Dorchester.  It is not locked because it's posh and has a

19   doorman.  It's locked because it is, you know, in a fairly

20   tough neighborhood and it's locked for security purposes.

21   And you can't get in unless you have a key.

22           And there is no explanation to this day from the

23   defendants how these investigators got inside that apartment

24   building.

25           What was the purpose behind it?  To make Mr. Gordon

1    know he wasn't even safe in his own home.  Neither was his

2    family.

3              What's the next paragraph?  Paragraph nine,

4    Mr. Gordon says he's been informed that investigators

5    obtained entry into his mother's locked apartment building

6    and questioned neighbors.  Defendants' response to that, not

7    one word.  They don't even deny that it happened nor explain

8    what business they had going into his mother's locked

9    apartment building and questioning neighbors.

10             I can tell the Court the logical reason they did it

11   is that Mr. Gordon's mother is the woman who was sitting in

12   court with the photo of her daughter who was murdered by her

13   husband.  Mr. Gordon's nephew David Gordon was the little

14   boy that witnessed the murder of his mother.

15             Later what happened is that the murderer sued for

16   custody of the children so that his sister could bring them

17   to visit him in prison where he was doing life without

18   parole.  That was a whole other saga that the Gordons had to

19   go through.

20             David Gordon, who is now 18 years old, lives with

21   Mr. Gordon's mother.  That little boy spent months sleeping

22   under his bed after he witnessed the murder of his mother by

23   his father.  Defendants know it because it's in the

24   newspaper articles that are in the public record and yet

25   they send investigators into his mother's locked apartment

1    building to terrorize them also.

2           And they also happen to know because we produced it

3    in discovery that Mr. Gordon's mother had written a letter

4    and Mr. Gordon's nephew David, who is now 18, had written a

5    letter talking about all the artwork that Mr. Gordon had

6    done throughout his life and how David Gordon even used to

7    when he was a little boy have Uncle Jayme's artwork on the

8    wall.

9           They went there to try to get these people also

10   scared off and for them to tell Mr. Gordon, which is exactly

11   what they did, they were terrified, and to get Mr. Gordon to

12   drop this case.

13          And they knew of his vulnerability when they did

14   these actions and they have yet to explain them.

15          They also haven't explained who are these women.

16   They didn't identify themselves from any private

17   investigation agency.  They just said they were doing a

18   check.  They admitted, defendants admitted in a letter that

19   there were, their words, conversations with Mr. Gordon's

20   neighbors that ceased on October 2nd.

21          October 2nd, by the way, Your Honor, was the day

22   that Mr. Gordon followed JC Lane and Associates in his car

23   and got the guy's license plate number.  It's no coincidence

24   that they then decided to call off, at least for the time

25   being, these strong-arm tactics.

1          But it doesn't end there.  That alone is simply

2     wrong and in violation of the Witness Intimidation Statute

3     in this state.  The statute reads very clearly that anyone

4     who misleads, intimidates or harasses another person and

5     that person is furthering a civil proceeding or is a person

6     who was attending or had made known his intention to attend

7     a civil proceeding is guilty of violating the statute.

8          The term "harass" shall mean to engage in any act

9     directed at a specific person or persons which act seriously

10    alarms or annoys such person or persons and would cause a

11    reasonable person to suffer substantial emotional distress.

12         That's exactly what happened in this case.  This

13    statute was amended in November of 2010 to apply to civil

14    cases.  It didn't use to.  It used to only apply to criminal

15    cases.  It was amended in 2010 to apply to civil cases and

16    also to apply not just to intentional behavior but to

17    reckless disregard, which at a minimum is what happened

18    here, although we submit it was intentional behavior.

19         Now, we are not here today to ask that anybody be

20    indicted.  But certainly if you're in violation of the

21    Massachusetts Witness Intimidation law, then your

22    investigation has gone too far and it is improper and there

23    must be some ramifications to that.

24         That's that part of their behavior.  Let's turn to

25    the second part.  The second part is detailed in paragraph

1    ten of Mr. Gordon's letter.  A David Allen who Mr. Gordon

2    hadn't worked for in 18 years was questioned by a private

3    investigator at his home in Burbank, California.  Mr. Gordon

4    had worked for Mr. Allen 18 years earlier at the Warner

5    Brothers Store in Braintree, Massachusetts.

6           Now, 18 years later a gentleman shows up at David

7    Allen's home in Burbank, California, identifies himself as

8    being from Thomas Dale and Associates.  If you go on the

9    website, you'll find Thomas Dale and Associates is a private

10   investigation firm.  No mention by the defendants who hired

11   Thomas Dale and Associates.  What instructions were they

12   given?  Why were they there?

13          And this gentleman, David Allen, says in the email

14   to Mr. Gordon, which is attached to our papers, that it was

15   only after this gentleman left that Mr. Allen on his own

16   Googled Mr. Gordon's name and saw the *Kung Fu Panda* lawsuit

17   so he had up until that point no reason to know that this

18   gentleman was there because DreamWorks was looking into

19   Mr. Gordon's allegations.  At best there was an omission.

20   At worst he was deliberately mislead.

21          But we do have affidavits from people who affirm

22   under oath they were absolutely deliberately misled.  Joe

23   Martinez gave an affidavit, and Mr. Gordon details it at

24   paragraph 12 but it is also attached to our moving papers,

25   to our reply, to our motion for a protective order.

1          Mr. Martinez specifically says that based on the

2     questioning of the private investigator, her questions left

3     him with the impression that Jayme Gordon had applied for a

4     new job --

5          **THE COURT:**  "Her questions," you mean the

6     investigator's?

7          **MS. BROOKS:**  Yes, Your Honor, the investigator's

8     questions left Mr. Martinez with the impression that

9     Mr. Gordon had applied for a new job and the woman calling

10    was seeking references for his prospective employer.

11         Now, Massachusetts Rule of Professional Conduct, I

12    believe it is 4.3, says that a lawyer shall not state or

13    imply that the lawyer is disinterested in talking to a third

14    party.  This case, this rule has further been expanded upon

15    in the In Re: Crossen case.  Mr. Crossen was a partner at

16    Foley & Hoag.  He was disbarred in 2008.  His disbarment was

17    taken all the way up to the Massachusetts Supreme Court.  He

18    argued that he was simply zealously representing or

19    defending his client.  He was an attorney in what is

20    somewhat notorious here in Massachusetts, the Demoulas v.

21    Demoulas litigation that went on for a decade.

22         What Mr. Crossen did was hire private investigators

23    to perpetuate a ruse where they pretended to be looking to

24    give a job to the judge's, who was presiding over the

25    Demoulas litigation, to that judge's former law clerk.  They

1    pretended to be potential employers and they interviewed

2    that law clerk on numerous occasions under the ruse of being

3    potential employers but in actuality trying to get that law

4    clerk to say things that they could use to disqualify the

5    presiding judge.

6          That in addition to some other behavior resulted in

7    the disbarment of Mr. Crossen.  And the Crossen case held

8    that a lawyer cannot use agents like investigators to do

9    what the lawyer himself could not do.  Since Mr. Crossen

10   would not be allowed under Rule 4.3 to pretend or imply to a

11   third party that he was disinterested, he can't use an

12   investigator to do that.

