UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAYME GORDON,<br><br>        Plaintiff,<br><br><br>     v.<br><br><br>DREAMWORKS ANIMATION SKG, INC.,<br>DREAMWORKS ANIMATION LLC, and<br>PARAMOUNT PICTURES, CORP.,<br><br>        Defendants. | C.A. No. 1:11-cv-10255-JLT |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ..............................................................................................4

    A.    Mr. Gordon's Creation Of Kung Fu Panda Power And
           DreamWorks' Attempts To Cover Up Its Theft ....................................4

    B.    Defendants' Mischaracterization Of Mr. Gordon's Preparation
           Of "The Book Of P.U." ........................................................................6

    C.    Defendants' Repeated Mischaracterizations Regarding Mr.
           Gordon's Computers and E-mail Accounts ..........................................7

    D.    The Parties' Two Day "Preservation Deposition" of Non-Party
           Mr. Partello .......................................................................................10

DISCUSSION ..................................................................................................................12

    A.    There Is No Legal or Factual Support for Defendants' Demands
           that Mr. Gordon and Mr. Partello "Turn Over" Their
           Computers, Memory Storage Devices, or E-mail Accounts ...............12

           1.    Forensic Imaging Is Highly Intrusive And Not Routine
                 Defendants Have No Basis To Demand The Intrusive
                 Imaging Of Electronic Devices .............................................12

           2.    A Forensic Exam Of Mr. Partello's Purported Storage
                 Devices, And His Personal Computer And Electronic
                 Mail Account Is Grossly Inappropriate ..................................14

           3.    Counsel's Review Of Mr. Gordon's E-Mail Accounts
                 Confirmed That Mr. Gordon Does Not Have E-Mails
                 Relevant To This Case ...........................................................15

           4.    A Forensic Exam of Mr. Gordon's Purported Storage
                 Devices And His Family's Computers Is Unwarranted ..........16

    B.    A Third Day Of Deposition Is Unjustified And Will Only
           Subject Mr. Gordon To Further Harassment ......................................17

    C.    Plaintiff Has Agreed To Make His Original Drawings Available
           For Forensic Analysis Under Appropriate Conditions Designed
           To Protect The Integrity Of The Documents .....................................19

CONCLUSION .................................................................................................................20

CERTIFICATE OF SERVICE .........................................................................................22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Balboa Threadworks, Inc. v. Stucky*,
    2006 WL 763668 (D. Kan., March 24, 2006)..........................................................................12

*Bethea v. Comcast*,
    218 F.R.D. 328 (D.D.C. 2003)................................................................................................13

*Capitol Records, Inc. v. Alaujan*,
    2009 WL 1292977 (D. Mass. May 6, 2009) ..........................................................................12

*Diepenhorst v. City of Battle Creek*,
    2006 U.S. Dist. LEXIS 48551 (W.D. Mich., June 30, 2006) .................................................13

*Genworth Fin. Wealth Mgmt., Inc. v. McMullan*,
    267 F.R.D. 443 (D.Conn. 2010)...........................................................................................12

*In re Ford Motor Co.*,
    345 F.3d 1315 (11th Cir. 2003) .............................................................................................14

*Plasse v. Tyco Electronics*,
    448 F.Supp. 2d 302 (D. Mass. 2006) ...................................................................................13

*Preferred Care Partners Holding Corp. v. Humana, Inc.,*
    2009 WL 982460 (S.D. Fla., April 9, 2009) ..........................................................................13

*Williams v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 144 (D. Mass. 2005)...........................................................................................13

OTHER AUTHORITIES

Fed.R.Civ.P. 34.................................................................................................................12, 14

## PRELIMINARY STATEMENT

Knowing that they have no defense to this case on the merits, Defendants' most recent motion is simply a continuation of their campaign to try to end this case through harassment, intimidation, and outrageous accusations. The Court may recall Defendants' previous attempts to harass and intimidate Mr. Gordon and his family through a nationwide team of private investigators. When those attempts failed, Defendants' campaign continued at Mr. Gordon's deposition which spanned two days and almost 14 hours and ended with Defendants interrogating Mr. Gordon about irrelevant and insulting issues such as ███████████ ████████████████████████ Despite the content and tone of the deposition, Mr. Gordon forthrightly answered the questions put to him. He also described the lengths to which he has gone to comply with Defendants' ongoing barrage of discovery demands:

> I searched very diligently for everything. I've gone everywhere, I've asked everyone. I've bothered everyone. . . . And we found one mystery piece the other day behind a family photo in their office for you guys. It was by accident. We searched everywhere for you.