13         That is exactly what the defendants have done in

14   this case.  And they ought to know about the In Re: Crossen

15   case, he was their former law partner.

16         In addition to that, they misled not only

17   Mr. Martinez, which we have a declaration to that effect,

18   but Derek Tuttle, which we also have a declaration.  Derek

19   Tuttle says that he received a call from a woman seeking a

20   character reference for Jayme Gordon.  She said she was

21   calling from Marcum.

22         Now, defendants make much of the fact that Marcum

23   has been identified and that it is their private

24   investigation firm.  If one goes online and looks up Marcum

25   LLP, it's actually identified as an accounting firm.  You

1   can't even tell from their website that they do private

2   investigation, at least from the home page.

3          She left Mr. Tuttle, and this is what Mr. Tuttle

4   says under oath, "with the impression that she was Jayme's

5   lawyer and that Marcum was the law firm representing Jayme."

6   Defendants' response, no denial.  Simply to say we hired

7   Marcum, we told them not to do anything illegal.  That is

8   simply not good enough under the law in this district.

9          What is interesting and what is conspicuously

10  absent from all of defendants' papers is any declarations

11  from the private investigation companies.  What instructions

12  were they actually given?  What questions did they actually

13  ask?  How did they obtain entry into locked apartment

14  buildings?  Why did they obtain entry into locked apartment

15  buildings?  Why were they surveilling Mr. Gordon, not just

16  on a routine basis as defendants characterize it, but

17  actually chasing him for twenty minutes at a time, popping

18  up everywhere he was?

19         Why did they gain entry into the locked apartment

20  building of Mr. Gordon's mother?  What did they hope to

21  accomplish there?

22         Not one word from one private investigator in this

23  case under oath nor even a mention by the defendants of at

24  least two of the three private investigation companies that

25  we've been able to identify.

1          That is not where it began though, Your Honor.  It

2     began actually back after we filed this lawsuit.  We filed

3     this lawsuit in February.  Now, what's interesting is that

4     the defendants' heavy-handed investigation did not start

5     until September, a few weeks before Mr. Gordon was to sit

6     for his deposition.

7          Why would they not have done a background check on

8     Mr. Gordon when this case was first filed?  What possible

9     purpose could it serve to crank up the heat and make him

10    feel like he was surrounded merely weeks before his

11    deposition?  To do exactly what they did:  Distract him,

12    distress him, and eventually cause us to have to postpone

13    his deposition until we could seek a protective order from

14    the Court and put an end to this kind of behavior.

15         But their actual case began, this type of campaign

16    began in March after we filed the case.  We have attached,

17    Your Honor, to our moving papers a letter from Mr. Zavin

18    where he says let's have a meeting and, by the way, it is

19    not a settlement meeting, he says, because we're not

20    settling, we're not giving you a dime.  But we want to show

21    you some things to convince you that you do not want to

22    pursue this case.

23         One of the things that they showed at that meeting

24    was a letter that they claimed was from DreamWorks to

25    Mr. Gordon.  It even had Jayme Gordon's name on there.  It

1    was even addressed to a Jayme Gordon at a P.O. box.

2         And in that letter it said that his submission to

3    DreamWorks was being returned unread.  When we got discovery

4    from defendants, that letter was conspicuously absent.  We

5    wrote to them, and that's also in our moving papers, and

6    said can we please have the letter.  They wrote back, and

7    Mr. Grossman, it's Exhibit D to Ms. McCallion's declaration,

8    Mr. Grossman wrote back and said, oh, we never said we have

9    that letter.  We said the letter is an example of what it

10   may have looked like and that this example incorporated the

11   electronic data which was received relating to the rejection

12   and return of Mr. Gordon's submission.

13        We were then fortunate enough, because Mr. Gordon

14   has paper everywhere, we were actually fortunate enough to

15   find the actual rejection letter from DreamWorks.  We

16   produced it to defendants.  That letter says not a word

17   about his submission being returned.

18        Now defendants have done a 180 and are telling this

19   Court that that letter is a true and correct copy of the

20   actual rejection letter and that that letter at page six of

21   their brief the defendants say indicates that no material

22   was actually sent to DreamWorks.  It is frankly unbelievable

23   the misrepresentations that have been repeatedly made.

24        But what happened is essentially when DreamWorks

25   wasn't able to convince counsel that this case didn't have

1    merit, because it does, they then began their campaign of

2    attempting to scare off Mr. Gordon and prevent him from

3    wanting to go forward with this lawsuit.

4           Now, I have one more area that I would like to

5    cover very briefly, Your Honor, because it is the character

6    assassination that is taking place by DreamWorks.

7           Your Honor issued an order granting our motion for

8    a protective order and saying that Mr. Gordon's deposition

9    shall not go forward until we have this hearing.  One hour

10   after Your Honor issued that order the defendants filed a

11   motion to dismiss.  It made no sense at the time why they

12   were doing that since Your Honor had already issued the

13   order.  It did once we read what their motion to dismiss

14   contained.

15          What it contained wasn't any response to what we

16   had said they had done.  And to this day they haven't

17   responded to it.  What it contained was the beginning of the

18   character assassination of Mr. Gordon and the attempt to

19   poison this jury pool.

20          This (indicating) is paragraph 12 of the

21   declaration of Mr. Shope.  Mr. Shope details -- let's see if

22   we can get this to focus.  There we are.

23          Mr. Shope details in this paragraph what he says is

24   a litany of the bad acts of Mr. Gordon.  He says, "In the

25   meantime, a review of public records showed, among other

1    things" -- oh, and, Your Honor, may I approach?  I have a

2    hard copy for the Court.

3              **THE COURT:**  Oh, okay.  I can look at this too.

4              **MS. BROOKS:**  Whichever the Court would prefer, Your

5    Honor.  We do have a copy for you.

6              **THE COURT:**  All right.  Thank you very much.

7              (Whereupon, a document was handed to the Court.)

8              **THE COURT:**  Go ahead, please.

9              **MS. BROOKS:**  And, Your Honor, it says, "In the

10   meantime, a review of the public records showed, among other

11   things."

12             Now, what's interesting is there were no public

13   records attached to this declaration.  And I actually

14   thought to myself how odd that you would refer to public

15   records and yet not attach them.  Wouldn't you want the

16   Court to see what the public records showed that you claim

17   they showed?

18             I got the answer once we got ahold of the public

19   records.  The answer is they're not attached because they

20   actually don't show what the defendants claim they showed.

21             The first is this:  They say the public record

22   shows that Mr. Gordon has a criminal conviction for assault.

23   First of all, that goes to no issue in this case.  It does

24   not go to his truthfulness.  This has nothing to do with the

25   conviction for fraud or deceit.

1              However, here's what the criminal conviction for

2       assault came from.  This (indicating) is the newspaper

3       article detailing what happened in court the day that the

4       murderer of Mr. Gordon's sister was brought in.  It says, "A

5       Quincy man waiting to be arraigned for allegedly murdering

6       the mother of his two children was attacked by the victim's

7       distraught brother in a busy Suffolk County courtroom

8       yesterday."