> McCallion Decl., Ex. A (Gordon Tr. 492:1-11).[1]

Having failed in their repeated attempts to scare off Mr. Gordon, Defendants then moved on to Mr. Partello, former sergeant of the Boston School Police, and a third party witness who Defendants are now demanding "produce all of his computers, memory storage devices and e-mail accounts for forensic imaging and analysis." Def. Mem. p. 1. Mr. Partello is now in the cross-hairs of the Defendants along with Mr. Gordon because he is the gentleman who had

---

[1] The Declaration of Kristen McCallion dated March 26, 2012 is referred to herein as the "McCallion Decl."

custody of a 1992[2] sketch pad of Mr. Gordon's that demonstrates beyond a doubt that Mr. Gordon created Kung Fu Panda Power decades ago.  One of the many things that Defendants failed to tell the Court is that Mr. Partello, ███████████████████████████ ████████████████████████████████, also sat through two days of deposition where Defendants repeatedly but unsuccessfully attempted to discredit Mr. Partello and cast doubt on his and Mr. Gordon's credibility, and the authenticity of the sketch pad.

When all of the Defendants' inflammatory accusations are pushed aside, their motion boils down to a demand for three things: (1) a third day of deposition with Mr. Gordon, where they will continue their attempts to embarrass and intimidate him; (2) that Mr. Gordon and Mr. Partello produce all of their computers, memory storage devices, and email accounts for forensic imaging and analysis, so that Defendants can invade their and their families' privacy and rummage through their personal lives; and (3) that Mr. Gordon's original sketches and artwork be produced for examination and testing by a forensic document examiner.

Taking the last request first, another thing that Defendants failed to accurately convey to the Court is that Mr. Gordon's counsel agreed to this request, and was attempting to establish ground rules for the testing of these documents, which are critical to Mr. Gordon and damning to the Defendants.  Mr. Gordon's counsel proposed that Defendants make a record of the alterations that may occur during the testing.  This request is reasonable given that the ink testing that Defendants propose requires that a minimum of 14 to 20 holes be punched in the document being analyzed.   Defendants steadfastly refused to discuss a process for recording the alterations, intentional or accidental, that may occur during the forensic review and apparently believe it is

---

[2] 1992 is the year that was printed by the manufacturer on the cover of the sketch pad at the time of its manufacture.  McCallion Decl., Ex. H.

their right to alter evidence with no controls.  Defendants' position is unreasonable and not supported by the law.

Likewise, there is no legitimate reason that Mr. Gordon should have to sit for a _third day_ of deposition, particularly when the second day of his deposition culminated in harassment. Defendants point to recently produced documents as the basis for their demand; however, the Court will recall that Defendants insisted that Mr. Gordon be deposed at the outset of the case for two full days.  They should not be allowed to argue now that these recently produced documents—which were predictable before Mr. Gordon's deposition—necessitates yet another day.  Moreover, the documents asserted by Defendants do not go to the claims that Mr. Gordon makes in this case, or are documents about which Mr. Gordon has no personal knowledge.

Finally, there is no legitimate basis for ordering Mr. Gordon or third party witness Mr. Partello to turn over their computers, memory storage devices, and/or e-mail accounts.  First, neither of these gentlemen owns a memory storage device that contains any files relevant to this case.  There has been no testimony to indicate otherwise.  Second, Mr. Partello never used his computer to create, store, or send any file related to this case.  Third, as Mr. Partello testified, he does not e-mail with Mr. Gordon and has not e-mailed Mr. Gordon in over three years.  His testimony is uncontroverted.  Mr. Partello also represented to counsel that he reviewed his e-mail account after his deposition and confirmed that it does not contain any e-mails relating to this case.  Fourth, Mr. Gordon does not own a computer that ever contained files relevant to this case, with the exception of a current computer that contains work product recently completed at his counsel's direction and privileged communications with counsel.  Fifth, counsel reviewed Mr. Gordon's e-mail accounts in August 2011 and advised Defendants that there were no e-mails in Mr. Gordon's accounts (with the exception of privileged communications) that were related to

this litigation.  Despite this, Defendants claim that it is "clear" that Mr. Gordon did not conduct "any search for relevant e-mails."  Def. Mem. p. 11.

In opposing Defendants' motion, Mr. Gordon respectfully seeks an Order from this Court that will finally put an end to Defendants' continuing attempts to intimidate and invade the privacy of Mr. Gordon, his family, and now, third party witness, Ken Partello.

## FACTUAL BACKGROUND

A.    **Mr. Gordon's Creation Of Kung Fu Panda Power And DreamWorks' Attempts To Cover Up Its Theft**

Since the 1980s, Mr. Gordon has been drawing his Kung Fu Panda Power characters, Kidd and Redd.   McCallion Decl., Ex. A (55:12-56:2).  In February of 2011, Mr. Gordon filed this suit against Defendants for copyright infringement of his Kung Fu Panda Power work.  The primary issue is whether Defendants' Kung Fu Panda films are infringing copies of Mr. Gordon's Kung Fu Panda Power characters, drawings, and stories.  Comparisons of Mr. Gordon's character drawings and Defendants' characters are shown below:

Gordon's Kung Fu Panda Power characters          Defendants' Kung Fu Panda characters