9              It goes on, "Taken out of the courtroom in

10      handcuffs, Gordon was later arraigned in Boston Municipal

11      Court on charges of assault and battery with a dangerous

12      weapon, shod feet," meaning he kicked him and he had shoes

13      on.  "He was released on personal recognizance."

14             It then gives the explanation from Mr. Gordon.

15      "Trying to explain the attack, Gordon said in an interview

16      that when he glimpsed a photograph of his 33-year old

17      sister, Patricia Aquino Gordon, which his mother had brought

18      to Murphy's arraignment, he flashed back to August 1st when

19      her body was discovered in her Dorchester apartment.  Gordon

20      said that day that he and other family members were allowed

21      to kiss, hug and say goodbye to his sister in a hallway of

22      the apartment before her lifeless body, a knife still

23      embedded in her chest, was carried out.  'It still hurts,'

24      said Gordon, who composed poems to his sister's memory that

25      the family distributed in the courtroom."

1          This was the conviction for assault.  This is the

2     context in which it was made.  Defendants well knew it and

3     yet didn't bother to tell the Court about it.

4          It went on.  This is back to Mr. Shope's paragraph

5     12.  It says, again referring to Mr. Gordon, "that he had

6     been the subject of a restraining order."  Again, irrelevant

7     to the issues in this case.

8          But here's the restraining order (indicating).  The

9     murderer of Mr. Gordon's sister sued Mr. Gordon for

10    attacking him in the courtroom.  In this lawsuit the

11    murderer, Robert Murphy, versus Jayme Gordon, brought a

12    motion for a restraining order saying, "This defendant did

13    attack me in open court and try to kill me."

14         He didn't really need a restraining order, he was

15    doing life in prison without parole at that point but he

16    filed a bevy of papers.  Again, the defendants deliberately

17    don't tell Your Honor the context in which this was done to

18    put it in the accurate light.

19         Next they say -- and this could go to Mr. Gordon's

20    reputation for honesty, that he had been sued for failure to

21    pay a credit card debt.  What they don't tell Your Honor is

22    that Mr. Gordon responded to that suit saying, "I have no

23    knowledge of the account you mentioned and do not owe the

24    money requested by you."

25         What the court then ordered, Mr. Gordon moved to

1    dismiss the lawsuit and the court on slide 11 says, it's

2    hard to read but it says, "Documents to be provided by

3    July 31, 2009 substantiating all credit card transactions,

4    payments and outgoing balances or case will be dismissed."

5    Meaning the credit card company had to come up with

6    documentation or the court was going to dismiss the case.

7           In fact, they didn't come up with the documentation

8    because it wasn't Mr. Gordon's card and the case was

9    dismissed.  The defendants don't tell Your Honor that.

10          Next, they say, again, paragraph 12, that

11   Mr. Gordon "made claims for a personal injury (loss of

12   hearing) but resisted an independent medical examination

13   with a Superior Court judge ruling that his case was not

14   likely to succeed on the merits."

15          Your Honor, this is probably the most insidious

16   one.  If you read just that, I assume what Your Honor came

17   away with was the conclusion Mr. Gordon had made a claim for

18   work-related injuries.  When they said, well, you need to

19   have some medical exams to support it, he refused and that

20   the Superior Court judge had ruled that his case was not

21   likely to succeed on the merits.  That was an absolute

22   deliberate misrepresentation by the defendants in an

23   under-oath declaration because here's what the actual public

24   records show.

25          They show that Mr. Gordon, indeed, was injured on

March 17, 2000 by an explosion involving some pyrotechnics
while he worked at the Fleet Center in Boston.  He was taken
to the emergency room where he was treated and subsequently
diagnosed as suffering from barotrauma which caused him to
have vertigo and be unable to climb up high ladders and be a
stagehand anymore.

Then in paragraphs four through -- and I'll go
through these quickly, Your Honor, rather than putting them
all on the ELMO.  Indeed, in December of '04 the defendants
wanted Mr. Gordon, the defendants in this case wanted
Mr. Gordon to go through a whole series of tests.  And
Mr. Gordon lists them in paragraphs four through eight of
his declaration in that case.

And what he says is I have already undergone these
tests.  My doctor gave me these tests.  The Worker's Comp.
doctor gave me these tests.  Some of these tests, they spin
you around, I get so nauseous I throw up.  I don't think I
need, therefore, to undergo any more independent tests since
I have already undergone independent tests.  And that is
specifically what he says at paragraph 10 of his
declaration.

This is in December of '04.  What happens is --
and, again, the defendants don't say a word about this to
Your Honor.  They say with a Superior Court judge ruling
that his claim was not likely to succeed on the merits,

1    here's how this case ended.

2         After hearing allowed on June 5th, 29 (sic), this

3    petition for approval of settlement was allowed by the

4    court.

5         The case that the defendants would have the Court

6    believe was so meritless that the judge found no likelihood

7    of success on the merits was settled for $285,000, because

8    Mr. Gordon, indeed, had been permanently injured as a result

9    of the explosion that occurred right next to his ear.

10        So where did the defendants get these words, "with

11   a Superior Court judge ruling that his claim was not likely

12   to succeed on the merits"?  They get it from something the

13   judge wrote in the margin eight months earlier.

14        Originally Mr. Gordon's lawyer asked for an

15   attachment of real estate in case they got a large judgment.

16   And the judge simply wrote in the margin, "The Court is not

17   persuaded that, at this stage," which was early on in the

18   case, "the plaintiff has a likelihood of succes on the

19   merits."

20        In other words, I am not going to give you your

21   preliminary injunction at this point in time.  That's all

22   the Court said.  But the defendants couple it with

23   Mr. Gordon supposedly refusing an independent medical exam,

24   thereby leaving this Court and the public and the jury pool

25   with the impression that Mr. Gordon is a scam artist and

1    that this was a scam.  And, in fact, they call him a scam

2    artist in their moving papers.

3         Now, just one more claim they make.  They say that

4    Mr. Gordon made a claim for accidental damage to his vehicle

5    for which he lacked documentation and that an adjustor

6    considered inflated by a factor of almost ten.

7         Let's look at what the actual public records show.

8    What the public records show is that Mr. Gordon submitted,

9    indeed, that his car was damaged by a Bobcat front loader.

10   Mr. Gordon submitted to their insurance carrier a claim.

11   Attached to the claim as Exhibit A was a police report.  So

12   much for no documentation.

13        Attached as Exhibit B was a copy of an estimate

14   that Mr. Gordon had received.  That estimate -- so

15   defendants are saying "for which he lacked documentation."

16   The estimate which is at slide 25, Your Honor, is from a

17   company called the Collision Center.  It itemizes over two

18   pages long all the damage to Mr. Gordon's car and the fact

19   that it was at least $6300 worth of damage.

20        Then they say, "And that an adjustor considered

21   inflated by a factor of ten."  That's not at all what

22   happened.  What happened as we detail on slide 26, right out

23   of the public records.  "According to my client," this is

24   Mr. Gordon's lawyer talking, "AIG sent him a check for

25   $701.90 as a proposed amount to satisfy his claim.  Because

1   the estimate to repair the damage to the vehicle was $6,593,

2   Mr. Gordon did not cash the check.  As of this date, the

3   vehicle has not been repaired."