Mr. Gordon drew the sketches depicted above in 1993 and 1994.  As Mr. Gordon testified, in 1999 he sent to Jeffrey Katzenberg, the CEO of DreamWorks, an outline of his Kung Fu Panda Power story, sketches of his giant panda Kidd, red panda Redd, and his "Five Fists of Fury" characters: a snake, crane, mantis, tiger, and monkey, as well as materials related to his theme song for the property, "P-P-P- Panda Power," a portion of which Mr. Gordon actually sang during his deposition.  *Id*. Ex. A (470:17-471:22).  DreamWorks asserts that by coincidence, just a few short months after Mr. Katzenberg received Mr. Gordon's submission at DreamWorks, ████████████████████████████████████████████████ ████████████████████████████████ DreamWorks embarked on the project that became Kung Fu Panda, featuring a giant panda, a red panda, and the "Furious Five" comprised of a snake, crane, mantis, tiger, and monkey.[3]

The saying that "a picture is worth a thousand words" rings particularly true in this case. Seeing all of this, Defendants have chosen to stop at nothing to mislead this Court and prevent this case from going to a jury.  To name just one example, the Court may recall defense counsel's attempt to shield Mr. Katzenberg from a deposition, claiming to the Court in November that Mr. Katzenberg "*has got no involvement in this*."[4]  Nothing could be further from the truth. ████████████████████████████████████████████ ██████████████████████████████████████████████████████████

---

[3] The striking similarities do not stop there and it is clear that Defendants recognize this since they went to great pains to have Mr. Katzenberg ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████

[4] Nov. 17, 2011 Hearing Tr. 54:23-24 (emphasis added).

███████████████████████████████████   ███████████████████

██████████████████████████.[5]

## B.     Defendants' Mischaracterization Of Mr. Gordon's Preparation Of "The Book Of P.U."

As Mr. Gordon testified during his two day deposition, he saw a trailer for Defendants'

Kung Fu Panda film in or around February or March 2008.  McCallion Decl., Ex. A (337:22 -

338:17).  Knowing that he was viewing only a small portion of a film that appeared to be an

infringing copy of his Kung Fu Panda Power work, Mr. Gordon compiled all of his Kung Fu

Panda Power stories and artwork that he could find in his home, and assembled everything into a

work he titled "The Book of P.U."  McCallion Decl., Ex. F.  Mr. Gordon mailed "The Book of

P.U." and other creative materials he had to the U.S. Copyright Office in May of 2008, the

month before Defendants' Kung Fu Panda was released.  McCallion Decl., Ex. A (337:22 –

339:1); and Ex. G.

Defendants misrepresent this 2008 copyright registration as containing "entirely new"

and "entirely different" artwork and stories than that which Mr. Gordon created in the 1990s.

Def. Mem. p. 7.  Mr. Gordon testified that "The Book of P.U." is an amalgam of updated prior

existing artwork and stories: "**All the material -- the Book of P.U. is made by preexisting**

**material, with preexisting material**;" "**Everything in this book preexisted 2008.**"  McCallion

Decl., Ex. A (359:5-7; 360:1-361:24; 342:11-346:9).  Defendants know that Mr. Gordon's "Book

of P.U." contains preexisting material — defense counsel described Mr. Gordon's story titled

"The Golden Medallions," which appears in "The Book of P.U." 2008 copyright registration, as

---

[5] ████████████████████████████████████████████████

██████████████████████████████████  McCallion Dec., Ex. K.

"basically the same as the story 'Bamboo for Two'" that appears in Mr. Gordon's 2000 copyright registration. *Id.* Ex. A (353:16-356:16).

Throughout his lifetime, Mr. Gordon has "made… a practice of shredding" prior versions of artwork as he enhanced and updated that artwork. *Id.* Ex. A (344:9-15; 362:1-19). Consistent with this practice, in 2008, as Mr. Gordon retyped and scanned his preexisting stories and artwork in compiling "The Book of P.U.," he marked up and then shred the prior existing hard copy material, which he viewed as no longer necessary to keep. Mr. Gordon has been completely forthcoming about this: "my practice is to shred things when I make something new, so I finished it and I had everything here. And I went through it line by line and marked it off as I went through and inputted it. By the time I was done with it, it was trash."[6] *Id.* Ex. A (363:2-365:3; 478:16-22).

**C.   Defendants' Repeated Mischaracterizations Regarding Mr. Gordon's Computers and E-mail Accounts**

Mr. Gordon owned a used Mac computer in 2008. *Id.* Ex. A (339:18-340:4). Over the years he has been given used computers by friends, has purchased used computers from strangers, and has salvaged used computers from the trash. *Id.* Ex. A (339:18-340:4; 163:6-164:17; 367:1- 368:20). Unsurprisingly, the computers Mr. Gordon and his family use do not often last very long, due to the condition they are in when Mr. Gordon and his family obtain them. The Mac used by Mr. Gordon in 2008 wasn't working very well and ultimately crashed so Mr. Gordon "boxed it and put it by the dumpster for free." *Id.* Ex. A (340:5-17; 546:3-547:16).