4          Mr. Gordon's attorney then said that their offer --

5   there was no adjustor saying that Mr. Gordon's claim was

6   inflated.  What they were trying to do was what insurance

7   companies do all the time.  They send the insured a check

8   and in fine print it says cashing of this check is

9   settlement in full.

10         Well, Mr. Gordon didn't do it.  And so the

11   adjustor -- sorry -- the attorney says, "Your offer to pay

12   $701 to satisfy a claim for damage that will require more

13   than $6,000 to repair is the type of deceptive act that is

14   in violation of," and then it cites Massachusetts law.

15         Defendants tell Your Honor none of this.

16   Defendants tell the public none of this.  They do it for one

17   reason and one reason only:  To taint the Court and taint

18   the jury pool and have everyone believe that Mr. Gordon is a

19   scam artist, as they call him, which is absolutely not true.

20         One more area, Your Honor, and I am finished.

21   Defendants have claimed that we, the attorneys -- they don't

22   stop their character assassination with Mr. Gordon -- that

23   we, the attorneys, have doctored documents in order to make

24   this case appear to have merit when it does not.

25         This (indicating), Your Honor, at slide 29 is a

1   comparison that we put in our complaint.  On the left side

2   is the drawing made by Mr. Gordon of the large regular panda

3   and the small red panda.  It is dated in 1993.  To the right

4   is an image we got right off the Internet of publicity for

5   *Kung Fu Panda*.

6          Now, until this case I didn't even know there was

7   such a thing as a red panda; but DreamWorks would have you

8   believe that somehow they all on their own, without any

9   submission from Mr. Gordon, which, by the way, they now

10  admit he did make a submission -- well, he sent something to

11  Jeffrey Katzenberg, the CEO of DreamWorks, in October of

12  1999.  *Kung Fu Panda* didn't come out until 2008.

13         So we've got the large Kung Fu Panda, fighting

14  panda, and the small red panda as his sidekick.  And all we

15  were trying to show, Your Honor, was the striking similarity

16  between Mr. Gordon's figures.  And it's not confined to this

17  drawing.  We have put in our complaint and we have turned

18  over to defendants voluminous drawings involving these two

19  panda figures.

20         Now, what defendants complain of is that the actual

21  shot on the Internet also contained background characters

22  (indicating), five of them.  And defendants are claiming

23  that by removing these five, we doctored, deliberately

24  doctored the image.

25         In no way did we change whatsoever the image of

1       what we were trying to compare which was the large panda and

2       the little red panda.  The images are identical.  We simply

3       removed the background so that one could focus on the two

4       pandas that we were focusing on.

5              We had no bad motive for removing the background

6       because, frankly, the background is also part of our case.

7              Here (indicating), for example, Your Honor, in the

8       background, and I'll let this auto focus, this background

9       figure right here (indicating), this is the Praying Mantis

10      that is one of the *Furious Five* in the DreamWorks *Kung Fu*

11      *Panda*.  We've blown it up right here (indicating).  This is

12      the exact figure (indicating).

13             Up in the upper left-hand corner, Your Honor,

14      that's Mr. Gordon's work.  That's called a "Karate Marty

15      Mantis" which he registered with the Copyright and Trademark

16      Office in 2000, eight years before the DreamWorks movie came

17      out.  There we have the Praying Mantis out of the DreamWorks

18      movie and here (indicating) we have Mr. Gordon's "Karate

19      Marty Mantis" copyrighted in 2000.

20             There was no reason for us to remove what is

21      actually more characters that DreamWorks has copied in this

22      case and they're a subject of this case other than to focus

23      on these two figures.

24             In sum, Your Honor, here's what we are asking for.

25      We are asking the Court to issue a protective order --

 1        **THE COURT:**  I will tell you what, defer the "in

 2    sum."  I am going to take a five-minute recess and you can

 3    all share in that time, all right.

 4        **MS. BROOKS:**  Thank you, Your Honor.

 5        **THE CLERK:**  Court is in recess.

 6

 7        (Recess.)

 8

 9        **THE CLERK:**  All rise for the Honorable Court.

10        **THE COURT:**  All right.  Sit down, everybody.

11        (Pause in proceedings.)

12        **THE CLERK:**  Everybody is back?  Okay.

13    Court is in session.

14        **THE COURT:**  Just as an aside, in my court any time

15    anybody needs a recess, all you have to do is raise your

16    hand and the Court will recognize you.  We don't have any

17    formal occasion for recesses.

18        **MS. BROOKS:**  Thank you, Your Honor.

19        **THE COURT:**  Now, you were saying, "in sum."

20        **MS. BROOKS:**  Yes, Your Honor.

21        The remedies that we seek are detailed at pages

22    eight and nine of our original motion for a protective

23    order.

24        First is we are asking an order from this Court

25    requiring defendants and their counsel and their agents to

1    cease all of their surveillance, harassment and

2    investigation of Mr. Gordon, his family, his friends, his

3    acquaintances.

4         Defendants respond that, well, they told us that

5    they had ceased on October 2nd.  The only thing they said to

6    us was in a letter that the conversations with neighbors had

7    ceased on October 2nd and the surveillance of Mr. Gordon had

8    ceased on October 2nd.  We know that the rest of the

9    investigation, including the misleading of witnesses,

10   potential witnesses, continued well after October 2nd.  And

11   they also said, And they had no plans at the present time to

12   resume the surveillance and the questioning or conversations

13   with neighbors, as they call it.  So, again we have no

14   assurances from them whatsoever.

15        The second thing we're asking for, Your Honor, is

16   what we asked the defendants in our original letter that

17   started this whole thing:  An order from this Court

18   requiring the defendants to disclose the identity of all the

19   investigators retained by their defendants, an order from

20   this Court requiring the defendants to produce to counsel

21   all copies of notes, reports, photographs, et cetera, that

22   were taken and to produce the instructions provided by

23   defendants or their counsel to every individual retained to

24   investigate or conduct surveillance.

25        Why is that necessary?  Because, No. one, we only

1    know from the people that we've heard from.  We have no idea

2    how many other people they have gone out there and misled.

3         We also need this now because counsel has made

4    affirmative representations under oath as to instructions

5    they supposedly gave investigators.  They remain

6    conspicuously silent about JC Lane and Associates and Thomas

7    Dale and Associates so we don't know who hired them or what

8    was ever said to them.

9         We asked for this in our initial letters.  So just

10   to put things back in perspective very quickly, Your Honor,

11   we wrote to counsel the Friday before Mr. Gordon's

12   deposition was to take place.  We asked them to cease all

13   activities.  We asked them to disclose who they hired and

14   what instructions they gave them.

15        We got back from them a letter that said that

16   Mr. Gordon should hardly be surprised that he is being --

17   and we also explained how distressed Mr. Gordon and his

18   family were as a result of this.  We got back a letter from,

19   the first letter from DreamWorks saying he should hardly be

20   surprised that he is the subject of an investigation and

21   that DreamWorks reserves the right to do anything it deems

22   appropriate in order to defend their client.