In 2008, Mr. Gordon used the second hand Mac to compile "The Book of P.U." by scanning, retyping, and updating prior existing drawings and stories, and using a program called

---

[6] It is ironic that Defendants should criticize Mr. Gordon for this practice when DreamWorks' own practice is to purge records every 90 days.

Photoshop.[7]  *Id*. Ex. A (342:12-344:8; 369:18-24).  It is Mr. Gordon's practice to "use a

computer like a typewriter" meaning that he types and prints documents without saving them to

the computer's hard drive.  *Id*. Ex. A (365:24-366:1).  As Mr. Gordon's testimony, and the

testimony of third parties deposed in this case has revealed, Mr. Gordon is not "highly tech

savvy" as Defendants purport (Def. Mem. p. 11):

> Q. Well, do you save files on the computer?
> A. Not really, no.
> Q. Do you do your banking by computer?
> A. No.
> Q. Do you pay bills by computer?
> A. No.
> Q. Do you keep your tax returns on your computer?
> A. No.

McCallion Decl., Ex. A (366:2-10).

While Mr. Gordon's computer habits may seem unusual to a business person, they are

normal to him.  Mr. Gordon is an artist who uses computers he has salvaged from the dumpster;

he is not a corporation with an administrative or document retention and filing staff.[8]

After printing the files for submission to the Copyright Office, Mr. Gordon saved "The

Book of P.U." on a portable thumb drive—not on the Mac.  *Id*. Ex. A (349:4-10). Despite Mr.

Gordon's diligent efforts of searching for this portable thumb drive over the last several years, he

---

[7] Defendants' accusation that Mr. Gordon "falsely stated" the date of creation for the works
comprising his 2008 copyright registration, is baseless. Def. Mem. pp. 7, 8.  As explained
previously, and as can clearly be seen on the corrected copyright registration filed with the
Copyright Office by Mr. Gordon (McCallion Decl., Ex. G), Mr. Gordon informed the
Copyright Office that "constituent parts of the work were completed by 1999" but that he
"engaged in acts of authorship through 2008."  This means that "constituent parts" of the
works that were registered by Mr. Gordon with the U.S. Copyright Office in 2008 had been
"completed by 1999."  At no time did Mr. Gordon, who is not a copyright attorney, and does
not understand the intricacies of copyright law, falsely state anything.

has been unable to locate it. *Id; see also id.* (365:8-14). Mr. Gordon does not currently possess

any electronic files of the artwork he prepared using Photoshop in 2008. *Id.* (524–526:14).

Defendants try very hard to make it appear as if there have been contradictory

explanations of Mr. Gordon's computer usage and ownership. Defendants' motion papers and,

in particular, the Affidavit of Mr. Grossman, are filled with misstatements, mischaracterizations,

and half-truths. Mr. Grossman states that "[o]n August 15, 2011, Kristen McCallion, Plaintiff's

counsel, agreed to make Plaintiff's computers and electronic files available for forensic

examination." Grossman Decl., ¶ 15; Def. Mem. p. 8. What Fish & Richardson actually said was

that they would "make accessible for forensic examination and imaging, the electronic media and

files that Mr. Gordon has located after a reasonable and diligent search." McCallion Decl., Ex.

L. Nowhere does this letter state or even imply that Mr. Gordon was making a family computer,

filled with personal information and privileged communications, accessible for forensic

examination. As explained to defense counsel, Mr. Gordon agreed to provide to Defendants a

disc obtained from the U.S. Copyright Office, which is a direct copy of Mr. Gordon's electronic

submission to the Copyright Office in 1999, so that it could be tested by forensic computer

experts; Defendants never bothered to test the disc. McCallion Decl.,¶ 12.

Indeed, there is no reason why Mr. Gordon's counsel would have agreed to make a

computer accessible for forensic examination because counsel understood that Mr. Gordon was

not in possession of any computer that contained any electronic files relevant to this case. *Id.* As

stated clearly to defense counsel on October 6, 2011, "while Mr. Madera noted that Mr. Gordon

has computers, Mr. Madera also noted that these computers were recently purchased by Mr.

---

[8] Admittedly Mr. Gordon's limited computer usage appears to be more extensive █████

Gordon and do not contain any files relevant to this litigation.  For this reason, we do not understand the basis for Defendants' reiteration of their request for a forensic examination of Mr. Gordon's computers, and we do not intend to produce them for forensic examination."  *Id*. Ex. L.

The same is true for e-mail.  Defendants do not mention that Fish & Richardson retrieved and reviewed all of the e-mails in Mr. Gordon's three e-mail accounts and confirmed to Defendants in August, 2011 that there were no e-mails in these accounts (with the exception of privileged communications between Mr. Gordon and his counsel) that were relevant to this litigation.  *Id*. Ex. M.