23        What we explained in our motion, Your Honor, why we

24   had to file the motion for a protective order, DreamWorks

25   doesn't get to deem anything.  That is up to Your Honor to

1   determine whether what they are doing is appropriate and is

2   proper or is unethical and illegal.  That is up to the Court

3   to decide whether DreamWorks can or cannot continue their

4   activities.  They don't get to deem anything just because

5   they're DreamWorks.

6        And so we are asking Your Honor to order them to

7   turn over who it was they hired, what instructions they were

8   given and what they got back in response.  We also asked at

9   paragraph five of our original motion that the pro hac vice

10  of Mr. Zavin be revoked.  We believed at that time because

11  Mr. Zavin had been writing the letters saying DreamWorks

12  deems, they'll do whatever they deem appropriate, that he

13  was behind hiring the private investigation firms.

14       Apparently he is not.  We now have a declaration

15  from Mr. Shope saying that he was the one that hired the

16  firms, firm, and that he was the one that gave instructions.

17  So we withdraw that request about Mr. Zavin's pro hac.

18       We also ask an order from the Court --

19       **THE COURT:**  You are withdrawing the request that it

20  be canceled?

21       **MS. BROOKS:**  Yes, Your Honor.

22       **THE COURT:**  Okay.

23       **MS. BROOKS:**  We are.

24       We are also asking an order from this Court

25  permitting Mr. Gordon's counsel to offer evidence at trial

1    about the improper conduct of the defendants' attorneys.

2    And after we offer that evidence, we will be asking the

3    Court to give the jury an unfair inference instruction that

4    they can assume that they behaved in this fashion because

5    they did believe Mr. Gordon's case had merit and they wanted

6    to scare him off.

7            Now, such a request is not unprecedented in this

8    district, Your Honor.  In the case of MIT versus ImClone at

9    440 F.Supp. 119, Judge Stearns issued just such an order.

10   In that case, and we are familiar with it because we were

11   actually, Fish & Richardson, representing MIT in that case.

12           In that case the actions of the defendants were

13   significantly less egregious than what has gone on here.  In

14   that case what the defendants did was they contacted, their

15   in-house counsel contacted Merck, one of their distributors

16   of Erbitux -- it was a patent case -- contacted Merck and

17   asked Merck did they realize that one of their employees, a

18   Dr. Gillies, was working with us because Dr. Gillies was one

19   of the listed inventors on the patent.  He had now left MIT

20   and was at Merck.  And did they know that and had they given

21   him permission.

22           Dr. Gillies was then brought into his boss's

23   office, called on the carpet, told you can't do that.  And

24   Dr. Gillies then says I'm sorry, I can't work with you any

25   more.

1          We came to Judge Stearns for a protective order.

2     They had essentially shuttered our witness, the witness who

3     would have the most knowledge of the facts of this case.  As

4     a result of that and after hearing, an all-day evidentiary

5     hearing where Judge Stearns required in-house counsel from

6     ImClone to testify, outside counsel from ImClone to testify,

7     and then they had hired, ImClone had an ethics expert and a

8     couple of other people.  We had an all-day hearing, at the

9     end of which Judge Stearns issued sanctions, allowed us to

10    introduce at trial the improper conduct of ImClone and said

11    he would consider giving an adverse inference instruction at

12    the time of trial.

13         So such a request is not only not unheard of in

14    this district but has actually been granted in this

15    district.

16         The case ended up settling the morning of trial,

17    probably in large part due to the fact that ImClone didn't

18    want to have to answer for its improper conduct in that

19    case.

20         So we are asking for the same thing here, Your

21    Honor.  Otherwise, the message is going to be that if you're

22    DreamWorks and you're up against somebody like Jayme Gordon,

23    who was born and raised in South Boston and Dorchester, you

24    can do anything you want.  You can get into his locked

25    apartment building.  You can get into his mother's locked

1   apartment building.  You can harass his neighbors.  You can

2   lead people to believe he's done something wrong.  You can

3   do a character assassination that is completely misleading

4   and improper in the papers.  You can poison the jury pool.

5   And you can scare the living daylights out of him.  And you

6   can get away with it because you're DreamWorks.  And that

7   just can't be.

8          There is, one of sayings on this courthouse, Your

9   Honor, as we walk in is that everybody is equal in this

10  courtroom, that everybody has their right to their fair

11  chance and day in court.  And that's all we're asking for

12  here, Your Honor.

13         **THE COURT:**  Okay.  Thank you.

14         **MR. ZAVIN:**  Thank you, Your Honor.

15         Well, I'm pleased to hear that I am not being

16  kicked out of this courtroom.  They're no longer asking for

17  my pro hac to be revoked.

18         Your Honor, Ms. Brooks made a number of points.

19  Let me try to address them seriatim.

20         There was a lot of hyperbole about this

21  investigation, how improper it was.  Your Honor, rather than

22  merely my characterization, I invite you to look at the

23  declarations that plaintiff actually submitted from its, the

24  people who were supposedly harassed or misled.  There is

25  nothing improper about this investigation.  It was

1    absolutely routine and there is nothing in the declarations

2    that indicates otherwise.

3           Yes, two women went to Jayme Gordon's neighbors and

4    asked them about him.  Nothing improper, nothing misleading.

5    What DreamWorks did is, yes, it looked at public records.

6    It talked to people who had known Jayme Gordon at various

7    times in his past, and for absolutely good reason.

8           Some of the issues in this case -- let me go back.

9           DreamWorks gets sued three years after a movie

10   comes out by a Mr. Gordon who claims suddenly that 10 years

11   earlier, 12 years earlier he created, he sent artwork to

12   DreamWorks.

13          DreamWorks knows a couple of things at this point.

14   One, having just gone through a trial in Los Angeles,

15   bizarrely on this exact same claim from a different

16   defendant, DreamWorks has absolutely knowledge of how this

17   movie was created.

18          The things that Mr. Gordon claimed were stolen from

19   him, copied, we know and there is evidence that's all been

20   turned over to the plaintiff here, that was created over a

21   period of four years by a dozen different people.  There is

22   incredible evidence on the creation which is why we offered

23   to meet with them and show them this prior to this lawsuit

24   ever getting underway.  That is No. one.

25          What DreamWorks also knows is even the complaint,

1    there is virtually no evidence of -- no claim of access.

2    The claims of access are bizarre.

3           The first claim is that somehow Mr. Gordon sent

4    something to Disney in the early '90s which Mr. Katzenberg,

5    who was the No. two at Disney, when he left Disney five

6    years later, stole from Disney, kept for eight years and

7    then used.

8           No evidence whatsoever.  No evidence what was

9    submitted to Disney even.

10          Then there is the claim that something was

11   submitted to DreamWorks.  DreamWorks has an elaborate system

12   to not look at all unsolicited submissions.  There is a

13   claim that something was sent to DreamWorks but it gets more

14   bizarre.  There is no evidence of even what was sent to

15   DreamWorks.

16          This is in 1999.  The plaintiff, he claims he sent

17   something.  We don't know what.  We also know it was

18   rejected.