Currently, in Mr. Gordon's house there are three computers his son bought for a total of "50 bucks" around December 2011, and two other computers that were purchased second hand about a year to a year and a half ago, one of which was a Christmas present for his son.  *Id*. Ex. A (368:12-20).  Mr. Gordon's deposition testimony is unequivocal: there currently is no computer or any other type of electronic media in Mr. Gordon's possession that has at any time stored any document, drawing, or file that has any relation whatsoever to this case, that would be subject to production.   Defendants have no evidence to the contrary.

### D.    The Parties' Two Day "Preservation Deposition" of Non-Party Mr. Partello

Ken Partello is a third party witness in this case.  Mr. Partello was an illustrator for the United States Army, from which he was honorably discharged in 1982.  *Id*. Ex. C (8:15-9:21). He thereafter worked for the Boston School Police where he attained the rank of sergeant.  *Id*. Mr. Partello worked with Mr. Gordon in Mr. Gordon's store in the Dedham mall, has been drawing with Mr. Gordon since the early 1990s, and is familiar with Mr. Gordon's illustrated stories, including Kung Fu Panda Power.  *Id*.  ████████████████████

---

████████████ McCallion Decl., Ex. E (178:17-20; 325:6-23).

██████████████████████████████████████

████████████████████

Mr. Partello agreed, in 2009, to look for documents that would be relevant this case.  *Id.*
Ex. C (21:2-25:16).  As a result of his search, Mr. Partello found a handful of sketches that he
had created based on Mr. Gordon's characters.  *Id.*  He went to his brother's house, scanned three
drawings using his brother's scanner and, using his brother's computer, e-mailed the scanned
drawings to Fish & Richardson.  *Id.* Ex. C (33:2-35:23). Mr. Partello also found a sketchbook of
Mr. Gordon's drawings.  *Id.*  A short time later, Fish & Richardson obtained all of the drawings
and the sketchbook directly from Mr. Partello, and has stored these drawings and sketchbook in a
safe in Boston since their receipt.  *Id.* ¶ 9.  Copies of the drawings and sketchbook retrieved from
Mr. Partello were annexed to Mr. Gordon's complaint and produced to Defendants in June.[9]  *Id.*
*In addition, Defendants' counsel personally inspected the original versions of the drawings and*
*sketchbook* located by Mr. Partello.  *Id.*  Despite Mr. Gordon's production of these original
drawings, and Defendant's inspection of them, Defendants criticize Mr. Partello for not having
saved the e-mail he sent to Fish & Richardson in 2009.  This argument is a complete distraction
given that Defendants inspected the original drawings Mr. Partello e-mailed, the e-mail sent by
Mr. Partello to Fish & Richardson has been produced to Defendants no less than three times, and
it was the subject of lengthy questioning at Mr. Partello's deposition. *Id.*

---

[9] With the exception of one drawing that was not provided to Fish & Richardson and which Mr.
Partello believes that he inadvertently left on his brother's scanner, in error.  McCallion
Decl., Ex. C (33:15-34:10).

**DISCUSSION**

A.     **There Is No Legal or Factual Support for Defendants' Demands that Mr.
       Gordon and Mr. Partello "Turn Over" Their Computers, Memory Storage
       Devices, or E-mail Accounts**

   1.     **Forensic Imaging Is Highly Intrusive And Not Routine Defendants Have
          No Basis To Demand The Intrusive Imaging Of Electronic Devices**

As the Advisory Committee to the Federal Rules of Civil Procedure has noted:

> Inspection or testing of certain types of electronically stored information or of a
> responding party's electronic information system may raise issues of confidentiality
> or privacy. The addition of testing and sampling to Rule 34(a) with regard to
> documents and electronically stored information is not meant to create a routine right
> of direct access to a party's electronic information system, although such access
> might be justified in some circumstances. Courts should guard against undue
> intrusiveness resulting from inspecting or testing such systems.

Fed.R.Civ.P. 34; Advisory Committee's Notes to 2006 Amendments.  The imaging of

another party's computer hard drive and e-mail account is permitted only under extreme

circumstances, for example, where the use of the computer or its files forms the basis of a

plaintiff's claims against a defendant, or where there is _evidence_ — not mere conjecture — of

deliberate spoliation, withholding, and/or alteration of documents that reside on the computer to

be examined.[10]  Here, there is absolutely no evidence that Mr. Gordon or Mr. Partello have

---

[10] _See, e.g., Genworth Fin. Wealth Mgmt., Inc. v. McMullan,_ 267 F.R.D. 443, 447-48
(D.Conn. 2010) (claim alleged was that defendant used computer to disseminate plaintiff's
information); _Balboa Threadworks, Inc. v. Stucky_, 2006 WL 763668, *4 (D.Kan. March 24,
2006) (infringement occurred by computer download); _Capitol Records, Inc. v. Alaujan_, 2009
WL 1292977 (D. Mass. May 6, 2009) (illegal downloading of songs by computer); _Plasse v.
Tyco Electronics_, 448 F.Supp. 2d 302 (D. Mass. 2006) (clear and convincing evidence that
plaintiff lied, and then altered documents on his computer that were material to his allegations);
_Preferred Care Partners Holding Corp. v. Humana, Inc.,_ 2009 WL 982460 (S.D. Fla. Apr. 9,
2009) (forensic exam ordered due to a "print and purge" scheme).

deliberately spoiled, withheld or destroyed any electronic evidence.  There is also no evidence

that any electronic evidence resides, or has ever resided, on the personal computers that are

currently in the homes of Mr. Partello or Mr. Gordon, with the exception of privileged

communications and work product Mr. Gordon has conducted at the direction of his counsel.