19          And then his third claim of access was, I had it on

20   the Internet.  But when he produced his files on those on

21   the Internet, none of the stuff he claims was copied was

22   actually on the Internet.

23          What we then find out is the materials that he

24   claims were copied, much of them, were registered copyright

25   in 2008 and 2011.  This was after the movie came out.  The

1     problem is he seems to have discarded the computer on which

2     these were created.

3            Now, we said in our papers "threw away" and the

4     plaintiff took us to task and said, How can you say he threw

5     it away, he merely discarded it.  But that's what happened.

6     I will adopt their word.

7            So what DreamWorks is looking at is a claim it

8     knows is absolutely nonsense.  Now the question is who is

9     Jayme Gordon and what is this all about?

10           Yes, DreamWorks absolutely did a routine background

11    investigation on Mr. Gordon.  An investigatory firm was

12    hired, a reputable one that is FBI and law enforcement

13    officers.  They talked to neighbors.  They were trying to

14    determine was this man an artist at all, how did --

15           **THE COURT:**  Who is this JC Lane --

16           **MR. ZAVIN:**  He was another investigator hired by a

17    subcontractor of the investigative -- of Marcum, Your Honor.

18    All of these were through Marcum.  They're all ex-law

19    enforcement officers.

20           **THE COURT:**  Okay.  Go ahead.

21           **MR. ZAVIN:**  And that's true in California also.

22           So there were no separate instructions given to

23    them.  These were all subcontractors.

24           The defendant, the plaintiff rather is making a big

25    point that somehow we hadn't put in affidavits from

1    investigators as to exactly what was done.  There are two

2    reasons for that.

3           One, it's absolutely not needed.  If you read the

4    plaintiff's own declaration, there is nothing in those

5    declarations that shows that anything improper was done.

6    Not one single thing.

7           Secondly, what they haven't told you is there has

8    been correspondence from the plaintiffs to us within the

9    last two weeks saying you have to turn over all of your

10   reports because it's, even though it's work product, because

11   you have waived.  And how have you waived?  It's because you

12   discussed the reports.  Even in Mr. Shope's affidavit,

13   merely by admitting there was an investigation, that's a

14   waiver of work product.

15          So what they're trying to do is say if you put in

16   the -- by not putting the application -- I'm sorry.

17          By not putting in the investigators' affidavits,

18   you're not rebutting what we said.  However, if you put in

19   the investigators' affidavits, that's a waiver of work

20   product.  That's exactly the game they're playing here.

21          In terms of -- and I'm loath to do this frankly,

22   given the tenor of this, but Ms. Brooks has made a big deal

23   about the convictions of Mr. Gordon and how inappropriate we

24   were to raise then.

25          One, they were only raised because, to explain why

1    the investigation was done.  We didn't, DreamWorks didn't

2    voluntarily come into this court waving any of this.  This

3    was all precipitated by plaintiff.

4           Two, in terms of misstatements in Mr. Shope's

5    declaration, I think unfortunately plaintiff is not aware of

6    all of the things in the public record about its own client.

7    For example, the restraining order that was discussed in

8    Mr. Shope's declaration is a different restraining order.

9           There are more than convictions that are outlined

10   in the declaration.  And I don't want to go into them.

11          **THE COURT:**  No, you better.  I mean --

12          **MR. ZAVIN:**  Okay, Your Honor.  If I may.

13          If Your Honor will permit Mr. Shope, who is more

14   familiar with this material, he will detail exactly what is

15   in the public record.

16          **THE COURT:**  Go ahead.

17          **MR. SHOPE:**  Yes, Your Honor.

18          There has been a suggestion that was, merely this

19   attack related to a judicial proceeding involving

20   Mr. Gordon's late sister.  That simply is not accurate.

21          Mr. Gordon has at least four convictions:  Assault

22   with a dangerous or deadly weapon -- this is in addition to

23   the attack that was mentioned.  So they're different,

24   assault with a dangerous and deadly weapon, convicted of

25   malicious -- willful and malicious destruction of personal

1    property.  Convicted of cruelty to animals.

2         He was prosecuted on charge, multiple charges of

3    dealing in LSD.  Those charges were dropped.  They were

4    dropped around the same time that Mr. Gordon's probation on

5    an earlier conviction was revoked and he was sent to jail

6    for three months.

7         So this may not be admissible at trial.  It may

8    ultimately not be relevant but the fact that as we were

9    looking at a claim that seemed very, very suspicious, and we

10   haven't even elaborated on the fact that he, quote,

11   discarded the computer that would permit us to determine

12   whether or not he had fabricated these drawings after the

13   fact, after learning about our movie.  After he destroyed

14   what would have been critical evidence in the case, we

15   thought that it was important to find out who we were

16   dealing with.

17        And that view was strengthened as we looked into

18   Mr.  Gordon and found out that he did have a criminal record

19   that was not a fleeting, youthful indiscretion but had

20   continued over time.

21        So, again, I don't think we need to decide today

22   whether any of that is going to come into evidence.  But

23   there has been an attack, including an attack on me

24   personally, suggesting that I've committed a felony when I

25   have done what anybody I think would do who is a competent

1    attorney confronted with a claim that looks very suspicious.

2    And so what we needed to do was to find out who is this

3    person.  Is he really an artist as they allege in the

4    complaint or is he somebody else?

5           As I said, there is a complaint in the plaintiff's

6    papers that we spoke to people that Mr. Gordon had dealt

7    with many years ago.  Well, in fact, Mr. Gordon alleges that

8    he created the materials at issue many years ago so it's

9    very logical that we would contact those people, the people

10   who were working with him or knew him back at that time, and

11   try to find out the truth of the matter.

12          And I want to address in particular this suggestion

13   that the investigators committed misrepresentations.  If you

14   look at the affidavits, and I urge you to do so, that have

15   been submitted by the other side, not a single one of those

16   affidavits actually states that there was a misstatement by

17   the investigator.  There was a set of assumptions, every

18   single one of these says, I was under the impression, I was

19   under the impression that somebody was seeking a character

20   reference or something like that.

21          Someone being under the impression is very

22   different from there being a false statement made.  So

23   obviously I wasn't there at every single investigation.  I

24   could only give instructions to my investigators to do this

25   by the book.  But there is absolutely not a scintilla of

1   evidence to suggest that this investigation was not done by

2   the book.

3           The only thing that has, that makes this at all

4   remarkable is that Mr. Gordon, perhaps because of his own

5   background, realized that he was being observed.  And so

6   most people would have just gone back into the house and

7   refrained from being observed.  He chose to pursue and to

8   take chase.

9           I think all of that has really nothing to do with

10  whether or not he needs to give a deposition in this case.

11          **THE COURT:**  Thank you.

12          **MR. ZAVIN:**  If I may, Your Honor, I would like to

13  refocus where Your Honor started this morning, which was on

14  Mr. Gordon's deposition.

15          We obviously have moved to dismiss this case based

16  on his failure to appear.  We understand that's a drastic

17  remedy that is unlikely to be granted.  We think the

18  appropriate remedy is to just immediately order his

19  deposition to be taken.