   Instead, Defendants' overreaching demands are based on groundless accusations and

suspicions, couched in a barrage of insolent accusations.  Allegations that there "may have been"

e-mail exchanges, and that Mr. Gordon "probably" has relevant emails are not nearly enough to

support Defendants' motion.  *See, e.g., Diepenhorst v. City of Battle Creek*, 2006 U.S. Dist.

LEXIS 48551, *10-11 (W.D. Mich. June 30, 2006) ("This court is therefore loathe to sanction

intrusive examination of an opponent's computer as a matter of course, or on the mere suspicion

that the opponent may be withholding discoverable information. Such conduct is always a

possibility in any case, but the courts have not allowed the requesting party to intrude upon the

premises of the responding party just to address the bare possibility of discovery misconduct.");

*Scotts Co.,* at *6 (Assertions that defendant "may be withholding discoverable information" are

"entirely insufficient" and "simply do not justify Court-mandated access to defendant's

information storage systems."); *Williams v. Mass. Mut. Life Ins. Co*., 226 F.R.D. 144, 146 (D.

Mass. 2005) (denying motion to appoint computer forensic expert because moving party failed to

present any "credible evidence that Defendants are unwilling to produce computer-generated

documents"); *Bethea v. Comcast*, 218 F.R.D. 328, 329-30 (D.D.C. 2003) (denying motion to

compel because, "[i]n the context of computer systems and computer records, inspection or

seizure is not permitted unless the moving party can demonstrate that the documents they seek to

compel do, in fact, exist and are being unlawfully withheld").

A further issue is that imaging a hard drive results in the production of massive amounts of irrelevant, and in Mr. Gordon's case, privileged information.

Moreover, Fed. Rule Civ. P. 34(a) does _not_ give _Defendants_ "the right to conduct the actual search" for documents and data on the computers of Mr. Gordon and Mr. Partello.  *In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003)(reversing for abuse of discretion the district court's grant of "sweeping" electronic discovery and finding that movant was "unentitled to this kind of discovery without -- at the outset -- a factual finding of some non-compliance with discovery rules by Ford").  Defendants simply have no evidence that would support their highly intrusive demand to image devices full of personal and privileged communications.  Rather, the request to invade Mr. Gordon's and Mr. Partello's personal lives is just the latest of Defendants' intimidation tactics.

### 2.  A Forensic Exam Of Mr. Partello's Purported Storage Devices, And His Personal Computer And Electronic Mail Account Is Grossly Inappropriate

At no time did Mr. Partello use his personal computer to create, save, or send a document or e-mail relevant to this case.  Despite these unrefuted facts, Defendants still claim that Mr. Partello should have to "turn over" his personal computer and memory storage devices for forensic imaging.  Since there is clearly no legitimate basis for Defendants' demand, its sole purpose is to invade the privacy of a third party witness in the hope that he will be intimidated away from any further involvement in this case.

Likewise, there is no basis for a forensic examination of Mr. Partello's personal e-mail account.  Defendants' sole basis for their demand to inspect Mr. Partello's e-mail account is that he e-mailed Fish & Richardson in 2009, but did not search his e-mail account *because he knew that he did not have any relevant e-mails in his e-mail account*.  Def. Mem. pp. 11-12, 16.  Mr. Partello testified that he does not currently exchange e-mails with Mr. Gordon, has not

14

exchanged an e-mail with Mr. Gordon in four years, and is not even aware of Mr. Gordon's email address. *Id*. Ex. B (40:1-9).   Nevertheless, Mr. Partello reviewed his e-mail account after his deposition, and confirmed that he has no e-mails that have anything to do with this case. *Id*. ¶ 3.  Also, as noted, the e-mail from Mr. Partello to Fish & Richardson attaching scanned copies of the drawings he found has now been produced to Defendants no less than three times, in three different file formats. *Supra*, p. 11.

Defendants' brazenly claim that Fish & Richardson's production of Mr. Partello's e-mail "demonstrate[s] that Partello had key emails that he failed to search for or produce."  Def. Mem. p. 16.  Clearly, this is not the case. Because Defendants' demands to further intrude on Mr. Partello's privacy have no basis in either fact or law, those demands should be denied.