20          But counsel for plaintiff has claimed two different

21  things as to why this deposition didn't occur and it may

22  show light on what is going on in the courtroom now.

23          Mr. Gordon's deposition in Ms. Brooks', she said

24  Mr. Gordon was too upset, this investigation was all much

25  too upsetting to him and even their counsel, all eight of

1   them, couldn't concentrate on preparing for his deposition

2   because this observation of Mr. Gordon, which it sees weeks

3   ago, upset everyone too much.

4          In their reply, in papers submitted to the Court,

5   they say something quite different.  They say, they didn't

6   -- Mr. Gordon's deposition was scheduled to go forward on I

7   believe a Wednesday.  The Friday preceding that is when this

8   first erupted.  They wrote a letter to me or to, plaintiffs'

9   counsel, saying what's going on with this investigation.  We

10   said there is an investigation.  Nothing improper is going

11   on.  That was we thought the end of it.

12          What they're now saying, what they said in their

13   reply is, As detailed in plaintiff's opposition to

14   defendants' motion to dismiss, when plaintiff first raised

15   these issues with the defendants on October 14th there was

16   no mention of postponing Mr. Gordon's deposition, which was

17   then scheduled for October 19th.  Plaintiff was simply

18   trying to get to the bottom of the extent of these

19   activities and to receive assurances from the defendants

20   that all such activities would cease.

21          So, therefore, what they've now said, what they

22   said on that, in their reply is they weren't that upset on

23   Friday that required canceling the deposition.  They weren't

24   claiming on that Friday that the deposition couldn't go

25   forward.  It's only when they saw an opportunity that

1      following Monday or Tuesday, the day before the deposition,

2      that for some reason they didn't want to take it or they

3      wanted to know what we had found out prior to the deposition

4      to try to protect their witness that this whole thing

5      erupted.

6            Mr. Gordon was apparently not that upset on the

7      Friday before his deposition that he couldn't have taken it.

8      They went on to say, It was only after defendants'

9      noncommittal response we received on October 17th wherein

10     defense counsel refuses to disclose the extent of these

11     activities and reserved the right to take any action that

12     they deemed appropriate in representing their clients did it

13     become imperative to seek a protective order from the court

14     before allowing Mr. Gordon's deposition to go forward.

15           That is directly contrary to Mr. Gordon's

16     declaration and it's directly contrary to what Ms. Brooks

17     just told the Court as to why that deposition was canceled.

18           Your Honor, I don't think, I am not going to try to

19     relitigate a personal injury case that Ms. Brooks was

20     apparently referring to.  I'm not going to try to relitigate

21     various other cases.  I simply suggest that, as Your Honor

22     stated, this case should be put back on track.  Mr. Gordon's

23     deposition should go forward.  There is no basis for turning

24     over investigatory reports or work product of a completely

25     appropriate investigation, which is the other remedy that

1    she seeks.

2         And there is certainly no basis whatsoever for the

3    Court certainly now deciding what is going to be presented

4    to a jury in this case, if this case surprisingly ever gets

5    to a jury.

6         Thank you.

7         **THE COURT:**  The prime issue that I am going to take

8    care of is to set a deposition date.  When is it going to be

9    convenient for the deposition to take place?

10        There will be no continuances so pick your date

11   carefully.

12        **MS. BROOKS:**  Your Honor, we would be available, we

13   would be available any time the 6th, 7th or 8th of December

14   or the 14th or 15th of December.

15        **THE COURT:**  Let me ask you, how long do you

16   anticipate it would take to do the deposition?

17        **MS. BROOKS:**  I would assume, Your Honor, that

18   they're limited to the seven hours.

19        **THE COURT:**  Well, that is the limit but then

20   somebody can always for an extension.  So I am asking you to

21   take a realistic look now.  Maybe I should ask defense

22   counsel.  How long do you think you will need?

23        **MR. ZAVIN:**  Your Honor, I think it realistically

24   may take more than the seven hours but certainly no more

25   than two days, probably less.  But I would like latitude to

1    take two days since this is the prime deposition we are

2    taking.  I think they have noticed 25 depositions.  This is

3    basically our key deposition, at least at the moment.

4         **THE COURT:**  That sounds reasonable to me.  So we

5    will set this down for two days of deposition.

6         **MR. ZAVIN:**  In terms of dates, Your Honor, might I

7    suggest the week of November 28th, because not only am I

8    available but I have every reason to believe that

9    plaintiff's counsel is available because they tried to

10   notice depositions of our people for three days that week,

11   the 29th, 30th and 31st.  So I assume they are available

12   that week and I would suggest two days, either the 29th,

13   30th, or the 30th and December 1st.

14        **THE COURT:**  How about that?

15        **MS. BROOKS:**  Your Honor, yes, we did initially send

16   depositions or noticed depositions.  The plaintiffs (sic)

17   told us that they could not do those dates and so I have a

18   mediation that I have to appear in the Southern District of

19   California on the 29th.  And then I have a hearing on, it's

20   actually on December 2nd but it's in the Bay area, I have to

21   go out on the 1st.  It is an all-day hearing.

22        That week is all chopped up unfortunately.

23        **THE COURT:**  How are you on the other dates that she

24   mentioned?

25        **MR. ZAVIN:**  Well, Ms. Brooks, what was the -- the

```
1    week of the 5th I'm out in California but what were the
2    second set of dates?
3           MS. BROOKS:  The second set of dates, Your Honor,
4    would be any time that, the 14th or 15th or 16th of
5    December.
6           MR. ZAVIN:  The 14th and 15th of December is
7    acceptable.
8           THE COURT:  Okay, those are the two dates.  The
9    14th and 15th is acceptable to both sides; is that right?
10          MS. BROOKS:  Yes, Your Honor.
11          THE COURT:  All right.  Now, where will the
12   depositions take place?
13          MR. ZAVIN:  At our local counsel's office in
14   Boston.
15          THE COURT:  That is satisfactory to everybody,
16   everybody understands that?
17          MS. BROOKS:  Yes, Your Honor.
18          THE COURT:  All right.  Now, as far as the other
19   matters that are brought up on the papers to me, I will make
20   some sort of disposition, which may be nothing more than to
21   defer any decision with respect to any sanctions or the like
22   until the case is over.  That is one option.
23          I am certainly not going to rule from the bench now
24   on anything that has been presented to me.  All right.
25          Now, what I suggest though is that you keep the
```

1   skirmishes to a minimum because I am going to be actively

2   overseeing your performance.  If it appears to me that there

3   is more skirmish than there is discovery going on, then I am

4   going to bring you back and impose on you the obligation of

5   letting me appoint a discovery master.  Which I could do now

6   except that I have some hope that the acrimony that has

7   existed up to this point can be set aside and you act as

8   very professionally as you did here speaking to me in my

9   courtroom.

10          Both sides, very professional presentation.  And I

11   expect that is going to be the way you are going to conduct

12   the depositions.

13          Don't get me involved in your deposition.  It will

14   not be a pleasant experience if you do.

15          Everybody understand that?

16          **MR. ZAVIN:**  Thank you, Your Honor.

17          **MR. SHOPE:**  Yes, Your Honor.

18          **MS. BROOKS:**  Yes, Your Honor.