### 3.   Counsel's Review Of Mr. Gordon's E-Mail Accounts Confirmed That Mr. Gordon Does Not Have E-Mails Relevant To This Case

Defendants' presumption that "relevant e-mails *probably* do exist" (Def. Mem. P. 11(emphasis added)) is also mere conjecture, and based on their recurrent mischaracterizations of facts, testimony, and representations made by Mr. Gordon's counsel.  Defendants' wholly baseless presumption relies on their claims that  Mr. Gordon (1) maintains three e-mail accounts; (2) is purportedly "highly tech savvy" because he "operated multiple websites including his still active www.jaymegordon.com;" (3) communicates by e-mail because he received an e-mail from Joe Martinez; and (4) "may have" e-mailed Diane Koro in 2008.  Def. Mem. p. 11.

Whether Mr. Gordon has one e-mail account or ten is irrelevant.  The issue is whether Defendants have put forth any proof that those accounts contain relevant information that would justify an invasion into Mr. Gordon's privacy.  They have not.  Further, Mr. Gordon is certainly not "tech savvy" as Mr. Gordon's testimony made abundantly clear.  *Supra*, p. 8.  He also never "operated" a website; in reality, he hired Ms. Koro to construct two websites, which she did at

her house on her computer.   McCallion Decl., Ex. D (Koro Tr. 30:17-32:24).  Also, Ms. Koro

testified that she last had contact with Mr. Gordon in 2004 so there was no e-mail exchange

between Mr. Gordon and Ms. Koro in 2008.  *Id*. Ex. D (118:9-12).

As noted above, Fish & Richardson retrieved and reviewed <u>all</u> of the e-mails in Mr.

Gordon's three web-based e-mail accounts and confirmed to Defendants that there were no

relevant e-mails in these accounts (with the exception of privileged communications between

Mr. Gordon and his counsel).  *Supra*, p. 10; McCallion Decl., Ex. M.   Defendants' proposed

forensic imaging of Mr. Gordon's e-mail accounts is without basis, is in no way supported by the

record of this case, and should be denied entirely.

### 4.  A Forensic Exam of Mr. Gordon's Purported Storage Devices And His Family's Computers Is Unwarranted

As noted, there are family computers in Mr. Gordon's house, *i.e*., the three computers his

son bought for a total of "50 bucks" around December 2011, and two other computers that were

purchased secondhand about a year to a year and a half ago.  *Supra*, p. 10.   These home

computers, which are predominantly used by Mr. Gordon's teenage son, obviously contain

personal information of Mr. Gordon and his family, beyond the scope of discovery, as well as

privileged communications between Mr. Gordon and his attorneys, and work product conducted

at the direction of counsel.  Beyond that, the fatal flaw in Defendants' request to examine Mr.

Gordon's computers is that Mr. Gordon does not own a computer that embodies, or at any time

embodied, any electronic information that would be produced to Defendants.  Defendants'

proposed forensic imaging of Mr. Gordon's computers is without basis, is in no way supported

by the record of this case, and should be denied entirely.

**B.     A Third Day Of Deposition Is Unjustified And Will Only Subject Mr. Gordon To Further Harassment**

In support of their demand for a third day to depose Mr. Gordon, Defendants falsely claim that Mr. Gordon deliberately failed to produce documents.  Def. Mem. p. 15.  Not true. Defendants repeatedly demanded more documents from Mr. Gordon.  In response to those requests, Mr. Gordon waded through boxes of old family memorabilia, including through the effects of his deceased father, in an effort  to search in every place imaginable, and produced documents on a rolling basis as drawings and stories—even drawings and stories that have no relation to the work at issue in this case—were uncovered.[11]  Defendants now attempt to use these documents to obtain another day of deposition.  Defendants set forth four categories of documents, which we discuss in turn.

*1)  Two Copyright Registrations Subsequently Obtained From The Copyright Office*

Before Mr. Gordon's deposition, Defendants knew that Mr. Gordon had obtained five copyright registrations on unrelated materials in the early 1990s.  Defendants also knew that the Copyright Office could only produce three of the registrations before the deposition date demanded by Defendants; they proceeded with the deposition anyway. Defendants have now obtained the two remaining registration deposit materials and it is undisputed that they have nothing to do with Mr. Gordon's allegations, including the purported "key" letter that has nothing "to do with pandas." See Grossman Aff., ¶ 31. No deposition is required to confirm this undisputed fact.

---

[11] Defendants take issue with Mr. Gordon's productions as being "as late as January and February 2012" (Def. Mem. p. 2) yet Defendants have also produced documents on a rolling basis, have produced documents as late as March 2012, and have recently advised Mr. Gordon's counsel that they will produce additional documentation this week.

2)  *E-mails Between Ken Partello and Fish & Richardson*

The e-mails between Mr. Partello and Fish & Richardson are also not a basis to award

Defendants a third deposition day: Mr. Gordon was not a party to these email communications,

and he does not have personal knowledge of them.  This was made clear in Mr. Gordon's

deposition when he was questioned on the drawings Mr. Partello located and emailed to Fish &

Richardson:

> Q. Were these all contained in the same notebook, these sketches?
> A. I don't know.
> Q. Where did these come from?
> A. I'm not sure exactly.
> ***
> A. Well, I'm not sure, I think these are -- this is some of the stuff that Ken had, so I don't know exactly where it came from.
> Q. Which stuff would Ken have had, and which stuff did you have
> A. I don't recall.