19          **THE COURT:**  Anything else that I should take up at

20   this time?

21          **MS. BROOKS:**  Your Honor, our only concern is that

22   the defendants' activities may resume then as Mr. Gordon's

23   deposition --

24          **THE COURT:**  No, I want that to stop.  Any reason

25   why you can't stop the investigations, whatever

1    investigations are going on?

2         **MR. ZAVIN:**  Well, Your Honor, we already said we

3    stopped the, any observation of Mr. Gordon or any discussion

4    with his neighbors.

5         We want to reserve the right based on the

6    deposition of Mr. Gordon and what occurs to conduct

7    perfectly legal inquiry that may result.

8         **THE COURT:**  You are talking about after the

9    deposition?

10        **MR. ZAVIN:**  That's correct, Your Honor.

11        **THE COURT:**  Oh, yes.  No, I am talking about

12   between now and the deposition.  Any reason --

13        **MR. ZAVIN:**  Then, Your Honor, between now and his

14   deposition I will undertake that there will be no further

15   investigation.

16        **THE COURT:**  All right.  And after that, of course,

17   is wide open.  You are certainly correct that you don't know

18   what you are going to learn at the deposition that may cause

19   you to want to take certain investigation.  And that is true

20   with the plaintiff as well.

21        Anything else?

22        **MS. BROOKS:**  Your Honor, the only other issue is

23   that we did notice the deposition of Mr. Katzenberg.  He is

24   the gentleman to whom Mr. Gordon sent his submission and

25   which plaintiffs -- defendants admit that it was indeed

1    addressed to him and we simply got back that he's in Europe.

2            He is the CEO of DreamWorks.  I'm afraid -- we may

3    as well while we are here before Your Honor perhaps set his

4    deposition date too so that we can lock that in.

5            **MR. ZAVIN:**  Your Honor, he is the CEO of a very

6    large company.  I don't know his schedule as I sit here.  We

7    will work with --

8            **THE COURT:**  Well, let's see if we can break it down

9    into pieces to help Mr. Katzenberg a little bit.

10           You want it to be after the deposition of your

11   client.  Everybody agrees that Katzenberg will come after

12   the deposition of the plaintiff?

13           **MR. ZAVIN:**  Yes, Your Honor.

14           **THE COURT:**  All right.  So we know it is not going

15   to happen before December, what are those dates again?

16           **MS. BROOKS:**  14th and 15th.

17           **MR. ZAVIN:**  December 14th and 15th, Your Honor.

18           **THE COURT:**  How long do you think you would need to

19   take his deposition?  Is one day enough or do you need two

20   days?

21           **MS. BROOKS:**  I think we should schedule two days

22   just in case, Your Honor.

23           **MR. ZAVIN:**  Your Honor, the man is the CEO of a

24   large company who has got no involvement in this.

25           **THE COURT:**  Then he will be out of there fast.  And

```
 1    I am not attempting to be frivolous when I say that.  We
 2    have a lot of CEOs from a lot of big companies and I am sure
 3    that they all have the same attitude when --
 4         MR. ZAVIN:  But, Your Honor, the only --
 5         THE COURT:  -- called upon to come into court here.
 6         MR. ZAVIN:  The only claim --
 7         THE COURT:  Can I just finish?
 8         MR. ZAVIN:  Yes, Your Honor.  I apologize.
 9         THE COURT:  We try to treat everybody the same.  If
10    they want to take his deposition, they are entitled to take
11    his deposition so we have to pick a date for him.
12         MR. ZAVIN:  Your Honor, I was not objecting to his
13    deposition being taken.  I apologize if that was the
14    impression I gave.  I was only objecting to this notion that
15    his deposition could possibly go more than the usual seven
16    hours.
17         The only claim is that he was sent a letter in
18    1999.  That's the only --
19         THE COURT:  It may well be.  If you are correct, it
20    may -- I have heard these arguments before.  And sometimes
21    what happens is the deposition is over in 15 minutes because
22    it turns out to be true what the assertion was, that the
23    deponent didn't know anything and so that became apparent in
24    15 minutes.
25         But the fact that we are going to pick a date or
```

1    give him a range of dates is not I don't think relevant to

2    your concern.

3          So sometime -- when do you want to take his

4    deposition?  Sometime after the 1st of the year?

5          **MS. BROOKS:**  I assume so, Your Honor, with the

6    holidays coming up, unless he might be available the week

7    between Christmas and New Year, but I certainly wouldn't

8    want to impose that on anyone if that is problematic.

9          So we'd ask as early in January as possible or

10   starting the third week of January.  I have a trial

11   unfortunately from January 10th to 20th but I am available

12   before that or any time after that.

13         **THE COURT:**  All right.  What is the first working

14   day in January?

15         **THE CLERK:**  January 3rd.

16         **THE COURT:**  January 3rd.  All right.  So why don't

17   you suggest to him that he pick either the 3rd, the 4th or

18   the 5th.  Is that the week?

19         **THE CLERK:**  Tuesday, Wednesday and Thursday.

20         **THE COURT:**  Tuesday, Wednesday, Thursday and/or

21   Friday, too, the 6th.  We are just making those as

22   suggestions to him.  If they are convenient, then it will be

23   a lock because it is convenient to the plaintiff as well.

24   And I think that he would appreciate just being given that

25   range.  And we expect that it will be no longer than a day

1    but we are going to set aside two days just in the event

2    that more time is needed.

3            **MR. ZAVIN:**  Your Honor, I will undertake to check

4    his schedule.  And if he is available those days, we will

5    schedule it.  If he is not, I will propose alternate dates.

6            **THE COURT:**  Yes.  Make sure that you come back with

7    an alternate.

8            **MR. ZAVIN:**  I will absolutely propose alternate

9    dates to plaintiff's counsel.

10           **THE COURT:**  All right.  Anything else?

11           **MS. BROOKS:**  Nothing on our behalf, Your Honor.

12   Thank you very much for your time.

13           **THE COURT:**  Thank you very much, Everybody.

14           **MR. MADERA:**  Your Honor, just one minor point, if I

15   may?

16           **THE COURT:**  Go ahead.

17           **MR. MADERA:**  At the scheduling conference you had

18   us list the various witnesses that we would need to conduct

19   depositions of.  And we listed Michael Eisner who had been

20   the CEO of Disney.  And you heard today the involvement of

21   Disney here.

22           I would need your permission, because you said no

23   other discovery absent permission of the Court --

24           **THE COURT:**  Yes.

25           **MR. MADERA:**  -- to be able to issue a subpoena

1    duces tecum to Disney for the documents which I did not

2    specifically list on that --

3              **THE COURT:**  Yes, you can do that.

4              **MR. MADERA:**  Okay.  Thank you.

5              **THE COURT:**  Okay.

6              Anything else?

7              **MR. ZAVIN:**  No, Your Honor.

8              **THE COURT:**  All right.  Thanks, Everybody.

9              **VOICES:**  Thank you.

10             **THE CLERK:**  Court is in recess.

11             (WHEREUPON, the proceedings were recessed at 12:40

12             p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

      I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

      /S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

**DATE: November 24, 2011**