McCallion Decl., Ex A (429:10 - 430:3).[12]

It is clear that Mr. Gordon has no personal knowledge of Mr. Partello's search and

retrieval of the drawings Mr. Partello provided to Fish & Richardson.  Yet, Defendants—with no

explanation why—state that they "were prejudiced by not knowing of these e-mails when they

took Plaintiff's deposition."  Def. Mem. p. 14.  Defendants questioned the sender of these e-

mails, *i.e.*, Mr. Partello, about his search for artwork, and his e-mail communication with Fish &

Richardson at length.  There is no prejudice to Defendants and no reason to depose Mr. Gordon.

---

[12]  *See also*, Mr. Gordon's further testimony regarding one of these drawings: "Q. Did you give the original of this drawing to your counsel? A. Yes. Q. Okay. And am I correct --  A. Actually, I didn't. I don't think I did.  I think Ken did." McCallion Decl., Ex. A (436:18-23).

3)  *Documents Produced By Disney In Response To Subpoena*

Defendants also claim that they should get a third day to depose Mr. Gordon on the documents produced by Disney.  However, a quick glance at these documents shows that there is no panda-related material in them and they are therefore unrelated to Mr. Gordon's claims in this case. Again, these documents provide no basis for yet another deposition of Mr. Gordon.

4)  *Documents Produced By Former Counsel Relating To An Unrelated Dispute With Disney*

As for the documents that may be produced by Mr. Gordon's counsel from ten years ago, it is entirely uncertain as to what, if anything, Ms. Lovrien has to produce, and a third deposition day should not be awarded based on an unknown.  Defendants' demands are, again, based on mere suppositions.

**C.    Plaintiff Has Agreed To Make His Original Drawings Available for Forensic Analysis Under Appropriate Conditions Designed to Protect The Integrity of The Documents**

At the outset, we note that Mr. Gordon and his counsel embrace, wholeheartedly, a forensic examination of Mr. Gordon's drawings, because it will finally put an end to Defendants' baseless allegations of "fabrication."  Mr. Gordon's counsel made several attempts to meet and confer with defense counsel; however, Mr. Gordon's counsels' proposals and efforts to agree on a fair and reasonable process by which this forensic analysis could take place were misinterpreted or ignored.  Mr. Gordon has produced copies of hundreds of drawings, most of which are approximately twenty years old and on very thin, virtually translucent sketching paper. Some of the documents are in a sketch book that is on the verge of falling apart as a result of its age. Due to the age and fragility of Mr. Gordon's drawings, Fish & Richardson maintains them

---

When asked again whether "these sketches [were] residing with Mr. Partello since the time they were drawn in 1993," Mr. Gordon testified: "I don't know."  *Id.* Ex. A (465:10-13).

in a safe in Boston and they are handled only on rare occasions.  It is only fair, and indeed, quite reasonable, that defense counsel and their expert maintain a written record memorializing their receipt, inspection, testing, and alteration of every original document.  For example, Mr. Flynn's handling may cause pages to come loose from the sketch book.   Additionally, Defendants' proposed ink testing requires no less than 14 to 20 holes be punched in any document analyzed in this way by Mr. Flynn.  McCallion Decl., Ex. P.  Plaintiff attempted to set up a protocol for the parties to review each original document prior to testing, stipulate to its present condition, and then make a record of the alterations to the documents resulting from the testing.  *Id*. Ex. Q. Defendants refused to discuss any protocol, apparently feeling entitled to alter the evidence in the case in any way that their expert sees fit.  Plaintiff will be prejudiced if the evidence is altered or destroyed as a result of Mr. Flynn's testing.  The Court should order Defendants' to agree on a reasonable protocol before Mr. Flynn is allowed to test this critical evidence.

## CONCLUSION

For all of the foregoing reasons, Mr. Gordon respectfully requests this Court to deny Defendants' baseless demand for a third deposition of Mr. Gordon, and to deny Defendants' overreaching demands that Mr. Gordon and Mr. Partello produce all of their computers, memory storage devices, and email accounts for forensic examination.  Mr. Gordon also respectfully requests the Court to order Defendants' to agree on a reasonable protocol before Mr. Flynn is allowed to test Mr. Gordon's original drawings.

Dated:  March 26, 2012 /s/ Gregory A. Madera
Gregory A. Madera, BBO #313,020
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210-1878
(617) 542-5070
madera@fr.com

Juanita R. Brooks, *pro hac vice*
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070
brooks@fr.com

Kristen McCallion, *pro hac vice*
FISH & RICHARDSON P.C.
601 Lexington Avenue, 52nd Floor
New York, NY 10022
(212) 765-5070
mccallion@fr.com

Attorneys for Plaintiff
JAYME GORDON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 26th day of March, 2012.

/s/ Gregory A. Madera
Gregory A. Madera