```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
       * * * * * * * * * * * * * *
 3     JAYME GORDON,                 *
              Plaintiff,             *
 4                                   *
                 vs.                 *      CIVIL ACTION
 5                                   *      No. 11-10255-JLT
       DREAMWORKS ANIMATION SKG,     *
 6     INC., et al                   *
              Defendants.            *
 7     * * * * * * * * * * * * * *

 8            BEFORE THE HONORABLE JOSEPH L. TAURO
                    UNITED STATES DISTRICT JUDGE
 9                          HEARING

10     A P P E A R A N C E S

11             FISH & RICHARDSON P.C.
               One Marina Park Drive
12             Boston, Massachusetts 02210-1878
               for the plaintiff
13             By:  Roger A. Denning, Esq.
                    Kristen A. McCallion, Esq.
14                  Gregory A. Madera, Esq.
                    Thomas A. Brown, Esq.
15

16             LOEB & LOEB LLP
               345 Park Avenue
17             New York, New York 10154
               for the defendants
18             By: Jonathan Zavin, Esq.
                   David Grossman, Esq.
19

20
                                    Courtroom No. 22
21                                  John J. Moakley Courthouse
                                    1 Courthouse Way
22                                  Boston, Massachusetts 02210
                                    November 19, 2012
23                                  11:10 a.m.

24

25
```

1    **APPEARANCES, CONTINUED**

2

3              FOLEY HOAG LLP
              Seaport West
              155 Seaport Boulevard
4              Boston, Massachusetts 02210-2600
              for the defendants
5              By: Julia Huston, Esq.
                  John A. Shope, Esq.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20              CAROL LYNN SCOTT, CSR, RMR
                 Official Court Reporter
21              One Courthouse Way, Suite 7204
                Boston, Massachusetts 02210
22                  (617) 330-1377

23

24

25

1                    <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good morning, everybody.

4              **VOICES:**  Good morning, Your Honor.

5              **THE CLERK:**  This is civil action No. 11-10255,

6       Gordon versus DreamWorks Animation.

7           Counsel please identify themselves for the record.

8              **MR. MADERA:**  Your Honor, Gregory Madera from

9       Fish & Richardson.  To my far left is Kristen McCallion,

10      also from our office, Roger Denning to my left here from our

11      San Diego office and Tom Brown also with me from Boston.

12             **THE COURT:**  Okay.  And you represent the?

13             **MR. MADERA:**  The plaintiff.

14             **THE COURT:**  The plaintiff, okay.  I just want

15      to make sure the record is clear.

16          And in the rear seats is?

17             **MR. ZAVIN:**  Good morning, Your Honor.

18      Jonathan Zavin from Loeb & Loeb representing the defendants

19      in this case.  With me is David Grossman, one of my partners

20      from Loeb & Loeb.  And to my right John Shope and Julia

21      Huston of the Foley firm who are also counsel for the

22      defendants.

23             **THE COURT:**  Okay, great.  Let's get started.

24          We have a couple of motions.  The first one I

25      thought we would do is the motion to dismiss on grounds of

```
1    spoliation.  Do you want to be heard?

2                  MR. ZAVIN:  I do, Your Honor.

3                  THE COURT:  Go ahead.

4                  MR. ZAVIN:  Thank you.

5          Your Honor, should I use the microphone?  I don't

6    know that it's working here.

7                  THE CLERK:  It is working.

8                  THE COURT:  It works.  I can hear you anyway

9    though.

10                 MR. ZAVIN:  Perhaps --

11                 THE COURT:  Whatever makes you comfortable.

12         (Pause in proceedings.)

13                 MR. ZAVIN:  Okay.  Good morning, Your Honor.

14                 THE COURT:  Good morning.

15                 MR. ZAVIN:  Your Honor, I don't know whether

16   you'd like me to go briefly through the facts of this case.

17   It may be helpful to the Court.  I don't know, it has been a

18   while since we have been here.

19                 THE COURT:  It has been a while since I read

20   the material.  I read a lot of this material over the last

21   several days so the facts are somewhat familiar to me.

22         Why don't you do what you think is comfortable to

23   you --

24                 MR. ZAVIN:  Okay.  Let me --

25                 THE COURT:  -- during your presentation.
```

1    Don't worry about imposing on me, okay.

2             **MR. ZAVIN:**  Okay.  Let me very briefly discuss

3    the background then because I think it will help inform what

4    we discuss later in terms of spoliation.

5             **THE COURT:**  All right.

6             **MR. ZAVIN:**  Mr. Gordon is a resident of

7    Boston.  He graduated from high school here in the early

8    1980s.  He did not have any further training or any training

9    in art and no professional experience in art.

10            At some time in the late, mid to late 1980s he

11   started drawing cartoons and writing stories for children

12   with respect to those cartoons.  And starting in the early

13   1990s he started registering for copyright various of these

14   cartoons and stories.

15            What is important here is that from 1990 to 1993

16   Mr. Gordon did five copyright registrations.  Hundreds of

17   pages of copyright registrations, hundreds of stories,

18   hundreds of drawings.  He virtually -- there were musings in

19   there.  There were cover letters.  Anything he sent anyone,

20   he registered everything for copyright.

21            In those five copyright registrations there were

22   absolutely nothing about *Kung Fu Panda* which he claims in

23   this case he created in 1980, late 1980s and early 1990s.

24   The only thing in these hundreds of pages of copyright

25   registration about pandas is there was one drawing of a

1    panda called Penelope Panda which doesn't look anything like

2    the panda in *Kung Fu Panda* and there is nothing that says

3    "kung fu" or anything else in any of these registrations.

4         In the 1990s Mr. Gordon then started submitting

5    copies of these stories or drawings to various studios,

6    networks, producers, agents, et cetera.  They were all

7    rejected.  No one was interested in any of his drawings.

8         What is also important here is he saved many of

9    those cover letters which explained what it was he was

10   submitting.  There is nothing in any of those cover letters

11   of any of those submissions in the 1990s about pandas.

12   There is no evidence whatsoever that he submitted anything

13   about pandas to anybody.

14        In 2000 Mr. Gordon did a website, created a

15   website.  This website was created by a website designer

16   named Diane Koro.  To create the website Mr. Gordon gave

17   Ms. Koro the material.  Mr. Gordon testified that he told

18   her he gave her everything he had.  She created the website

19   based on this.

20        In the 2000 website there now is something about

21   pandas.  There is something called "Panda Power" which has a

22   large panda and a small panda called "Kidd" and "Redd"

23   respectively and there's a four-page story called, "Bamboo

24   for Two."

25        The two pandas on that website look absolutely

1   nothing again like the pandas in the film *Kung Fu Panda*.

2   The large panda looks somewhat like a bulldog.  And,

3   frankly, the small, quote, "panda" looks like it was

4   directly copied from the Disney character Timon from the

5   *Lion King* who is a meerkat.  There is no similarity between

6   those drawings and *Kung Fu Panda* nor is the word "kung fu"

7   used.  Again, it's "panda power."

8        In the four-page story called, "Bamboo for Two,"

9   there is no similarity between that story and the story of

10  *Kung Fu Panda*, the film.  "Bamboo for Two" is there are

11  these two pandas who live for hundreds of years in a

12  monastery and have magic powers from medallions which they

13  wear on their chest in the drawings and then go off at some

14  point in the 1970s to the west, I think to the United

15  States, to do something.  No similarity whatsoever with *Kung*

16  *Fu Panda*.

17       So that is the state of the documentary evidence up

18  through 2000, with one exception which I'll get to later.

19       In 2008 Mr. Gordon sees a trailer, in March 2008

20  sees a trailer for the film *Kung Fu Panda*.  This trailer

21  contains virtually every element that Mr. Gordon claims was

22  copied from him.  It contains the large panda Po.  It

23  contains the small panda Shifu.  It contains the five

24  characters called the "Furious Five," references to the

25  valley of peace.  It's virtually --

1          **THE COURT:**  What contains all this you are

2     saying?

3          **MR. ZAVIN:**  The trailer for the film --

4          **THE COURT:**  Trailer.

5          **MR. ZAVIN:**  The trailer for the film which

6     Mr. Gordon saw --

7          **THE COURT:**  Okay.

8          **MR. ZAVIN:**  -- admitted to seeing in March of

9     2008.

10          **THE COURT:**  Okay, go ahead.

11          **MR. ZAVIN:**  Following his viewing of the

12     trailer what Mr. Gordon does is he spends the next two

13     months creating a, something he calls the *Book of P.U.*, P.U.

14     being P period U period, supposedly standing for "Panda

15     United," and creates this large package of material which he

16     then registers with the Copyright Office a few days prior to

17     the release of the film which was in June 2008.

18          Now we get to the spoliation motion.  Mr. Gordon

19     starting in 2008 has intentionally destroyed virtually every

20     piece of evidence that might allow defendants to defend the

21     claim as to what existed prior to his creation of the *Book

22     of P.U.* in 2008.

23          Your Honor, I'm not terribly technologically

24     sophisticated but here I would like to just show you, if I

25     can, some of the testimony of Mr. Gordon on this.

1              Can we put this on the screen?

2                   **THE CLERK:**  Yes, I can.

3                   **MR. ZAVIN:**  Okay.

4              This was from Mr. Gordon's deposition --

5                   **THE COURT:**  I don't have it -- is this it

6    here?

7                   **THE CLERK:**  PC4.

8                   **THE COURT:**  Creates new evidence, is that it?

9                   **MR. ZAVIN:**  That's correct, Your Honor.

10                  **THE COURT:**  All right, go ahead.

11                  **MR. ZAVIN:**  This is Mr. Gordon's testimony

12   during his deposition regarding the creation of the *Book of*

13   *P.U.*  He admitted in his deposition -- I will give Your

14   Honor a chance to read it.

15             (Pause in proceedings.)

16                  **THE COURT:**  Okay.

17                  **MR. ZAVIN:**  So what Mr. Gordon testified that

18   he did is he claimed he had various preexisting material and

19   he -- in other testimony he said it was scraps and notes in

20   different forms and he somehow compiled this, changed it,

21   because he admitted changing it, he wasn't copying it, to

22   create the *Book of P.U.*  And then what he did is he

23   intentionally shredded it.  This was not a question of

24   losing it, inadvertently misplacing it.  We can get to why

25   he did this later on but there is absolutely no factual

1    dispute that Mr. Gordon intentionally destroyed any evidence

2    of what existed prior to 2008.

3            This (indicating) is an example of the type of

4    changes he made.  As you'll recall, Your Honor, I just had

5    said that his prior example of a panda looked like a

6    bulldog.  This was from his website.  The image on the left

7    is the image that actually appeared on Mr. Gordon's website

8    in 2000 and the image on the right is what he registered for

9    copyright in 2008.  You'll see he changed the face.  He

10   removed the mask.  He removed the medallions.  He made Timon

11   or the red panda look older.  He made him look less silly

12   because the DreamWorks' character isn't silly.  He changed

13   it in every way he could, including putting in "Kung Fu

14   Panda" instead of saying "Panda Power" to make it more like

15   the movie.

16           So there is no question that the *Book of P.U.* was

17   not a copy of preexisting material, it was an alteration of

18   preexisting material.

19           Okay.  What he then does, after making, creating

20   the *Book of P.U.* -- and the *Book of P.U.* is important.  This

21   2008 is really the basis of Mr. Gordon's claim.  This is

22   what he's claiming for the most part what was infringed.

23   Again, we'll get the exception later.

24           So first he shreds all of the documents that he's

25   used but it gets worse.  Oh, and this is his testimony on

1   that.

2            (Pause in proceedings while the Court read the

3            document.)

4            **THE COURT:**  Okay, I have read it.

5            **MR. ZAVIN:**  He then testifies to the following

6   question, "Does anyone else have copies of the material that

7   you shredded?

8            "ANSWER:  That's why I shredded it, so no one would

9   have copies."

10           Okay, so first he shreds every document.  Then he

11   gets rid of his computers.  And the reason this is relevant

12   is what he testified to that he did was that he had taken

13   these old documents and scanned them into his computer into

14   a program called Photo Shop and manipulated them then so the

15   computers would have shown what was scanned in but he got

16   rid of them all.  Every computer that he claims he did the

17   *Book of P.U.* on he discarded.  And his reasons for

18   discarding computers was, well, they broke down.  In one

19   case it was hit by lightning.  It was virtually every excuse

20   except my dog ate it.  But he gets rid of all the computers.

21           But there is more.  The next thing he does is he

22   said this was copied onto a thumb drive.  He, quote, lost

23   the thumb drive so now all electronic evidence --

24           **THE COURT:**  What is a thumb drive?

25           **MR. ZAVIN:**  A thumb drive, Your Honor, is --

1    they're literally called a "thumb drive" because they're

2    about the size of a thumb.  They're this big (indicating).

3    You can put them in your computer and copy files from the

4    computer onto this drive, this hard drive.  It's just merely

5    a way of saving documents.

6              **THE COURT:**  Okay.

7              **MR. ZAVIN:**  So he claimed he had done that but

8    he, quote, lost the thumb drive.

9              So there is absolutely no record whatsoever on what

10   these preexisting materials were based on and presumably it

11   was these preexisting materials that he claims were

12   infringed by DreamWorks in 1999, because his claim of access

13   here is that he sent something to DreamWorks in 1999 that

14   included these preexisting materials.  He has no record

15   whatsoever of what he sent to DreamWorks.  He has no cover

16   letter indicating what was sent.  He has no copy and he

17   intentionally destroyed what he claims was sent to

18   DreamWorks.

19             But the spoliation gets worse.  Then in litigating

20   this case, in 2009 -- I'm sorry -- in 2011 in the context of

21   this litigation plaintiffs had to reveal potential witnesses

22   to defendants.  One of the witnesses they revealed is a

23   gentleman named Derek Tuttle.  Within days of plaintiffs

24   learning of -- I'm sorry -- defendants learning of the

25   existence of Derek Tuttle, Mr. Gordon sends this email to

1    Mr. Tuttle:

2           "Please immediately delete this and anything else

3    to and fro, from all locations.  Please do not text as well.

4    Phone is on for conversation only."

5           In his deposition -- I believe this is included in

6    the record as an exhibit, Your Honor -- is Mr. Gordon's

7    testimony as to why he did this.  It is virtually, his

8    testimony is virtually incomprehensible.

9           What it came down to is his excuse.  First he

10   denied he sent the email that said, well, someone else in my

11   family may have sent it because the computer was in a public

12   location.  Then he claimed that he didn't know why he sent

13   this.  Then he claimed that he didn't want to receive spam

14   and somehow Mr. Tuttle receiving his emails would create

15   spam in Mr. Gordon's in-box.

16          The fact is he directed a witness to specifically

17   delete all emails.  But it gets worse.

18          Not surprisingly it turns out Mr. Gordon is a

19   prolific user of email.  He had eight separate email

20   accounts.  Mr. Gordon didn't have a single email that he

21   produced originally in connection with this litigation.

22   Nothing.  He claimed that he had no emails.

23          What happened was there was a gap in his emails.

24   And as Your Honor will probably recall, we, the defendants,

25   had asked for Mr. Gordon to produce his computers in this

1    action.  They declined.  We went back and forth with

2    plaintiff's counsel for approximately six to eight months.

3    When first there was the claim that he had no computers,

4    then it was the claim he had destroyed all the original

5    computers and all we have is two new, used computers,

6    various confusion as to what Mr. Gordon had or didn't have.

7           In his deposition Mr. Gordon testified finally when

8    deposed at the end of 2011 that he, in fact, had five

9    computers.  Still would not be -- plaintiff wouldn't turn

10   them over.  We then make a motion to Your Honor to compel

11   which Your Honor granted.  And pursuant to that order

12   Mr. Gordon's attorneys turned over Mr. Gordon's computers to

13   be mirror imaged and looked at by defendants' forensic

14   expert.

15          A couple of things about that.  Despite

16   Mr. Gordon's testimony that he had five computers, only four

17   get turned over.  No explanation.

18          No. two -- and this, frankly, standing alone

19   without any of the rest of this warrants dismissal of this

20   case.  After plaintiffs -- defendants make a motion to

21   compel and within days before Your Honor ruling that the

22   computers have to be turned over, Mr. Gordon runs on his

23   computers a program called Permanent Eraser whose sole

24   purpose is to delete files to make them unreadable.

25          There is no question that the Permanent Eraser was

1   on his computer and it was on all four.  And this is a

2   program that does not come normally on Mac computers.  You

3   have to get it and intentionally load it.  It was run right

4   before these computers were to be turned over.

5          Your Honor may recall that what happened next was

6   we actually discovered this a day or so before plaintiff's

7   opposition to the motion to compel -- I'm sorry -- the

8   motion for spoliation, to dismiss because of spoliation was

9   due.  We tell this to plaintiffs and say why don't you take

10  some extra time, we're going to put this evidence before the

11  Court.  They declined.  They put in their opposition.  And

12  then they objected to us putting in any further evidence on

13  the existence of Permanent Eraser.

14         In that opposition they say, well, yes, Permanent

15  Eraser was run but you, the plaintiff -- the defendants

16  don't have any evidence that the files it was deleting had

17  anything to do with *Kung Fu Panda*.

18         Well, the problem for plaintiff is that the

19  forensic examination was continuing.  And this is very hard

20  to do because of the type of deletion that was done.  What

21  the forensic examiner then found within a week or two was

22  there was absolutely proof that the files deleted had to do

23  with *Kung Fu Panda* because while the files were gone, this

24  type of deletion leaves a record of the file folders.  And

25  the file folders were labeled such things as "Kung Fu Panda

1    Power," "Kidd Panda."  These were all files from these

2    folders that were deleted.

3            So the spoliation in this case is literally

4    bizarre.  First he shreds every piece of paper involving the

5    preexisting material which is what he is suing on.  That is

6    the very material he is suing on, he shreds it.  Then he

7    throws away the computers on which this was done.  Then he

8    deletes emails.  Then he instructs a witness to delete

9    emails.

10           Then the Court orders his computers to be produced.

11   He runs Permanent Eraser on these computers with the

12   absolute intention of deleting files.

13           And as the final step we have evidence that the

14   files deleted had something to do with *Kung Fu Panda*.

15           What is the state of the law here on spoliation?

16   One of the things that is argued here -- there is a

17   five-part test for spoliation.  And the tests are the

18   destruction of -- that records or evidence was actually

19   destroyed or not preserved, that's the first part.

20           The second part is that the evidence would have

21   been discoverable.

22           The third part is the intent to destroy.  Did the

23   party intend to destroy it?

24           The fourth is that the party at the time he

25   destroyed the evidence must know or have reason to know that

1   litigation -- that this evidence might be involved in

2   litigation.

3           And the fifth is the prejudice to the --

4           **THE COURT:**  Objectively or subjectively?

5           **MR. ZAVIN:**  I believe it's objectively, Your

6   Honor, but it's not know but had reason to know.  So it is

7   not, the party moving for dismissal on spoliation does not

8   have to show that the other party knew but rather just had

9   reason to know that litigation was, you know, was a

10  possibility.

11          Some of these are not in doubt or rather not in

12  question in this motion.  I don't think that plaintiff will

13  claim that no documents were destroyed.  It is beyond doubt

14  that documents were shredded.  It's beyond doubt the

15  computers were thrown away.  I don't think that's an issue

16  in this case -- in this motion.

17          Similarly, there is no question that this material

18  was all discoverable.  This goes to the very heart of the

19  plaintiff's case.  This material that was, the preexisting

20  material that was destroyed is what they claim was

21  infringed.

22          The intent to destroy I think plaintiff would

23  dispute.  They say, well, he destroyed it, he shredded the

24  preexisting material but he didn't intend to destroy, you

25  know, things to spoliate them.  But, Your Honor, this was

1    absolutely intentional.  What he thought the effect would be

2    I have no idea.  I can't go inside Mr. Gordon's mind.  But

3    did he intend to destroy the preexisting material?

4    Absolutely.

5              And in this connection, one of the interesting

6    things about this motion is there's one thing that is

7    missing in this motion:  Any declaration by Mr. Gordon.  You

8    can look through these papers and you will not find a

9    declaration by Mr. Gordon saying I didn't run Permanent

10   Eraser, I didn't run -- I didn't delete *Kung Fu Panda* files.

11   The record is absolutely silent.  What you have is argument

12   by his lawyers but no --

13             **THE COURT:**  He did not reply to the motion to

14   compel; is that it?

15             **MR. ZAVIN:**  He did reply to the motion to

16   compel, Your Honor.

17             **THE COURT:**  But not substantively on this one.

18             **MR. ZAVIN:**  On the motion to dismiss on

19   grounds of spoliation he did not put in --

20             **THE COURT:**  Wait.  I have got a jury out

21   competing for your attention.

22             **MR. ZAVIN:**  Certainly, Your Honor.

23             (Pause in proceedings.)

24             **THE COURT:**  Okay.  We are going to take a

25   little break here.  The jury has reached a verdict.  I want

```
 1    to assemble the lawyers.  Just give them enough room to sit

 2    down here, please.  You are more than welcome to stay and

 3    watch the verdict.

 4

 5              (Recess at 11:35 a.m.)

 6

 7                   THE COURT:  Everybody back?

 8                   MR. ZAVIN:  Yes, Your Honor.

 9                   THE COURT:  Okay.  We just took a verdict in

10    the case and now we are back.

11                   THE CLERK:  I have to switch the computer

12    back, okay.  You are still on the PowerPoint?

13                   MR. ZAVIN:  I am.

14                   THE CLERK:  Okay.

15              (Whereupon, the Court and the Clerk conferred.)

16                   THE COURT:  Do you need to be refreshed as to

17    where you were?

18                   MR. ZAVIN:  I think I more or less remember,

19    Your Honor.  No, Your Honor, I do not need to be refreshed.

20                   THE CLERK:  What are you doing?

21                   MR. ZAVIN:  I just accidentally disconnected

22    the microphone.

23                   THE CLERK:  Oh.

24                   THE COURT:  That is why I couldn't hear you.

25                   MR. ZAVIN:  Yes.  I do not need to be
```

 1    refreshed, Your Honor.

 2                    **THE COURT:**  All right, go ahead.

 3                    **MR. ZAVIN:**  Your Honor, what I was talking

 4    about prior to the break was the five-part test for

 5    spoliation.  And, just to refresh Your Honor's recollection,

 6    the first part is actual destruction, which there is no

 7    question about here.

 8            The second part is whether the evidence would have

 9    been discoverable or relevant.  There is no question that

10    this is relevant and we'll get back to how relevant it is in

11    a moment.

12            The intent to destroy is the third.  And Your Honor

13    asked, that's -- the test there is did he intend to destroy

14    it and the answer is unquestionably yes, he did.  This was

15    not an accident.  This was not a loss.  He both

16    intentionally shredded documents, he intentionally threw

17    computers away, and he intentionally ran Permanent Eraser on

18    his computer.

19            The fourth test is at the time the destruction of

20    evidence occurs is the fact that the evidence will be

21    relevant for litigation reasonably foreseeable.  Did the

22    party destroying the evidence know or should he have known?

23    Was it reasonably foreseeable that this would be involved in

24    the litigation?

25            Your Honor at this point asked whether that was

1    objective or subjective.  It is objective, should he have

2    known that it was relevant.  And, Your Honor, this the

3    plaintiff is disputing.  His claim is, at least as far as

4    the shredding of documents, his claim goes something like

5    this.  I saw the plaintiff's -- the defendant's trailer for

6    the movie.  I spent the next two months, quote, preserving

7    my copy.  I consulted with a lawyer in 2008, possibly even

8    before filing for the copyright registration.  I consulted

9    with a litigator but the claim wasn't brought till 2011 and,

10   therefore, I didn't reasonably foresee that this evidence

11   would be used in connection with litigation.

12         That is, with all due respect, bizarre.  He could

13   give no reason as to why he was spending two months of his

14   life creating this material, why he was registering it, why

15   he was consulting with counsel if he wasn't considering

16   litigation.  Clearly he either knew or should have known

17   that this was, that there was a possibility litigation would

18   ensue.

19         The fifth factor which in many ways the courts have

20   said is ultimately the most important is the prejudice to

21   the other party.  And the prejudice to the other party is

22   completely manifest here.  His basic claim, again, with one

23   exception which I'll get to, is it was the preexisting

24   material that existed in the 1990s that DreamWorks

25   infringed.  It has to be because they couldn't have

1    infringed something that didn't exist until 2008.  And the

2    only way you can see whether that preexisting material is

3    substantially similar to DreamWorks material is to compare

4    the two.  That is the only way to do it.  He in effect

5    intentionally eliminated DreamWorks' ability to defend this

6    case by saying wait a second, this preexisting material

7    didn't look at all like *Kung Fu Panda*.  That's off the

8    table.

9         Now, Mr. Gordon's argument in response to that is,

10    well, I base this on preexisting material in 2008.  I

11    destroyed it, I destroyed the preexisting material but you

12    can cross-examine me at trial and it's a question of

13    credibility for the jury as to what was in this preexisting

14    material.

15         With permission, Your Honor, I am going to digress

16    to American musical theater for a moment.  I don't know if

17    Your Honor is familiar with the musical *Guys and Dolls* but

18    there is a scene in *Guys and Dolls* where the main character

19    Nathan Detroit makes his living setting up crap games.  And

20    he sets up a crap game in a subway basement in New York.

21    And one of the players in the game is Big Julie.  Big Julie

22    is a gangster from Chicago.

23         **THE COURT:**  "I want to shoot craps."

24         (Laughter.)

25         **MR. ZAVIN:**  Your Honor, I am pleased to know

1    that you know a classic of the American musical theater.

2              THE COURT:  Let the record show that even my

3    accent was correct.

4         (Laughter.)

5              MR. ZAVIN:  Absolutely, and I agree with Your

6    Honor.

7              THE COURT:  Great movie.

8              MR. ZAVIN:  Great movie.  And if Your Honor

9    remembers the scene Big Julie is losing.  Big Julie can't

10   win.  So Big Julie decides he wants to play with his own

11   dice and he pulls out the dice and shows them to Nathan

12   Detroit.  And Nathan Detroit says, "These dice don't have

13   any spots on them."  And Big Julie's response was, "I erased

14   them but I remember where they were."  And then he forces

15   Nathan Detroit to play craps with dice without any spots on

16   them.  And when Nathan Detroit says, "But how do I know what

17   I am rolling," Big Julie says, "Don't you trust me?"

18        That is exactly what the plaintiff has done here.

19   He's erased the spots.  He shredded every piece of evidence

20   that could show what was actually existing or on the dice

21   and then he's saying, well, the remedy is you can

22   cross-examine me and I'll tell you where the spots were.

23   That is not the law on spoliation.

24        The prejudice to the defendant is completely

25   manifest and it's incurable.  There is no way to create it.

1    There is no way the defendant can say but you're stuff that

2    you claim that we copied wasn't at all like ours because it

3    doesn't exist.  The only remedy here is dismissal and the

4    cases agree with that.

5         First of all, the running of Permanent Eraser alone

6    on his computer during the course of the litigation

7    justifies dismissal.  There are a plethora of cases that say

8    just that.  And one of the -- this is a case in which I put

9    on, you know, Your Honor can see the cite to it:  *Plasse*

10   *versus Tyco Electronics, Corp*. where that -- almost exactly

11   like this case.  The party moves to compel, computer, there

12   is a court-ordered production of the computer before --

13   after the motion to compel is made, the plaintiff deleted

14   files.  He ran a program I think in this case called Window

15   Washer which is very similar to Permanent Eraser.

16        And what the courts said in this case and they say

17   in every other case is doing this is so bad, it so undercuts

18   the purpose of discovering litigation that it justifies

19   dismissal because there is no way to know what you erased.

20   You know, you, the plaintiff, can say, well, the files

21   weren't relevant.  They wouldn't have affected the result

22   but you, the plaintiff, have made sure that no one will ever

23   know that.

24        Now, again, going back to Big Julie, you've erased

25   the spots and now you're saying take my word for it.  So

this is a recent case from the District of Massachusetts
dismissing one -- and a direct quote from this case is,
"Plaintiff argues that the inaccessible documents are not
relevant and their deletion would, therefore, be
meaningless.  As the documents have disappeared, the court
is in no position to assess this claim.  The systematic
destruction of these documents certainly suggests
otherwise."

Okay.  And here, similarly, when a Window Washer
program was run -- and this case is *Ameriwood versus
Liberman*.  This is a case from the Eastern District of
Missouri in 2007.  Again, after a motion to compel was made
files were erased from the computer.  The court dismissed
the case.  It said it is impossible to put Humpty Dumpty
back together again.  That is not a direct quote from the
case, Your Honor, I'm making that, that's my gloss on it.

Again, another case, *Communications Center versus
Hewitt*.  This is Eastern District of California.  They ran a
program called Evidence Eliminator despite, you know, a
motion to compel and a court order.  Case dismissed.

Finally, very recently in March of this year in
California a case *Pringle v. Adams* where the plaintiffs
disposed of hard drives.  It made it impossible to determine
the creation date of his work.  Required dismissal.

And, again, in *Kvitka versus Puffin* a decision

1    throwing out a computer in this case, not running a file

2    eliminator program but throwing out a computer which may

3    have had all the files on it, that's cause for a dismissal

4    of the case.

5         And as Your Honor will recall, this plaintiff has

6    done all of that.  He shredded documents.  He threw out his

7    computers.  He lost his thumb drive.  And he ran Permanent

8    Eraser on his computer.

9         Your Honor, the prejudice is absolutely clear.

10        Now what I'd like to do for one moment on the

11   spoliation motion is discuss one piece of evidence that I am

12   sure that the plaintiff is going to put on every computer

13   screen here in a moment.  I won't do it.

14             **THE COURT:**  Excuse me one minute.

15        (Whereupon, the Court and the Law Clerk conferred.)

16             **THE COURT:**  Our research sort of indicated,

17   just to take you back a step, that the First Circuit has

18   generally discouraged dismissal as a sanction for

19   spoliation.  Now, that is, as we see a couple of cases, the

20   cases are *Collazo-Santiago* and then *Vazquez-Corales* --

21   forgive my pronunciation.  Are you familiar with those

22   cases?

23             **MR. ZAVIN:**  Your Honor, I couldn't hear the

24   name of the case, I'm sorry.

25             **THE COURT:**  It's *Collazo-Santiago*, 149 F.3d at

1      28.   And then the other case that I have in my notes here is

2      *Vazquez-Corales*.

3                      MR. ZAVIN:   And these were decided what year,

4      Your Honor?

5                      THE COURT:   1997 the last one and the first

6      one, I am not sure.

7                      MR. DENNING:   It was 1998, Your Honor.

8                      THE COURT:   1998?

9                      MR. DENNING:   Yes, sir.

10                     MR. ZAVIN:   Your Honor, yes, I'm generally

11     familiar with those cases.   I would point out to Your Honor

12     that *Plasse* which was in the District of Massachusetts,

13     dismissed the action for spoliation, was in 2006.

14         And that while dismissal is certainly a harsh

15     sanction, I don't think the First Circuit has said if the

16     parties make it impossible to defend the case, that

17     dismissal is inappropriate.

18         There is no way to cure this.   There is no

19     instruction that could be given here to a jury that says,

20     that cures this type of spoliation because ultimately there

21     is no way for the jury to see what was destroyed, to see

22     where they were similar to the film.

23                     THE COURT:   Well, maybe that argues for the

24     sanction here being a striking of the recorded material,

25     the --

1          **MR. ZAVIN:**  Of the copyright.

2          **THE COURT:**  -- copyright material.

3          **MR. ZAVIN:**  We have suggested that with

4    respect to the 2008 registration --

5          **THE COURT:**  P.U.

6          **MR. ZAVIN:**  The P.U., yes.  That would solve

7    half the problem but, Your Honor, it only solves half the

8    problem because that deals with the shredding of the

9    preexisting material and it deals with the throwing away of

10   the computers to some extent.  It does not deal with the

11   rest of this problem, Your Honor, which is the running of --

12   the deletion of emails and the running of eraser programs on

13   his computers while these were being produced because --

14         **THE COURT:**  Well, you are talking about the

15   punitive, you are not talking about --

16         **MR. ZAVIN:**  No, Your Honor, I'm not talking

17   about punitive.  I'm talking about prejudice.

18         I certainly, look, my personal belief, Your Honor,

19   is punitive dismissal is more than warranted here.  It is

20   almost impossible to think of anything he didn't destroy.  I

21   mean, he did destruction in every conceivable way but I'm

22   focusing on prejudice here.

23         This plaintiff, his entire case is based primarily

24   on his own oral testimony they he sent something to

25   DreamWorks, that it contained something similar to *Kung Fu*

1    *Panda.*  He erased all his emails and all his documents that

2    might bear on that question.  We don't know what was erased

3    and that's the very fundamental problem that courts have

4    been dealing with when there is a wholesale destruction like

5    this and a permanent erasure of documents.  How would we

6    ever know what was erased and that is something that the

7    plaintiff clearly intentionally did.  There is nothing

8    accidental about running a scrubbing program --

9              **THE COURT:**  According to you that is his

10   defense too, he says you don't know, you can't prove it.

11             **MR. ZAVIN:**  And the courts have absolutely

12   rejected that.  There is not a case that has accepted that

13   defense.  Every court has said of course we don't know

14   because you made it impossible to know.  You can't defend it

15   this way.

16        He basically said I've erased it, made it

17   impossible to know whether it's relevant, and, therefore,

18   you can't prove it's relevant, therefore, it's not a

19   problem.

20             There is no court that I'm aware of that's accepted

21   that defense because it basically eliminates any problem of

22   spoliation as long as you're efficient at it.  As long as

23   you erase everything so no one ever knows, you could never

24   be tagged with spoliation.

25             Your Honor, and this goes to the last piece of

```
1   evidence.  One of the things that this, the plaintiff is
2   going to do today is they've got a drawing that they claim
3   is from 1992.  It's a pencil drawing.  This was registered
4   for copyright in 2011, just prior to this suit.  The
5   plaintiff's story --
6              THE COURT:  A pencil drawing?
7              MR. ZAVIN:  It's a pencil drawing, it's a
8   series --
9              THE COURT:  2002 pencil drawing --
10             MR. ZAVIN:  No, 1992.
11             THE COURT:  1992 that was registered.
12             MR. ZAVIN:  Registered copyright in 2011.
13             THE COURT:  Okay.
14             MR. ZAVIN:  The plaintiff's story with respect
15  to these drawings is as follows:
16             That in the early '90s he was, he created these
17  drawings of a panda, a big panda, small panda, that around
18  the borders of the drawing is, you know, five animals that
19  are the same type of animals as are the "Furious Five" in
20  the film.  That there is a label "Kung Fu Panda Power" on
21  these.  And he claims this is evidence that this actually
22  existed before 1999.  It's his only document that shows that
23  anything existed before 1999.
24             His story with respect to these documents is they
25  were created on paper.  They were in his friend's garage,
```

1   Mr. Partello's garage in a locker from the early '90s

2   through 2009 when they were, quote, discovered and

3   registered with Copyright in 2011.  And he says, aha, this

4   shows that the "Kung Fu Panda," i.e., drawings of "Kung Fu

5   Panda" and, therefore, this shows I -- and I claim I sent

6   something like this to DreamWorks in 1999.

7        His spoliation of all of his computer records and

8   his emails and his direction to other people to destroy

9   emails go right to the veracity of that document also

10  because, Your Honor, what forensic examination showed on

11  that document is, one, it was all done in pencil so it

12  wasn't dateable so any of these parts could have been added

13  at any time.

14        No. two, while the pencil scribblings on the paper

15  couldn't be dated, the paper could be.  And the paper was

16  manufactured in 1964 and it was an onion skin paper, not

17  generally used for drawings.  It was a copying paper.

18        So what the plaintiff's story is is in 1992 he used

19  28-year old paper that was manufactured just around the time

20  he was born to do drawings that he put in his friend's

21  garage to sit there for, I don't know, 17 years and suddenly

22  appear in connection with this lawsuit.

23        His spoliation of evidence of all his computers

24  just at the time when we were, we, the defendants, were

25  asking for them goes directly to the credibility of those

1       documents too.  We don't know what he erased.  And he did it

2       intentionally and there is -- I can't think of any cure here

3       short of dismissal.  I mean, I think the case, as we say in

4       our summary judgment motion, there are lots of grounds to

5       dismiss this case but on spoliation grounds how is the

6       defendant supposed to defend an action like this when the

7       plaintiff deliberately destroys every piece of relevant

8       evidence except the one or two scraps of paper that he think

9       are going to help, thinks are going to help him.

10              Your Honor, what I'd like to do is, I know I'm not

11      on a clock which I appreciate, but I'd like to reserve some

12      time to respond to anything that plaintiff may say here.

13                    THE COURT:  Okay, thank you.

14              Go ahead.  Who wants to do it, go ahead.

15                    MR. DENNING:  I'll argue, Your Honor.  My name

16      is Roger Denning.  I'm from Fish & Richardson from the San

17      Diego office representing the plaintiff Jayme Gordon.  Your

18      Honor may remember my colleague Juanita Brooks who has

19      appeared before Your Honor on behalf of Mr. Gordon before.

20      She was going to join me here today but she's on trial in

21      North Carolina that's lasted a little longer than she

22      expected it to be so she sends her regrets but I am happy to

23      represent the plaintiff in front of the Court today.

24                    THE COURT:  All right, thank you.

25                    MR. DENNING:  I have some hard copy printouts

1      of the slides that I want to show the Court.  With Your

2      Honor's permission I'll approach and give a copy to the

3      Court so you can see them?

4              THE COURT:  Sure.  Give Christine one too.

5              (Pause in proceedings.)

6              THE COURT:  Okay.  I am all set now.

7              MR. DENNING:  Thank you, Your Honor.

8          I'm going to start with some slides that are in the

9      summary judgment only because that's where I had my

10     introduction to respond to Mr. Zavin's introduction so the

11     first few slides are going to be in that deck.  Then I'll

12     move to the other.

13             THE COURT:  Okay.

14             MR. DENNING:  And when you're ready, if I

15     could have the computer switched to mine?

16             THE CLERK:  Sure.

17             MR. DENNING:  Thank you.

18         So an introduction I think is in order here because

19     I think it's very important to be clear on what artwork

20     Mr. Gordon created and when.  The defendants have tried to

21     give the impression that Mr. Gordon has two sets of artwork,

22     the 2000 registration, the 2008 registration.  What they

23     haven't talked about and what I think is important to focus

24     on is the artwork created in the early 1990s, '92, '93, '94,

25     which was then registered with the Copyright Office before

1    filing of the suit in 2011.

2            This is a timeline and it's slide No. two of my

3    summary judgment slide deck.  This is a timeline that shows

4    when Mr. Gordon created the various artwork in this case.

5    And as you can see, from 1990 to 1999 he created a bunch of

6    "Kung Fu Panda Power" artwork.  We have that artwork here

7    with us in hard copy today.  I want to be very careful with

8    it but this (indicating) is, for example, one of the sketch

9    pads in which Mr. Gordon created the drawings that you see

10   here in the upper left and I'll show you some of the slides

11   here in a minute.

12           Then you will see in 1999 he sent his submission to

13   DreamWorks which is documented in DreamWorks files, we can

14   talk about that.  In 2000 he registered some new artwork in

15   2000, the "Panda Power" artwork.  In 2008 he then registered

16   the *Book of P.U.* which Your Honor is familiar with which, as

17   Mr. Gordon has testified, compiles a lot of the artwork from

18   the early 1990s.  And we can see that by comparing what's in

19   the *Book of P.U.* to those drawings from the early 1990s.

20           And then you can see in early 2011 Mr. Gordon

21   registered the artwork from the early 1990s.  The copyright

22   existed as of the early 1990s but as Your Honor is familiar,

23   according to the Copyright Code, you must register your

24   artwork before filing litigation on this matter and so

25   that's why Mr. Gordon did that.

1            On the next few slides are examples of Mr. Gordon's

2     artwork from the early 1990s.  We can see in slide three a

3     drawing of what he called "Kidd", the big panda, and "Redd,"

4     the small panda.  In the upper left-hand corner you can see

5     the KFPP which stands for "Kung Fu Panda Power."  So when

6     the defendants say Mr. Gordon never used the words "kung fu"

7     before he saw the *Kung Fu Panda*, that's just patently not

8     true.

9            You can see in slide four an artwork -- I'm sorry,

10    slide three an artwork from 1992.  He used the words "Kung

11    Fu Panda Power."

12           Slide four is more artwork from the early 1990s,

13    this one in 1993 --

14                THE COURT:  Wait a minute.  I am missing

15    something I think.

16           (Pause in proceedings.)

17                THE COURT:  Page three I don't see anything

18    about KFPP.

19                MR. DENNING:  In the upper left-hand corner on

20    page three there are the letters KFPP.  Do you see those,

21    Your Honor?  I'll put it on the --

22                THE COURT:  I see KFA.

23                MR. DENNING:  That's stylist writing but it's

24    KFPP which stands for "Kung Fu Panda Power."

25                THE COURT:  All right.

1          MR. DENNING:  And if you go to slide four,

2     it's even clearer on slide four at the very top.  This one

3     is dated 1993 by Mr. Gordon and it spells it out, "Kung Fu

4     Panda Power" at the top.

5          THE COURT:  I do see that.

6          MR. DENNING:  And you can see also in the

7     bottom left of that slide, slide four, it says, "The Five

8     Fists" which Mr. Gordon developed, "The Five Fists of Fury,"

9     The monkey, the crane, the tiger and mantis and so on, the

10    five companions.  And we just see more artwork in slide

11    five.

12          In slide six we see more artwork from 1992,

13    including starting there we see some of the other creatures,

14    including the tiger in slide six.

15          In slide seven we see more of the artwork for

16    Mr. Gordon in the early 1990s.  All of these are things that

17    predated the *Book of P.U.* by 15, 17, 18 years.

18          Is it possible to switch to the ELMO for one

19    second?

20          THE CLERK:  Sure.

21          MR. DENNING:  Thank you.

22          You know, Mr. Zavin I'm sure unwittingly gave the

23    impression to the Court that all of this was drawn on that

24    paper from 1968 that he said can't be dated.  That's simply

25    not true.

1          This (indicating) is a sketch pad.  And if we open

2      it up -- I'm going to do this very carefully -- Your Honor

3      can see throughout it this is the artwork that is depicted

4      and a lot of those -- maybe I can scan a little bit -- that

5      is depicted in a lot of those exhibits that I just showed to

6      the Court.  This is all on very thin onion skin paper but we

7      can see Mr. Gordon's characters, including here's an

8      example, a very clear one (indicating).  This is the picture

9      of "Kidd" and "Redd" standing in front of the Globe.

10          One of the pictures, if I flip it over -- I

11      probably have it backwards here -- if I flip it over, you

12      can see in the upper left there the letters KFPP, "Kung Fu

13      Panda Power."  It shows the two characters and then in the

14      lower right it has the date 1994.

15          All of these are drawn on a sketch pad which has

16      the date on it, a printed date.  This isn't something

17      Mr. Gordon wrote.  I'm having a hard time getting it on the

18      screen here, I'm going to do it sideways.

19          This isn't something Mr. Gordon wrote.  This is

20      right there (indicating) on the sketch pad, 1992, the Mead

21      Corporation.  This sketch pad was manufactured in 1992.  And

22      Mr. Gordon drew his artwork in this sketch pad that year and

23      over the next couple of years.  That's the artwork that I

24      think the defendants have chosen to ignore or at least don't

25      want to focus on in this case.

1          If we can switch back to the slides from the ELMO,

2     I'd appreciate it.

3              **THE CLERK:**  Sure.

4              **MR. DENNING:**  Thank you.

5          And there is just more and more and more

6     (indicating) of this artwork, all from the early 1990s.

7     Some of this was in Mr. Gordon's possession.  Some of this

8     was with his friend Mr. Partello who was the former military

9     drawing specialist and a police sketch artist, Mr. Partello

10    had some of these drawings in his possession as well.

11         All of these have been registered in 2011.  All of

12    these were drawn in the early 1990s.  In fact, on slide 18

13    we can see a couple of drawings that Mr. Partello made of

14    Mr. Gordon's characters.  They worked together on a lot of

15    these projects and you can see, he drew "Kidd" and "Redd."

16    He drew "The Five Fists of Fury," the animals who helped

17    them in their kung fu.

18         Mr. Partello testified at slide 19 whether he had

19    any doubt that he drew those characters in 1992.  The

20    defendants deposed Mr. Partello.  He said, "No, I don't have

21    any doubt."  So the testimony corroborates the documents

22    from the early 1990s.

23         In slide 20 we see the registration --

24              **THE COURT:**  Is he a percipient witness?  Did

25    he testify that he saw the drawings being made?

1            **MR. DENNING:**  That's right, Your Honor.  And

2      he worked with Mr. Partello, they worked together in the

3      Animation Station Store down at the Dedham Mall.  He saw

4      Mr. Gordon drawing these characters constantly at the store,

5      drawing them on clothing that they would then sell.

6      Mr. Partello, you know, he's a drawer, he did what drawers

7      do.  He saw Mr. Gordon's designs and he drew his own take on

8      those characters.  All of this from really 20 years ago.

9      All of these documents exist from 20 years ago.

10            Now, they weren't registered until 2011.  But the

11     documents themselves, and we have given them to the

12     defendants for their forensic analysis, these are all

13     genuine documents from the early 1990s but are now

14     registered and they're --

15            **THE COURT:**  Did you analyze these documents?

16            **MR. DENNING:**  Are you talking to me, Your

17     Honor?

18            **THE COURT:**  No, the defendant.

19            **MR. ZAVIN:**  Yes, Your Honor, we had them

20     forensically examined.  Because they were done in pencil,

21     there is no way to date when the pencil markings were done

22     so anything could have been added to them at any time or

23     they could have been created at any time.  The bulk of the

24     documents --

25            **THE COURT:**  The pad itself was dated 1992.

1          **MR. ZAVIN:**  The pad itself was dated, that pad

2     was dated 1992 but those sketches in that pad don't look

3     as -- they're not really suing on those sketches.  They're

4     suing on the other sketches because those sketches don't

5     look like DreamWorks' *Kung Fu Panda.*

6          **THE COURT:**  All right.  Go ahead.

7          **MR. DENNING:**  Thank you, Your Honor.

8          We are suing on all of the sketches, just so the

9     record is clear.  Those sketches do we believe show

10    copyright infringement.

11         So that takes us up to the year 2000 and we talked

12    a little bit about Mr. Gordon's 2000 registration of the

13    "Panda Power" in the Patent Office.  That's kind of, if you

14    put them in buckets, the early 1990s, that's bucket one.

15    The 2000 registration is bucket two.  That's registered in

16    the year 2000 in the Copyright Office.

17         Mr. Gordon had created a website with the help of a

18    woman named Diane Koro to put some of his artwork on the

19    web.  He didn't put all of it but he put some of his artwork

20    on the web.  And in order to protect that he filed a

21    copyright registration in the year 2000 which included this

22    idea of "Panda Power," of the big panda named "Kidd," the

23    young panda or the small one, red panda named "Redd" and

24    that these were kung fu characters.  So that's bucket

25    No. two.

```
 1              Stories, all sorts of songs, everything about the

 2    "Panda Power," registered in 2000.  And then that brings us

 3    up to 2008.

 4              (Whereupon, the Court and the Law Clerk conferred.)

 5              THE COURT:  The question arises in my law

 6    clerk's mind which makes it important for you to answer --

 7              MR. DENNING:  Of course, Your Honor.

 8              THE COURT:  -- what about the 2011 drawings

 9    that were found in the garage?  Are they part of this case?

10              MR. DENNING:  They are, Your Honor.  And

11    that's roughly half of the early 1990s documents.  So this

12    sketch pad that I showed you earlier --

13              THE COURT:  Yes.

14              MR. DENNING:  -- this was found in

15    Mr. Partello's garage.  This sketch pad that's dated 1992

16    and it has all the drawings inside of it that are dated

17    1992, 1993, 1994, that was found by Mr. Partello in his

18    garage, registered in 2011 and it's part of this case.

19              THE COURT:  She wants to know do you have

20    other sketches that were not in the garage?

21              MR. DENNING:  We do, Your Honor.

22    Mr. Gordon --

23              THE COURT:  That are part of the same era.

24              MR. DENNING:  We do, Your Honor.

25    Mr. Gordon --
```

1          **THE COURT:**  That you filed for protection?

2          **MR. DENNING:**  We did.  Mr. Gordon filed for

3     copyright registration on all of his artwork from the early

4     1990s related to his "Kung Fu Panda Power" property as he

5     called it but this series of sketches and characters.  Some

6     of those were found in Mr. Gordon's friend's garage,

7     Mr. Partello's garage.  Some of them Mr. Gordon had in his

8     own possession.

9          And just for, to make sure the record is clear, to

10    my colleague Ms. McCallion's declaration in opposition to

11    the defendants' motion for summary judgment she attached an

12    Exhibit L.  Exhibit L shows the sketches from Mr. Gordon

13    from the early 1990s that he found in his own possession and

14    then registered in 2011.

15         In Exhibit M, M as in Mary, shows the documents

16    from Mr. Partello's garage that were dated early 1990s and

17    then were registered in 2011.  All of those are part of this

18    case but if you want to separate out what was found in

19    Mr. Gordon's possession, what was found in Ken Partello's

20    possession, Exhibit L is the first, Exhibit M is the second.

21         Okay.  So that brings us up to 2008 when Mr. Gordon

22    sees the *Kung Fu Panda* trailer while he is watching *Shrek*

23    with his son and says, oh, my God, these are my pandas,

24    these are the things that I sent to Mr. Katzenberg years

25    ago.

1          At that point Mr. Gordon who is not a copyright

2    lawyer, he's an artist, a self-made artist from South

3    Boston, decided I'm going to pull together what I have, put

4    it in a new book, register it with the Copyright Office.

5    That's the *Book of P.U* and we can see that in slide 29 of

6    the presentation.

7          Now, why did he create the *Book of P.U.*?  He

8    testified -- and he was asked this in deposition.

9    Mr. Gordon has been deposed three times in this case by the

10   defendants.  He was asked, Why did you create the *Book of*

11   *P.U.*?

12         P.U. is Pandas United.  I think Your Honor probably

13   knows that by now, when I say "*Book of P.U.*," that's what

14   I'm referring to.  He said, See, I saw the movie coming up,

15   and I wanted to make sure I got all my stories and stuff

16   copyrighted in the Copyright Office before the movie came

17   out.

18         He wasn't -- they asked him, Were you thinking of

19   suing?  He said, No, I just wanted to get these documents on

20   the record before the movie came out.

21              **THE COURT:**  Why?

22              **MR. DENNING:**  Well, we can --

23              **THE COURT:**  The only thing you need the

24   copyright for is to sue; right?

25              **MR. DENNING:**  He didn't know what was going to

1    be in the movie.  He didn't want -- he didn't know what was

2    going to come next.  He just wanted it on the record.  In

3    his -- he's not a copyright lawyer.  He doesn't know the

4    intricacies of copyright law.  He didn't know that you had

5    to file in order to sue.  He didn't know any of that.  He

6    just wanted really for his own sake and for the sake of his

7    son who has seen him drawing these characters for all of his

8    life, he wanted to get something on file before the movie

9    came out that said this is what I created.

10             **THE COURT:**  Your colleague wants your

11   attention.

12             (Whereupon, counsel conferred.)

13             **MR. DENNING:**  My colleague advises me that he

14   was also trying to license his own artwork to other people

15   and so having these on file in the Copyright Office he

16   thought was important to him.

17             Now, there has been a lot of conversation I'll say

18   about how he created this *Book of P.U.* and what he did.  The

19   record from the deposition shows, that's true, this was all

20   created from preexisting material.  That's Mr. Gordon's

21   testimony at his deposition repeatedly.  They asked him many

22   times how did you make the *Book of P.U.*, from preexisting

23   material, from preexisting material.

24             All of the material in the *Book of P.U.* was made

25   from preexisting material.

1              **THE COURT:**  Which he didn't copy but he said

2      he changed.

3              **MR. DENNING:**  Well, what he did, Your Honor,

4      and what he explained in his deposition, he had hard copies

5      of things, photocopies of the drawings that we see in his

6      early 1990s sketch book.  He had photocopies of them.  He

7      would copy and paste in the old school way of copy and

8      paste, meaning he would get out a pair of scissors, you

9      know, cut out his red panda, get out a pair of scissors, cut

10     out his giant panda, and then tape them to a piece of paper

11     and then scan that in and that would be the new drawing.

12         What was he left with?  He was left with scraps of

13     paper that were cut up, taped together, like a kid's, you

14     know, art project, all of this stuff left over when he was

15     done.  What did he do with that?  He shredded it because it

16     was worthless.  It was just the remains of this cut and

17     paste exercise that he went through to get the computerized

18     version of this artwork.

19         Mr. Gordon lives, and still does, lives in public

20     housing in South Boston.  This is a place where people

21     routinely, you know, look in the garbage to see what other

22     people have put there.  Mr. Gordon didn't want to throw away

23     scraps of his artwork.  He shredded it just like he shreds

24     his bills and other personal materials.  It sounds

25     nefarious.  It's not.  He just had scraps of his artwork

1    that were left over after he cut and pasted them together

2    that he didn't need and couldn't use anymore so he disposed

3    of them.

4         Now, the defendants say he shredded all of this

5    preexisting material.  Well, that's clearly not the case.

6    We have the preexisting material right here (indicating).

7    These are the originals of all of that artwork.  Sure, he

8    shredded the pages that he cut up and that he taped together

9    but he didn't shred the preexisting material.  And you can

10   see that very clearly if you look at, for example, slide 36

11   from our presentation.  On the left-hand side you see a

12   sketch from the early 1990s from Mr. Gordon.  On the

13   right-hand side you see the same image from the *Book of P.U.*

14   just colored in.

15        You may wonder if he destroyed, if he shredded all

16   of the preexisting material, how did we get that image on

17   the left?  Well, we got it because he still had copies of

18   that preexisting material.  That was kind of Mr. Gordon's

19   MO.  He would make lots of photocopies of his work.  He

20   would ship them off in different packages to a lot of

21   different studios or people trying to get them to license so

22   he had photocopies of this stuff around all the time.  He

23   still has those and he still has the originals (indicating).

24        The only thing that he, quote, shredded was the

25   stuff that he had cut up, copied and pasted, glued together

1    and then scanned.  That's all that he shredded.  And we know

2    that by looking at sketch after sketch.

3           In slide 37 we see on the left the preexisting

4    sketch, the one we just looked at a moment ago of the two

5    pandas standing in front of the globe and on the right we

6    see those two pandas standing in front of bamboo.  What did

7    he do?  He cut around them in front of the globe, cut out

8    bamboo from another piece of artwork, taped the two together

9    and scanned it into the *Book of P.U.*  He still has that

10   preexisting material.  That's the material that was

11   registered in 2011.

12          Slide 38 has more of the same.

13          Okay, then he registered the *Book of P.U.* in 2008.

14   That's the third bucket of art that Mr. Gordon is asserting

15   against DreamWorks here.

16          Bucket one -- I'm sorry -- bucket one, the early

17   1990 sketches from these notepads, from these files, that

18   are on 1992 sketch paper and that were registered in 2011.

19          Bucket two, the 2000 registration of the "Panda

20   Power."

21          Bucket three, the *Book of P.U.*  Any one of those

22   individually is sufficient for Mr. Gordon's case to succeed

23   against DreamWorks, any one of them individually.

24          With Your Honor's permission, I'll now move on to

25   the issue of spoliation that the defendants brought up, move

1    away from the, kind of the general overview and that would

2    mean switching the slide deck to the spoliation motion slide

3    deck.  And I'll have to make a quick change on the fly here

4    as well.

5          Okay.  So the defendants have taken a bit of a

6    scatter-shot approach alleging all sorts of different

7    spoliation.  I'll address them one by one.  And I think it's

8    important to address them individually because when you do

9    that, you understand there really has been no spoliation

10   here.

11         I start with the five elements of spoliation.  And

12   this is from the *Citizens for Consume versus Abbott Labs*

13   case, a District of Massachusetts case.  And there are five

14   elements, as you know, for showing spoliation.  You really

15   have to -- in the defendants' presentation, there really are

16   two areas where he thinks there was spoliation.

17         First when Mr. Gordon created the *Book of P.U.* and

18   he shredded the cut-and-paste materials.  That was in 2008.

19         The second occurred two years later, in their mind,

20   in 2010 and 2011 with regard to the deleting of emails or

21   the deleting of files which I'll show the Court never really

22   happened.  But those two are totally separate and they

23   shouldn't be mixed.

24         With regard to the first, the *Book of P.U.*, you

25   know, the record is clear Mr. Gordon didn't shred all of the

1    preexisting material.  He still has it.  You can compare

2    this to the *Book of P.U.*  And Mr. Gordon will testify, yeah,

3    this drawing from the *Book of P.U.*, I used this drawing from

4    1992 to make it.  That drawing from the *Book of P.U.*, I used

5    this drawing from 1994 to make it.

6         Now, they could cross-examine him at trial and say,

7    well, this one looks a little different.  This one is

8    colored in.  That one is in black and white.  And he can

9    explain those differences but really that's a matter of

10   credibility for the jury to determine at trial.  He did not

11   shred all the preexisting materials like they say.

12        With regard to the 2010, 2011 supposed deletion of

13   emails and wiping of files, that just didn't happen and

14   we'll get to that in a second.  That just didn't happen.

15   There was no spoliation, was no deletion at all with regard

16   to the second set.

17        In my next slide, which is slide three, I have, and

18   this is the reason I was able to tell Your Honor that the

19   *Collazo-Santiago* case is a 1998 case because Your Honor was

20   exactly right.  In the First Circuit, and quoting that case,

21   "As a general principle, the court views 'dismissal with

22   prejudice as a harsh sanction, which runs counter to our

23   strong policy favoring the disposition of cases on the

24   merits.'"

25        And it goes on, this is in the *Driggin versus*

1    *American Security Alarm Company* from Maine in 2000.  It goes

2    on to cite the *Vazquez-Corales* case that Your Honor

3    mentioned from 1997 for the proposition that, "In accordance

4    with that policy courts will impose a sanction only where

5    there is severe prejudice or egregious conduct."

6           And in this case I think Your Honor will see there

7    simply wasn't any of that.

8           And there is the *Vazquez-Corales* case on slide

9    four, the same thing I just talked through.

10          Okay.  Let's talk about the first alleged

11   spoliation which is the shredding of the materials.

12          **THE COURT:**  How would you classify or

13   characterize actions taken to destroy material in the middle

14   of a federal judge's dealing with them, you know, by way of

15   motion, compel, all actions that are really zeroed in on the

16   efficacy of the manner in which your client was handling the

17   material?  How do you just -- do we let him get away with

18   it?

19          **MR. DENNING:**  You're talking in the 2010, 2011

20   and after?

21          **THE COURT:**  Yes.

22          **MR. DENNING:**  It didn't happen --

23          **THE COURT:**  The motion to compel -- well, I

24   was here.  I mean, I did the motion to compel.

25          **MR. DENNING:**  The motion to compel absolutely

1    happened and Mr. Gordon turned over all of his computers.

2    And I can talk Your Honor through exactly what happened.

3    What didn't happen was the deletion of any files.  That is

4    what didn't happen.

5           And if that's what Your Honor wants to focus on,

6    I'm happy to skip forward to that part --

7           **THE COURT:**  I am focusing on anything that

8    might well be considered as contrary to reasonable practice.

9           **MR. DENNING:**  Okay.  So let me move ahead to

10   exactly what Your Honor's point was.

11          I'm going to move forward to slide 30 in this

12   spoliation slide deck which addresses this argument

13   directly.

14          First of all, Mr. Gordon produced all of the

15   computers in his possession, custody or control.  Your Honor

16   ordered Mr. Gordon to produce those computers.  He

17   absolutely did in response to the motion to compel.  He

18   testified at his deposition -- and he was deposed three

19   times -- he testified at his deposition that he had two

20   computers at the time of the deposition, and that's on slide

21   31.

22          And then on slide 32 he was asked, he said I have

23   additional computers.  They said how many.  He said I have

24   right now two but my son just bought three more for 50

25   bucks, two iMacs and an eMac.

1          Now, there is something important embedded in that

2     answer.  His son bought three of these computers for 50

3     bucks.  These aren't, you know, the latest and greatest

4     iMacs that he's getting at the Apple Store at the mall.

5     These are three old, second-hand computers that he bought

6     for a grand total of 50 bucks.  That's the type of computer

7     that Mr. Gordon is used to having, right.  You know, public

8     housing in South Boston, he's not going to the store buying

9     brand-new, reliable, dependable computers.  He's buying

10    second- and third-hand computers for $10 or $15 each.

11         That's why Mr. Gordon is not somebody who relies on

12    computers.  His testimony in this case is I treated a

13    computer like a typewriter.  I typed in my document.  I'd

14    print it out.  I'd turn the computer off.  He doesn't save

15    documents over periods of time because that computer is

16    going to break next week, he knows, because the last one

17    broke after a week.  That's his experience with computers.

18         So at the time of his deposition he said I have two

19    and my son just bought three.  Now, counsel said, well, wait

20    a minute, that makes five and they only turned over the four

21    to us.

22         Well, here's what happened.  Two of those computers

23    that his son bought for 50 bucks, he couldn't even turn them

24    on.  They didn't work so they put them in the dumpster.

25    Never even got them to work.  That means they were down to

three.

Mr. Gordon subsequently acquired another computer.
That took us up to four.  Mr. Gordon gave all four of those
computers to the defendants so the only computers that they
didn't get were the two that Mr. Gordon couldn't even turn
on.  He never got them to work.  So they have looked at
computer forensic analysis, they have looked at every
computer that Mr. Gordon had at the time of the Court's
motion to compel.

By the way, he got rid of those two computers in
between the time of his deposition when he said he had five
and the Court's order on the motion to compel so we produced
everything he had at the time of the motion to compel.

Okay.  Their expert looked at those four computers.
And I think this is extremely informative, it's slide 34 in
my presentation.  This is what the defendants' expert had to
say about those four computers and it's completely
consistent with what I just said about how Mr. Gordon uses
these second- and third-hand computers.  This is in an
affidavit from Mr. Kevin Faulkner.

And I've highlighted, in the middle of that
paragraph he says, "The four computers that were turned over
to Protiviti consisted of two computers that neither Gordon
nor his family appear to use on any regular basis, one
computer that appears to be used primarily by Gordon's son,

1    and a fourth computer that has little to no information on

2    it of relevance to this action."

3           So their expert looked at these computers and said

4    you know what, they don't even use two of these.   The third

5    one his son uses and the fourth one doesn't appear to be --

6    there is little to no evidence of or little to no

7    information that is relevant to this case.

8           Consistent, Mr. Gordon doesn't use a computer the

9    way lawyers use a computer or the way executives at

10   DreamWorks use a computer.  He just doesn't.

11          Okay.  So let's talk about the email accounts.

12   They claim that Mr. Gordon hid email accounts from them.  He

13   clearly did not.  He identified the three email accounts

14   that he had used.  We identified them to the defendants.

15   They scoured those three email accounts.  Found nothing with

16   one exception, I'll talk about that in a minute, the Tuttle

17   email.  Found nothing in those email accounts.

18          They came to us and said, well, it looks like maybe

19   there are five other email accounts that Mr. Gordon has.  We

20   said, all right, give us the names, we'll give you the

21   information.  We sat down with Mr. Gordon for hours trying

22   to figure out what the passwords were to those five email

23   accounts.  Mr. Gordon didn't use those accounts so he didn't

24   know or remember the passwords but eventually we got them

25   reset by working with the provider of the email accounts and

1    we turned those five over to the defendants so they got to

2    scour through those email accounts.

3           At one point in their briefing defendants say there

4    were 927 emails sent to one of those accounts.  It was sent

5    to that account.  It was 927 pieces of spam email sent to

6    Mr. Gordon's account.  He didn't send any from that account

7    whatsoever.

8           We have given them all of the email accounts that

9    Mr. Gordon deals with.  They say, well, how come we don't

10   see any emails during this year-long period before the case

11   between counsel and Mr. Gordon.  That's because we didn't

12   communicate with Mr. Gordon through email as we submitted in

13   a declaration so there are no hidden emails, no deleted

14   emails, nothing nefarious whatsoever.  He's turned over

15   everything he has.  The defendants have looked through it

16   and there is nothing there.

17          **THE COURT:**  Wasn't that a busy period of

18   registration and all?  Have I got it right?  There is an

19   absence of any communication between your client and the law

20   firm?

21          **MR. DENNING:**  We started working -- I don't

22   want to --

23          **THE COURT:**  I think that there about 11 months

24   no nothing.

25          **MR. DENNING:**  That's right, Your Honor.  We

1    did not communicate with Mr. Gordon.  We looked at our own

2    files.  We looked at our own email accounts to say did

3    anybody email Mr. Gordon during that time period.  We

4    didn't.  We met in person with Mr. Gordon.  He brought

5    things like these sketch pads with him as we sat down and

6    talked with him about it.

7           We didn't, in fact, we didn't know he communicated

8    with email at all until once the litigation got going, those

9    emails we've logged on our privilege log in this case.

10          So there just were no communications relating to

11   this lawsuit.  There just weren't any.  And they have the

12   email accounts.  They looked through them and there is just

13   nothing there.  Nothing there.  It's because Mr. Gordon

14   communicated in person with us.

15          I'm going to skip forward here to this email

16   from -- that they claim from Mr. Tuttle shows that

17   Mr. Gordon was instructing Mr. Tuttle to delete emails.

18              **THE COURT:**  What number is that?

19              **MR. DENNING:**  That's going to be slide --

20   well, we start at slide 43, Your Honor.  And this is the

21   excerpt from the declaration from my colleague Ms. McCallion

22   that states simply, "Mr. Gordon's counsel made a thorough

23   search of their email accounts," meaning ours, "and we did

24   not find any email communication with Mr. Gordon during this

25   time period," from December 7, 2010 to October 19, 2011.  I

1    think that's the 11 months that Your Honor is talking about.

2                    **THE COURT:**  Yes.

3              **MR. DENNING:**  We just, we didn't find anything

4    in our records.  We didn't communicate with Mr. Gordon

5    through email during that time period so it's really no

6    surprise that he didn't have emails to or from us in his

7    email accounts.

8              Now, in slide 44 he was asked in his deposition,

9    "Since the spring of 2008, have you deleted any emails

10   whatsoever from you, to you, to someone else, from someone

11   else, regarding *Kung Fu Panda*?"  Since 2008 have you deleted

12   any emails whatsoever, from you, to you, to someone else,

13   from someone else, regarding *Kung Fu Panda*?

14             And his answer at that the deposition, "No, no

15   one's really written me about *Kung Fu Panda*."

16             They're frustrated.  They said where are all these

17   emails.  Well, there just aren't any.  It's really no

18   surprise when you understand --

19                    **THE COURT:**  What does "really written" mean?

20   No one has written I understand.  What does "really written"

21   mean?

22             **MR. DENNING:**  I think that's Mr. Gordon's way

23   of speaking, Your Honor.  I don't think he meant anything by

24   it but I think he's saying no one's really written me about

25   *Kung Fu Panda*.

1          **THE COURT:**  It invites inquiry, doesn't that?

2          **MR. DENNING:**  And the defendants were happy --

3     they were welcome to follow up on it and say, well, wait a

4     minute, what do you mean "really written"?  Is that

5     different than "written"?  But they didn't, that was their

6     prerogative.  They didn't so we're left with the record that

7     the answer is no.  No.

8          Okay.  So then they actually, if Your Honor

9     continues to the next page, they ask more questions around

10    this subject.  They say, "Wait, let's start slowly.  In the

11    last two years have you deleted emails from your email

12    accounts?"

13          And he references, you know, spam and those sorts

14    of things that come to his account, do you mean that?

15          And they say, "Just the answer is yes or no.  Have

16    you deleted emails from your accounts?"

17          He says, "Particularly spam, I have no idea if I

18    emptied the spam or whatever, I don't know."

19          "Spam" meaning, if Your Honor is familiar with

20    spam, I won't explain but basically the junk email that you

21    get from people trying to sell you things or they get your

22    email account somewhere and so they send you an email saying

23    sign up for this service or don't you want to buy this

24    product or I'm the, you know, Prince of Nigeria and if you

25    send me money, I'll pay you accordingly.

1           He says you know, I don't know.  And, you know,

2    porn, spam, same sort of thing, if I see it, I delete it.

3    If I see something bad, I delete it.  I really don't pay

4    attention.

5           "Have you gone through your email accounts at any

6    time, at one time and deleted a lot of emails?

7           "Not that I recall particularly.

8           "Have you gone through any of your computers at any

9    time and deleted a lot of material all at once?

10          "Not that I recall particularly, but I've cleaned

11   up a few, sure."

12          So there is no evidence that Mr. Gordon deleted any

13   emails relevant to this case.  You know, to put into

14   perspective here, clearly there are employees at DreamWorks

15   who delete emails.  They do it all the time.  They're not

16   supposed to delete anything relevant to this case.  That's

17   the standard.  Don't delete anything relevant to this case.

18          Mr Gordon there is no evidence has deleted anything

19   relevant to this case.  None whatsoever.  And it's no

20   surprise that he's not -- if he's not emailing us about the

21   case, who would he be emailing about the case?  There is

22   just no evidence of that whatsoever.

23          In an attempt to try to find something nefarious,

24   the defendants have latched on to this email in slide 47.

25   This is one that they excerpted for the Court in their

1   presentation but they took it completely out of context to

2   make it sound like something it's not.  This is an email

3   that Mr. Gordon sent to Mr. Tuttle who goes by

4   "Kingtut@sprynet.com."  And if you read the email, you

5   realize it's just silliness.  This is not an instruction to

6   delete documents.  It's silliness.

7        "Darth," he begins, as in Darth Vader from the *Star*

8   *Wars* movies.  "Darth, we have had to temporarily block your

9   account from all addresses.  Any reply will automatically be

10  deleted and unread.  The furry Ewok is forever blocked."

11  The furry Ewok.  "Please immediately delete this and

12  anything else to and fro, from 'all' locations.  Please do

13  not text as well.  Phone is on for conversation only.  Good

14  luck.  Luke aka Jabba The Hut.  'May the force be with

15  you.'"

16       Now, the defendants are looking at this trying to

17  find anything to latch on to to say aha, there is a deletion

18  of something related to *Kung Fu Panda*.  There is no way you

19  can read from this document to say, okay, he's telling his

20  friend delete everything related to *Kung Fu Panda*.

21  Absolutely not.

22       They explored this with him at deposition.  It's on

23  page 48, his testimony about it.  Mr. Gordon says, "But if

24  it is --" they ask is this from your email account.  "But if

25  it is, it's not relative to this case by any stretch."

1          "Not relative to this case," I think he means

2    relevant but not related to this case by any stretch.

3          If that's what they have to hang their hat on to

4    show that Mr. Gordon has somehow deleted evidence relating

5    to this case, it just falls flat.  That, you cannot read in

6    that email talking about Darth Vader and Luke Skywalker and

7    a furry Ewok that he is talking about deleting emails

8    relating to *Kung Fu Panda*.  You simply cannot at all.

9          There are plenty of cases and we go into them in

10   slide 49 that talk about destroying emails in the ordinary

11   course of business, deleting emails unrelated to the case,

12   unmotivated by bad faith.  That is not cause for sanction at

13   all in this case.  And that's certainly what we have with

14   Mr. Gordon.

15         All right.  This gets us now finally to the issue

16   of the files that they say were deleted from Mr. Gordon's

17   computer because of this secure erase software.

18              **THE COURT:**  Except for the file covers.

19              **MR. DENNING:**  The file folders?

20              **THE COURT:**  Folders.

21              **MR. DENNING:**  Yes, I think file folders.  File

22   folders are just a way to keep a bunch of files in one

23   place.

24              **THE COURT:**  I understand.  Those were not

25   destroyed.

1          **MR. DENNING:**  Those were not destroyed.  We

2     have them.  We have them all.  They are privileged documents

3     so we have secured them, "we" meaning counsel for Mr. Gordon

4     have secured all of those documents.  They're in our

5     possession.  The communication with Mr. Gordon where he sent

6     them to us, it's on our privilege log.  We have all of those

7     documents.  Counsel said they then -- they've been erased.

8     They haven't been.  We have those documents.  And this is

9     all set forth in docket items 147 and 148.

10         I know the briefing on the spoliation motion was

11    kind of, it was in spits and spurts.  Here they started with

12    their motion for spoliation, we opposed and then they filed

13    a motion for leave to be able to file supplemental briefing

14    which we opposed.  And then they filed a reply to that which

15    we filed an opposition to the motion to reply.  So there are

16    three, three briefs we filed.  It's a little bit

17    unconventional but those are in, those statements are in

18    docket items 147 and 148 in the Court's files.

19         We explained, and that's why I'm really kind of

20    confused by their statement that those files are gone,

21    they're not gone.  We have them.  And, you know, we can make

22    them available for an in camera inspection by the Court if

23    that's what the Court wants to do.  But they're work product

24    documents which we have maintained.

25         Now, they try to lump that together with this file

1    erase program that they found on Mr. Gordon's computer.  One

2    has nothing to do with the other.  He did not use that

3    secure erase software to delete these files.  He didn't.  He

4    just gave them to us.  Deleted them from his computer and

5    gave them to us.

6            The final delete was used on one of his four

7    computers and the record will show -- and our forensics

8    expert looked at this as well -- showed that computer was

9    repeatedly crashing, meaning, you know, just it would stop

10   working.  And he put together -- I'm going to point the

11   Court to slide 59 of our presentation where it shows -- this

12   is from Mr. Holbrook who is our computer forensics expert

13   who looked at Mr. Gordon's computers as well.  There is only

14   one computer that there is any evidence that this secure

15   erase program was used at all.  This relates to that

16   computer.  And he puts together what's called a Crash

17   Report.  You can look back in kind of the memory of a

18   computer and figure out when it crashed.  And he said, well,

19   here between March 15th and April 11th the computer crashed

20   repeatedly.  On April 9th the computer crashed again.  On

21   April 10th, this is when they say, oh, we know he's used

22   this Permanent Eraser.  Well, you know why, because

23   Mr. Gordon was trying to use the Permanent Eraser to erase

24   the programs that kept crashing and Permanent Eraser

25   crashed.

1          The computer was a piece of junk.  He was trying to

2     delete the programs that had viruses in it that were causing

3     his computer to crash.  He tried to delete them and then

4     Permanent Eraser crashed.  There is a log of it there.

5          Afterwards he installed Firefox which is a

6     different browser similar to Safari and he continued to try

7     to use the computer.

8          So there is simply no evidence whatsoever that

9     Mr. Gordon ever used that file deletion software to delete

10    anything relevant to this case.  The only evidence points to

11    he was using it to remove this Safari program, which is just

12    an Internet browser like Internet Explorer or Google Chrome,

13    to remove that Safari browser because it kept crashing his

14    computer.

15         No evidence he deleted any files whatsoever.  In

16    fact, the evidence is to the contrary.  We have those files.

17         So when --

18              THE COURT:  When you say, "We have those

19    files," you mean every piece of paper that was in the file?

20              MR. DENNING:  We have it electronically but,

21    yes, every page.

22              THE COURT:  Okay.

23              MR. DENNING:  Every page we have.  So nothing

24    whatsoever was deleted.

25              THE COURT:  Not just the covers that are an

1    index as to what should have been in there?

2              **MR. DENNING:**   Correct, Your Honor.   We have

3    every document that he had, we have.   And if we printed out,

4    it would be, I don't know --

5              **THE COURT:**   I think your answer is

6    straightforward and my question is clear.

7              **MR. DENNING:**   Okay.   Thank you, Your Honor.

8         So that, all of that, what I just explained is why

9    I said Mr. Gordon has done nothing wrong during this 2011,

10   2012 time frame when the Court ordered Mr. Gordon to produce

11   his computers.

12             **THE COURT:**   Let me ask a nonsubstantive

13   question.   What is it that makes me have an impression that

14   your client is very, very difficult?   I mean, getting it out

15   of him is really, you are dragging it, literally having to

16   get on the floor and pull it away from him.

17        I am not used to that.   I am used to giving an

18   order and somebody obeys it.

19             **MR. DENNING:**   Well, with respect to your order

20   to compel the computers --

21             **THE COURT:**   Yes.

22             **MR. DENNING:**   -- we complied immediately, Your

23   Honor.   We --

24             **THE COURT:**   Well, you went back and forth and

25   back and forth.   I think there must have been three

1    exchanges of memos as to whether somebody was going to

2    respond, forgetting about the response.

3              **MR. DENNING:**  Your Honor, I think that largely

4    came down to the fact that these were irrelevant computers.

5    Mr. Gordon doesn't store anything on them so our point was

6    this really is a distraction from I think the crux of this

7    lawsuit and we wanted to avoid the distraction.

8         But when Your Honor said please produce the

9    documents, you know, we had Mr. Gordon --

10             **THE COURT:**  I know, but that gets down to

11   counsel's Big Julie idea that you want them to take your

12   word for what is in them.

13             **MR. DENNING:**  But they don't have to take our

14   word for what's in it, Your Honor.  You can look at the

15   evidence of what was on the computers.  You know, their

16   expert, their expert was the one who said when I looked at

17   these four computers, two of them looked like they never

18   used them, one of them was used only by the kids and then

19   the last one doesn't have anything relevant to the case on

20   it.  I mean, that's their expert.

21             **THE COURT:**  Okay.  Go ahead.

22             **MR. DENNING:**  Okay.  So all of that, I was

23   trying to get to Your Honor's pointed question which was,

24   you know, did he do something during the time that we were

25   litigating this case that, you know, he hid evidence or

1    destroyed evidence.  The answer is absolutely not.

2    Absolutely not.  There is no evidence whatsoever and he

3    didn't.  The only files that related to this case we have in

4    our possession.  And if Your Honor wants to see them in

5    camera, we can make them available.

6          But their attempt to paint any of this as

7    spoliation of evidence is simply contrary to the evidence

8    and their request for the extreme sanction of dismissal

9    based on that is completely unwarranted.

10          **THE COURT:**  How about the P.U., P-U, how about

11    taking that out of the case?

12          **MR. DENNING:**  Okay.  So, and that's what I was

13    planning to address early in my presentation which is on,

14    starting on slide 5 of the slide deck.  And I'm making sure,

15    because I think I talked about most of this with the Court

16    already, it's really about how Mr. Gordon made the *Book of*

17    *P.U.* and it's what I described to you that Mr. Gordon, you

18    know, cut and pasted.

19          **THE COURT:**  Yes.

20          **MR. DENNING:**  Those are the things that he

21    shredded and threw away, just the scraps that were left

22    over.  He testified about how he does that and that's what

23    he's done for a long time.

24          But for them to say, well, we can't believe what's

25    in the *Book of P.U.* because we don't have the preexisting

1    materials he used to create it, the answer is that's simply

2    not true.  Here (indicating) are the preexisting materials.

3    Mister -- we have the files that Mr. Gordon had, you know,

4    in his possession.  You'll recognize this one (indicating).

5    I have it in plastic so that I don't get my fingerprints on

6    it but you'll recognize this one as kind of the

7    fundamental --

8             **THE COURT:**  The argument is that the lineage

9    is questionable because it is done in pencil and that can't

10   be dated.  I am just quoting now.  I know nothing about the

11   subject.

12            **MR. DENNING:**  Yes.  So why was it done in

13   pencil?  Because he's an artist and artists sketch in

14   pencil.  That's the way Mr. Gordon chose to do it.  That's

15   the way a lot of these sketch artists choose to do.  They

16   use pencil.

17            If they want to challenge the veracity and say,

18   wait a minute, this, you know, we don't think that this

19   particular paper is from the right time frame, we've given

20   it to them.  They have taken all this stuff to Arizona to

21   have their forensics analyst go through it, pour through it.

22            The best they've been able to come up with is one

23   page was on paper from 1968.  Well, that's really no

24   surprise if you understand how Mr. Gordon just draws on

25   whatever paper is available to him and he gets a piece of

1   paper at a second-hand store or he gets a notebook in the

2   dumpster, he uses it to draw things on so that's no

3   evidence.  If anything, that goes to the weight and there

4   they're, you know, perfectly entitled to cross-examine

5   Mr. Gordon at trial, show him this drawing (indicating) that

6   says 1993 on it and "Kung Fu Panda Power" at the top and

7   cross-examine him to their heart's content about whether

8   that date is truly accurate.  That's, it's really what the

9   case comes down to.

10              **THE COURT:**  Okay.

11              **MR. DENNING:**  There is no spoliation.

12              **THE COURT:**  Have you been heard?

13              **MR. DENNING:**  I have, Your Honor.

14              **THE COURT:**  Okay.  Anything else?  We are

15   bucking against the time where we are going to go to a

16   recess.

17              **MR. ZAVIN:**  Yes, Your Honor, if I may very

18   briefly?

19              **THE COURT:**  Okay.

20              **MR. ZAVIN:**  Your Honor, first the defendant --

21   I'm sorry -- the plaintiff quoted from the first expert's,

22   the expert's first affidavit with respect to what was on

23   Mr. Gordon's computers, not the later one, because as I

24   explained over the subsequent weeks when he was examining

25   it, he found that there had been *Kung Fu Panda* related

1    files, that they were deleted.

2              Counsel is now claiming that they have all of these

3    files.  With all due respect, Your Honor, I suggest that is

4    an overstatement by counsel.

5              One, they didn't mirror the computer at any time as

6    far as we know.  And if they did, they should have turned it

7    over to us because, after Mr. Gordon erased these files.

8              The second thing is, the only thing that was on a

9    privilege log is they preserved some Internet research

10   called the "Keys to the Kingdom," that Gordon had located by

11   Michael Eisner.  That was what was on the privilege log.

12   None of the rest of this was.

13             Third, with all due respect to Mr. Gordon's

14   counsel, they don't know what was deleted from Mr. Gordon's

15   computers as we don't.  He ran this program for the sole

16   purpose of deleting files.  This notion that he did it to

17   crash, because his computer crashed, the Court has dealt

18   with that previously.

19             I'd' like to read what the Court said because he is

20   not the first destroyer of evidence to come up with this

21   notion that, oh, I erased files on my computer because my

22   computer was crashing.

23             In the case of *Ameriwood versus Liberman* the

24   defendants who erased files ran a program, I think it was

25   Windows Washers in this case, said that the computers were

crashing and the program was run to solve the problems of the crashing.  The court said that this is akin to shredding files because the filing cabinet was disorganized.

It was the exact same excuse tried to be used there and the Court said absolutely not.  You can't win the motion -- when your computers are under court order to be produced, you can't run one of these programs, erase files, and then use the excuse I was just cleaning up my computer.

With respect to the shredding of documents and the preexisting evidence, Mr. Gordon did not testify that he based the *Book of P.U.* on the drawings that counsel is showing you today.  He testified that everything he based it on was destroyed.  And in that respect, Your Honor, one of the things the plaintiff is suing on here in the *Book of P.U.* is a lengthy set of 15 or 16 stories that he claims are akin to the movie.  There is not a single document that survived his shredding that shows any of those stories.  And it's part, it's the basic part of his claim, he is claiming that the plot of *Kung Fu Panda* was copied from his *Book of P.U.* which was based on preexisting stories.

The only story, literally the only writing about pandas by the plaintiff prior to the *Book of P.U.* that exists today is on his website.  There is a story called "Bamboo for Two" which has nothing to do with *Kung Fu Panda*. It was incorporated in the *Book of P.U.*  It sticks out like

1   a sore thumb.  Everything else was destroyed and now he's

2   going to sue DreamWorks based on stories that first spring

3   into existence in 2008.

4              THE COURT:  Where are the stories?

5              MR. ZAVIN:  I'm sorry, Your Honor?

6              THE COURT:  I am asking him.  Counsel, where

7   are the stories?

8              MR. DENNING:  The stories from the *Book of*

9   *P.U.*, we have some of them, Your Honor.  He doesn't have all

10  of them, meaning if you look in -- what I mean is if you

11  look in the 1992 '93 '94 materials, not all the --

12             THE COURT:  What do you claim that you don't

13  have?  What do you claim that you don't have?

14             MR. ZAVIN:  He does not have the written

15  stories, Your Honor, in the *Book of P.U.*, except for the one

16  story, "Bamboo For Two," there are no written stories that

17  precede 2008.

18             MR. DENNING:  That's correct, Your Honor.  One

19  of the stories --

20             THE COURT:  Why didn't you turn them over?

21             MR. DENNING:  Mr. Gordon hasn't found them.

22  He doesn't know where they are.

23             THE COURT:  All right.  Anything else?

24             MR. DENNING:  And, Your Honor, I'll say we're

25  not relying on that either, the stuff that he didn't, hasn't

1    turned over.

2                    THE COURT:  Well, you may not be relying on it

3    but it is part of the picture.

4                    MR. DENNING:  And, I think that's right.  It

5    speaks to, you know, how Mr. Gordon was constantly shipping

6    these different things to different studios at different

7    times.

8                    THE COURT:  Okay.  I will take -- very well

9    presented, everybody, thank you, and I will take it under

10   advisement.

11                   THE CLERK:  All rise for the Honorable Court.

12               MR. ZAVIN:  Your Honor?

13                   THE COURT:  Yes.

14               MR. ZAVIN:  May I ask, there is also a motion

15   for summary judgment pending.

16                   THE COURT:  Yes, I know that.  We started with

17   that.

18               MR. ZAVIN:  No, we didn't, Your Honor.  We

19   started with the spoliation.  There has been no argument on

20   the motion for summary judgment.  We can either take a

21   recess and do it later or we can come back if you want, if

22   you want to decide this motion first --

23                   THE COURT:  I may be confused but I was

24   looking at the stack of papers that you gave me and I

25   thought that I thumbed through the summary judgment ones.

 1           MR. ZAVIN:  Your Honor, I believe that what

 2    happened is in plaintiff's counsel's argument he gave you

 3    the deck, what he's calling his deck on summary judgment

 4    because he wanted to use a couple of slides on that in the

 5    spoliation.

 6           THE COURT:  I may have been confused, all

 7    right.  So why don't you -- is it convenient for you to come

 8    back at 2:15?

 9           (Whereupon, the Court and the Clerk conferred.)

10           THE COURT:  2:15 I have got the FBI coming.

11    How about 2:30, is that convenient for you?

12           MR. DENNING:  It is fine for the plaintiffs,

13    Your Honor.

14           MR. ZAVIN:  We will do that, Your Honor.

15           THE COURT:  All right.  See you at 2:30.

16    Thank you.

17

18           (Luncheon recess.)

19

20

21

22

23

24

25

1          **AFTERNOON PROCEEDINGS**

2          **THE CLERK:**  All rise for the Honorable Court.

3          **THE COURT:**  Good afternoon, everybody.

4          **VOICES:**  Good afternoon, Your Honor.

5          **THE COURT:**  Okay.  Round two, the summary

6  judgment.

7          **MR. ZAVIN:**  Thank you, Your Honor.

8          While they are somewhat intertwined, the spoliation

9  motion and the summary judgment motion, at least factually,

10  the defendants are moving on four separate grounds for

11  summary judgment irrespective of the spoliation.  What I'd

12  like to do is talk at least about three of them at this

13  point.

14          First, going back factually, just briefly, the only

15  access that plaintiff now claims, he had other theories of

16  access in his complaint but the only theory of access that

17  the plaintiff is pursuing is a claim that in, sometime in

18  1999, in the fall of 1999, he sent a submission to Jeffrey

19  Katzenberg at DreamWorks.  His claim is that he enclosed

20  with this letter some binder of material, that Katzenberg

21  saw this and that DreamWorks then created *Kung Fu Panda*

22  based on Katzenberg accessing this material and using it to

23  create *Kung Fu Panda*.

24          Okay.  Factually the first problem and the first

25  grounds we're moving for summary judgment is that Mr. Gordon

1    has absolutely no copy of what he clams he submitted to

2    DreamWorks.  There is actually grave reason to doubt he

3    submitted anything to DreamWorks because what happened is

4    the only evidence of any submission to DreamWorks is a

5    couple of days after he supposedly sent a letter, which we

6    acknowledge a letter was sent, DreamWorks sends back a

7    letter to Mr. Gordon saying they decline -- pursuant to

8    their policy they decline to consider his proposal.  Not

9    that they don't -- not that he sent any artwork, that they

10   declined to consider his proposal.  That is the only

11   evidence, written evidence of any contract between

12   Mr. Gordon and DreamWorks in 1999.

13          Coincidentally in discovery in this case documents

14   were subpoenaed from Disney.  It turns out that on the exact

15   same day that Mr. DreamWorks (sic) wrote his letter --

16   Mr. Gordon wrote his letter to DreamWorks, he wrote a letter

17   to Disney and in that letter to Disney, which there is a

18   copy of, Mr. Gordon said would you consider a proposal to

19   partner with me on my website which I'm setting up.  It had

20   nothing to do with any submission of material.

21          In the rejection letter DreamWorks said we decline

22   to, his request to submit a proposal.

23          Mr. Gordon is now claiming that DreamWorks copied

24   from something he submitted in 1999.  That's the only thing

25   they could have copied from.  But there is absolutely no

1    evidence, one, that he submitted anything or, two, what it

2    was that he submitted.

3           Now, in order for there to be copyright

4    infringement there must be a showing that the defendant

5    copied from something specific.  There cannot possibly be

6    that showing nor could the jury possibly make a comparison.

7    There is nothing to show the jury here what was submitted in

8    1999.

9           So the first grounds that we're moving for summary

10   judgment is as a pure matter of law, and the law is pretty

11   clear on this, particularly in the First Circuit, that in

12   order to state a copyright claim, a plaintiff has to have a

13   copy of what he alleges was infringed.  Purely logical.  If

14   you say something was copied, you have to have a copy of

15   what you say was copied.

16          What plaintiffs are trying to do here is sort of a

17   hide the ball and this is where it goes over to the

18   spoliation.  What they're saying is, well, in 2008 we

19   registered something, that this had some of the material

20   that we claim was existing in 2000 -- in 1999 and,

21   therefore, the jury should look at this 2008 registration to

22   see what was submitted in 1999.  The 2008 registration

23   obviously having been created after Mr. Gordon was aware of

24   the film *Kung Fu Panda*.

25          The law is clear on this.  And there is a very

1   recent case in the First Circuit, you can't do this.  You

2   can't take a later work which is admittedly not identical to

3   the earlier work and use that as the basis of comparison.

4   And the cases on this, the first one, Your Honor, and this

5   one, in this case I urge, I'm sure the Court will and your

6   clerks will look at these cases carefully, because there is

7   some disagreement about what they say.

8        The first case is *Airframe versus L-3*

9   *Communications* which is a First Circuit case in 2011.  In

10  this case the plaintiff claimed that defendant had infringed

11  some source code of the plaintiffs.  It was in connection

12  with an airline resource management system, ARMS.  What the

13  plaintiff claimed was that the software infringed was dated

14  back in 2003 or thereabouts, 2002, 2003, because that was

15  when the claimed infringement occurred.

16       What the plaintiff then showed for purposes of

17  comparison however was a later version of 2009 code.  What

18  the court said was that the plaintiff did not produce the

19  relevant source code because it hadn't produced that which

20  it claims was copied and it's their burden to produce it.

21  Without meeting that burden you can't prove copyright cases

22  as a matter of law.

23       And the First Circuit said, and I quote, "A

24  comparison can take place -- before a comparison can take

25  place, the plaintiff must necessarily establish the content

1    of the copyrighted work that it contends was infringed."

2         Now, the plaintiff is trying to distinguish

3    *Airframe*, although the plaintiff's --

4              THE COURT:  What does that mean?  Does that

5    mean that you can come up with a facsimile?

6              MR. ZAVIN:  If you can show an exact copy of

7    what you claim was infringed, you have met that part of the

8    burden of proof.  But the later version, which was

9    admittedly different, is not useable for that purpose.

10             THE COURT:  And what is being attempted here?

11             MR. ZAVIN:  They are trying to use that 2008,

12   first they're trying to use the 2008 *Book of P.U.*

13   registration as a substitute for what was supposedly given

14   in 1999.  They admitted, the plaintiff has admitted clearly

15   in his testimony, he does not, one, he does not have a copy

16   of what was submitted in 1999, if anything.

17        Two, he has admitted that the *Book of P.U.* is not

18   the same as what was admitted, submitted in 1999.  So he is

19   asking the Court to allow the jury to compare the *Kung Fu*

20   *Panda* film with the 2008 registration which didn't exist in

21   1999 and which the plaintiff admitted is different than what

22   was submitted in 1999.  Absolutely not permitted as a matter

23   of law.

24        What the plaintiff is claiming on *Airframe* is that

25   somehow this case has to do with registration.  It's the

1   fact that the 2009 work was not the registered work so

2   that -- and that the earlier works were registered and,

3   therefore, the court was saying you have to compare the

4   registered work.  That is a complete misreading of *Airframe*.

5   It's not, what's relevant is not whether the earlier or

6   later work, which one was registered, it's do you have a

7   copy of what you're claiming that the plaintiff or the

8   defendant copied.

9        The court in *Airframe* cited another First Circuit

10  opinion, *Unistrut Corp. versus Power*.  This was in 1960

11  where again the plaintiff did something similar.  He was

12  claiming a 1942 catalog was infringed but tried to do a

13  comparison with a 1943 catalog which was admittedly

14  different than the 1942 catalog.  The First Circuit said you

15  can't do this.  You've got to have a copy of what you claim

16  was infringed.

17       There is a very clear case, also First Circuit,

18  *Torres-Negron v. J&N Records*.  This is in 2007.  In this

19  case a songwriter gave a band a song, and that was

20  undisputed, he gave the band a song.  He gave them the

21  lyrics and music.  The band subsequently records it and then

22  later records it again without permission.  The songwriter

23  wants to sue them for copyright infringement.

24       The problem he had was he gave away his only copy.

25  The claim was I gave my only copy, I didn't have another

1      copy at the time, so he reconstructed it.  He basically

2      listened to what the band had played, he reconstructed the

3      music and lyrics, he copyrighted that and then sued them for

4      copyright infringement.  The First Circuit said you can't do

5      that.  You don't have a copy of what you claim was copied.

6      What you have is a later reconstruction.

7              Now, what the plaintiff is claiming is, oh, my

8      reconstruction is different because I have the originals in

9      front of me in 2008 when I did my reconstruction so my

10     reconstruction is different than *Torres*.

11             One, Your Honor, the evidence is clear, spoliation

12     aside, which I'll mention one more time again soon, that

13     they didn't have the originals in front of them.  Those nice

14     drawings which plaintiff's counsel has shown Your Honor from

15     early 19- -- which they claim are from the early 1990s, the

16     testimony is unequivocal that they were either in

17     Mr. Partello's locker until 2009 or they were, one of them

18     which is not terribly similar to *Kung Fu Panda* was in

19     Mr. Gordon's possession but he didn't know he had it.  He

20     only found, quote, "found" it in 2009.  And he couldn't,

21     didn't refer to those originals in creating the 2008

22     registration.  Absolutely clear testimony from Mr. Gordon.

23             And, of course, Mr. Gordon has ensured that no one

24     knows what the 2008, similarity between 2008 registration

25     and anything he submitted in 1999 is because he destroyed

1    everything.  He shredded it.  And as we said this morning,

2    there is no evidence of any stories existing prior to 2008,

3    and that's a major part of his claim, except that one story

4    which has nothing to do with *Kung Fu Panda*.  And all of the

5    other artwork in that 2008 is admittedly different.  His

6    testimony is I've changed it, it's not the same.

7           Your Honor, one of the things the courts have said,

8    the reason you need an exact copy is absolutely to prevent

9    fraud.  In a case in the Ninth Circuit*, Seiler versus*

10   *Lucasfilm*, and Your Honor is probably familiar, given your

11   familiarity with *Guys and Dolls*, I'm going to assume some

12   familiarity with *Star Trek* -- I'm sorry -- *Star Wars*, okay.

13          **THE COURT:**  Bad bet, sorry.

14          (Laughter.)

15          **MR. ZAVIN:**  Okay.  In *Star Wars*, the famous

16   Lucas trilogy, there is something called "Walkers" -- I'm

17   not a *Star Wars* fan either -- the "Imperial Walkers" which

18   are sort of big machines that look like huge 50-story

19   robots.  The film came out in 1980 I believe.  There was a

20   copyright claim by the plaintiff that Lucas had copied the

21   design for these "Imperial Walkers" from something the

22   plaintiff called "Garthian Striders" which he claimed were

23   created in 1979 but he didn't have copies of those.  So he

24   copyrighted something he created in 1981 and registered it.

25   And he claimed the date of creation of 1978, very similar to

1    what the plaintiff in this case is doing.

2         The Ninth Circuit said, and I quote, "The contents

3    of Seiler's works are at issue.  There could be no proof of

4    substantial similarity and, thus, of copyright infringement

5    unless Seiler's works are juxtaposed with Lucas' and the

6    contents compared.  Since the contents are material and must

7    be proven, Seiler must either produce the original or show

8    that it is unavailable through no fault of his own.  This he

9    could not do."

10        Your Honor, the plaintiff cannot produce the

11   original or show it's available through no fault of his own.

12   What the jury -- the plaintiff is saying, well, let the case

13   go to the jury and the jury is going to decide.  It is one

14   thing for a jury to decide substantial similarity between

15   two existing works where they can look at work A and look at

16   work B.  That may be a question for a jury, assuming certain

17   other criteria are met.  It is not for the jury to say,

18   well, let's look at work A and let's try to figure out what

19   is in work B.  That's not a jury question.

20        What *Airframe* says, what *Seiler* says, what all

21   these other cases say is you have to have a copy of what you

22   supposedly claim was infringed.  So that's the first ground

23   for summary judgment.  Absolutely a matter of law in the

24   First Circuit.

25        Second grounds is -- oh, and, by the way, I would

show Your Honor one slide in this respect of just -- no, I'm
going to read it, it's easier.  Mr. Gordon's testimony on
this point:

"QUESTION:  So you don't have a copy of anything,
any story you sent to Mr. Katzenberg; correct?

"ANSWER:  Just what's in the *Book of P.U.*

"QUESTION:  But you don't have a copy of what you
sent to them?  It's different than what's in the *Book of
P.U.*; correct?

"ANSWER:  Correct."

There is no question what he clams he sent to
Katzenberg was different than what's in the *Book of P.U.*

The next grounds for -- and by the way, Your Honor,
with respect to these drawings that are claimed were in
1992, he admits that those couldn't have been sent to
Katzenberg because he didn't have them in his possession.
His claim is that something like them was sent to
Katzenberg.  But his testimony is clear:

Between the early '90s and 2009 when they were
discovered he didn't have them, they were not available to
him.

The second grounds for dismissal on summary
judgment is access, Your Honor, and this is an independent
ground.  As Your Honor undoubtedly is aware, to prove
copying, since a plaintiff can never generally show that he

1    was there when the defendant physically copied his work,

2    what the law is is you can prove copying by showing access

3    and substantial similarity.  These are two independent

4    things.  It's not enough just to show the works are

5    substantially similar.  You must show, the plaintiff must

6    show that the defendant had a reasonable opportunity to copy

7    his work.  And the operative phrase is "reasonable

8    opportunity," not bare possibility.  The standard is higher

9    than that.  A plaintiff must show something more than bare

10   possibility.

11         What the evidence shows here is as follows, and I'm

12   going to say where the plaintiff disagrees with it.

13         A letter was sent to DreamWorks.  No evidence

14   anything was attached to it.  DreamWorks has an absolute

15   policy, as does every studio, in order frankly to protect

16   itself from being in just this situation, that they do not

17   consider unsolicited submissions.  These are legal policies

18   that have been put in by the studios.  They are rigorously

19   enforced.

20         The letters sent to Mr. Katzenberg --

21   Mr. Katzenberg is the CEO of a fairly large public

22   corporation.  He does not open his own mail.  He testified,

23   and he clearly testified that in the office he does not open

24   his own mail.  What plaintiffs has tried to do is conflate

25   that testimony where Mr. Katzenberg said if something was

1    sent to his home, he might open it.  This was not sent to

2    his home.  This was sent to the office.  Unequivocal

3    testimony.

4         The testimony is his assistant opens it.  If they

5    see on glimpsing at the first page it's an unsolicited

6    submission, it's sent to the legal department where there is

7    someone who is not involved in making films at all who sends

8    it back if there is a submission or sends a rejection letter

9    if that's appropriate.

10        That's exactly what happened here, that in the

11   material submitted, Your Honor, there was an affidavit of

12   Jessie Gonzales who is the person responsible for sending

13   back unsolicited submissions and he explains exactly what

14   happened in this one and why it was sent back with the

15   letter it was, because there was nothing with it.

16        They have, DreamWorks has a number of forms that

17   they use that is an electronic template that DreamWorks sent

18   it back.  The letter itself is varied from the electronic

19   template because Gonzales testified that he then tailors the

20   template to the individual letter that has been received.

21   Plaintiff didn't even bother deposing Mr. Gonzales.

22        There is no genuine issue of fact as to what

23   happened here.  Their only claim of access is this letter to

24   Mr. Katzenberg, where there is no evidence that he either

25   saw it, ever saw it or there was anything attached to it.

1          The second problem with their access is they're

2     claiming access to the wrong person.  Hardly surprisingly,

3     the evidence is overwhelming and uncontradicted that

4     Mr. Katzenberg didn't create this movie or any of the

5     elements that plaintiffs claim was copied.  The evidence is

6     Mr. Katzenberg in early 2000, among discussing other ideas,

7     said it would be interesting to make a movie about pandas.

8     That's it.  Nothing about kung fu.  Nothing about big

9     pandas, small pandas, no other element, just pandas.

10          After that it went off to the creative department.

11     We'll get to this on independent creation but the undisputed

12     evidence is that each of the elements that plaintiff claims

13     was copied from him was created by a dozen different people

14     over the course of the next four years.  Plaintiff didn't

15     bother deposing any of these people.  All of them submitted

16     sworn declarations.

17          And plaintiff -- so, for example, the plaintiff is

18     making a big deal about, oh, there is a big panda and a

19     small panda.  Well, the fact is the small panda didn't get

20     into this movie till three years after development started

21     and we can show who came up with it.  We know who came up

22     with it.  It wasn't Katzenberg.  Katzenberg didn't even know

23     most of these people.

24          Plaintiff has made absolutely no attempt to show

25     access by any of these people to his work.  So going to

1    access, they don't have -- there is no genuine issue of fact

2    on this.  They have no evidence at all that any of these

3    people accessed his work.

4           There is a case right on point in the First Circuit

5    involving the New England Patriots here.  And this case is

6    *Grubb versus KMS Patriots*, it's a First Circuit case in

7    1996.  In that case the Patriots wanted to create a new logo

8    for the team logo for their helmets.  And they contacted an

9    outside design firm and they retained a designer named Loh,

10   L-O-H.  Mr. Loh created a design.  There was a coincidence

11   in timing.  He created it at some point between February 4th

12   and February 12th.

13          On February 9th the plaintiff in this case

14   submitted a logo to the Patriots' main office and said I've

15   heard you're looking for a new logo, this is my idea for the

16   design of the logo.  The plaintiff then claimed that the

17   logo that the Patriots adopted designed by Mr. Loh was

18   substantially similar to his logo.  The court dismissed this

19   on the grounds, among other things, of failure of access

20   because what they said is, okay, at best what you've shown

21   is that your client sent something to the Patriots but, one,

22   the Patriots have a policy in place not to keep unsolicited

23   submissions away from their design team, that's No. one.

24   And number -- which DreamWorks had, absolutely.

25          And, No. two, you haven't shown any access by the

1    person who actually created it.  And what's called bare

2    corporate receipt, merely saying that the New England

3    Patriots received this when it's clear that the creator of

4    this was Mr. Loh, that's not showing access, Your Honor.

5    And the court, the First Circuit said nope, that doesn't say

6    he copied --

7              **THE COURT:**  You are talking about creator of

8    the logo that actually was used?

9              **MR. ZAVIN:**  That's correct.  And, similarly,

10   in the case of *Kung Fu Panda*, the movie and all the elements

11   were created by different people.  They weren't created by

12   Mr. Katzenberg.

13         Now, plaintiff's argument is that Mr. Katzenberg is

14   head of the studio and he's involved in all of the films,

15   which is true.  He has meetings with people as the films are

16   developed.  He makes comments, et cetera, absolutely

17   correct, but he doesn't develop the original elements.

18   That's not his job.

19         And this film was created by 400 people, literally

20   400 people worked on this from between the year, beginning

21   of the year 2000 to when it was released in 2008 and that's

22   400 creative people, not counting marketing and not counting

23   distribution.  That's what it took to create this film.

24         That brings us to the third independent grounds for

25   dismissing this case on summary judgment.  Independent

1    creation is a complete defense to a copyright case.  In

2    copyright, unlike patent, merely because you have --

3              **THE COURT:**  Whose independent creation?

4              **MR. ZAVIN:**  The independent creation of the

5    defendant.

6              **THE COURT:**  Okay.

7              **MR. ZAVIN:**  In a patent case, Your Honor, all

8    the plaintiff has to do is show I came up with this idea

9    first and then for 17 years there is an absolute

10   exclusivity.  It says anyone who comes up with this same

11   idea, you have to license it from me, whether you came up

12   with it independently or not, because I have exclusivity

13   under the patent.

14        Copyright law is completely different in that

15   respect.  Copyright law, the only thing it protects against

16   is copying.  So, in other words, Your Honor, if you come up

17   with a *Hamlet* and write *Hamlet* and I somehow write *Hamlet*

18   without reference to yours, and I don't copy yours, the fact

19   that they're identical does not make for a copyright case.

20        Now, that is probably a bad example because of this

21   doctrine of striking similarity which really doesn't come

22   into play here but that's the basic idea.  Copyright

23   infringement is copying it.

24        If the defendant can show he independently created

25   it, there is no copyright infringement.

1           In this case there is absolutely overwhelming

2    undisputed proof of independent creation.  What we've

3    submitted on this motion, Your Honor, is the declarations of

4    10 to 14 people each of whom created one of the elements,

5    one or more of the elements that plaintiff claims was copied

6    from him.  We have the testimony, we also have thousands of

7    pages of documents showing the progression of the creation

8    of this film having nothing to do with Mr. Gordon.  This is

9    a completely unrebutted case of independent creation.

10          Plaintiff's only argument against granting summary

11   judgment on independent creation is -- they never bothered

12   to depose these people.  They don't have anything to

13   contradict their testimony.  They don't have anything to

14   contradict the documents that showed that this is how the

15   film was created.  Their only argument is that somehow

16   independent creation is a question for the jury.  That this

17   is -- it's never to the fact -- the effect that independent

18   creation is an affirmative defense that should usually be,

19   you know, referred to a jury.

20          First, the defendants can't -- the plaintiff can't

21   create an issue of fact simply by disagreeing with his

22   testimony.  I mean, that is clear because in, again, *Grubb*

23   *versus The Patriots*, what the First Circuit said is that the

24   plaintiff can not create an issue of fact simply by

25   disagreeing with it.  "To deny the motion for summary

1    judgment the court would have to discredit the testimony of

2    the defendant's witnesses.  It is well settled that on

3    summary judgment, absent specific facts, discrediting

4    testimony from a witness associated with the defendant and

5    absent a direct conflict in the testimony, the plaintiff,

6    although entitled to have his own evidence taken as true, is

7    not entitled to have the defendant's evidence positively

8    disbelieved."

9          The First Circuit has indeed granted summary

10   judgment on independent creation and cases are cited in our

11   reply brief.  The plaintiff is simply wrong that this cannot

12   be a ground for granting summary judgment.

13         What the plaintiff is asking this Court to do is

14   let it have a trial despite the fact that it has no evidence

15   that the jury couldn't compare the works it claims were

16   infringed, despite the fact that it has no evidence of

17   access really by Mr. Katzenberg and certainly not by the

18   creators, and despite the fact that it has no -- nothing to

19   contradict independent evidence.  Let's have a three-week

20   trial where DreamWorks has to bring in 20 witnesses from

21   California to testify to the exact same things that they

22   said in their declaration on independent creation and maybe

23   the jury will disbelieve them.

24         Well, frankly, if the trial, if the record on the

25   trial is the same as it is here, if the jury did disbelieve

1    them and grant the plaintiff's verdict, frankly I think that

2    Your Honor would feel compelled to grant judgment NOV

3    because there would be no support for such a judgment.

4         And, I mean, it goes so far as the plaintiff

5    doesn't even have a theory how all of these independent

6    people had access to Gordon's work.  There is not even a

7    theory, a viable theory.

8         Okay.  Your Honor, in our papers we also pointed

9    out that we believe a fourth ground for dismissal is lack of

10   substantial similarity.  I think we will rest on our papers

11   on those and not take Your Honor's time because these three

12   grounds are so clear.  Just briefly though, on lack of

13   substantial similarity, if Your Honor, if you don't look at

14   the *Book of P.U.*, that thing that was created after

15   Mr. Gordon saw the plaintiff's (sic) trailer, there is

16   nothing that -- there is no story.  He's got zero story that

17   is similar.  And those pencil drawings he has just as

18   artwork aren't similar to what the characters looked like.

19   They're ideas.  It's an idea about a large panda and a small

20   panda.  Ideas aren't copyrightable.  That doesn't make

21   substantial similarity.  So he can't win even if those

22   drawings survive on substantial similarity.

23        I'd like an opportunity briefly to discuss anything

24   that plaintiff raises.

25             **THE COURT:**  All right.  Go ahead, please.

1          **MR. DENNING:**  Thank you, Your Honor.

2          And I'm just going to address the three arguments

3     that counsel for DreamWorks addressed and I'll do them in

4     the order that they addressed them.

5          (Pause in proceedings.)

6          **MR. DENNING:**  I apologize, Your Honor, one

7     second.  Technical difficulties.

8          (Pause in proceedings.)

9          **MR. DENNING:**  We'll go the back up, I'll just

10    use the pushing the button.

11         So the first argument is -- and this is on slide 40

12    of the summary judgment deck that I gave to the Court

13    earlier this afternoon.  And the point simply is the law

14    does not require Mr. Gordon to produce the exact work he

15    sent to DreamWorks and that DreamWorks copied.  And the law

16    is absolutely clear in the First Circuit and elsewhere that

17    that is the case.  We do not have to, Mr. Gordon does not

18    have to produce the exact copy.

19         **THE COURT:**  All right.  Let's deal with that

20    right now.  What does the defendant say about that?

21         **MR. ZAVIN:**  We believe that the law is quite

22    the opposite way, that Mr. Gordon does have to produce a

23    copy.  One of the cases that's clear on this is, and it's

24    cited numerous times, is *Kodadek versus MTV* where the court

25    explained that under the copyright law a copy means an exact

1    or virtually exact copy of the work and --

2              THE COURT:  Okay.  All right.

3              MR. DENNING:  I have all of those cases in

4    here, Your Honor, and the plaintiffs -- I'm sorry -- the

5    defendants are just reading them incorrectly.

6              Starting at the very beginning with the *Airframe*

7    case that they rely on for this point, and I'm happy to

8    explain to the Court what the *Airframe* court said and how

9    that's different from our situation here.

10             In essence what the *Airframe* court said and what

11   all these cases say is that you have to compare what is

12   registered in the Copyright Office with what infringes.

13   That's what they say.  You have to compare what is

14   registered with what infringes.

15             In this case we have three buckets of things that

16   are registered.  We have the early 1990s artwork which was

17   registered in 2011.  Just like all plaintiffs do in

18   copyright cases, you register before you file suit, so the

19   early 1909s.

20             We have the 2000 bucket, the 2000 copyright

21   registration of "Panda Power."

22             And we have the 2008 *Book of P.U.*

23             You compare those things to what infringes to the

24   *Kung Fu Panda* movie.  Any one of those you can do, any one

25   of them is sufficient, but that is what you need to do:

1     Compare what is submitted in the Copyright Office with what

2     is said to have been copied.

3          If we look at the *Airframe* case -- and this is on

4     slide 46 I believe of my slide deck -- here's what happened

5     in *Airframe*.  Airframe registered a 2003 version of their

6     source code in the Copyright Office.  They then claim that

7     the defendants were infringing and they had their experts

8     compare a 2009 version of their source code to the alleged

9     infringing source code.  They didn't compare it to the 2003

10    which is what was registered in the Copyright Office.  They

11    compared it to something else, the 2009.

12         And, in fact, there was no evidence on the record

13    that the 2009 source code was the same or even similar to

14    the 2003 stuff that was registered.  So they were only

15    comparing the accused product to something that wasn't at

16    all registered in the Copyright Office.  The court said you

17    can't do that.  You need to register what you claim they

18    have infringed.  You should have registered the 2009 stuff

19    or you should have compared the defendant's product to your

20    2003 stuff which was registered.  That's what the court

21    said.

22         And here's, on slide 47 here's the exact language

23    from the *Airframe* case.  Rosen is the expert for the

24    plaintiff in that case.  It says, "Rosen made no direct

25    comparison between the allegedly infringing M3 program and

1  the ARMS source code versions covered by Airframe's

2  copyright registrations."  They didn't make that comparison.

3          And they go on to say, "Rosen's declaration," the

4  expert's declaration, this is on slide 48, "said nothing

5  about similarities between the 2009 ARMS version and

6  Airframe's earlier registered ARMS versions."

7          And they conclude, "Having presented no evidence

8  sufficient to prove the content of its registered source

9  code versions, Airframe cannot show that any of its

10  registered works is substantially similar to the alleged

11  infringing M3 program, and Airframe has failed to create a

12  genuine issue of material fact as to its claim of copyright

13  infringement."

14          That's what *Airframe* holds.  It's completely

15  inapplicable to our case.  In our case Mr. Gordon did

16  register his copyrights.  He registered all three buckets of

17  his copyrights.

18          And in our case Mr. Gordon's claims of infringement

19  are based on those copyright submissions, the 2011 from the

20  early '90s artwork, the 2000 and the 2008.  We are comparing

21  the copyright registrations to *Kung Fu Panda*.  And that's

22  exactly what *Airframe* said you should do.  Exactly what you

23  should do.

24          So *Airframe* is completely beside the point.  We are

25  complying with what *Airframe* said.

1          Now, defendants say, well, okay, but can you show

2     what you submitted to DreamWorks?  Can Mr. Gordon say here

3     is the package of information I submitted to DreamWorks?

4     You don't have to do -- you don't have to say exactly what

5     you submitted if you can make that comparison from the

6     copyright registered work to the infringed work.  And there

7     is a case called *Pearson Education*.  It's a Southern

8     District of New York case, 2012.  It issued after we briefed

9     this in our summary judgment opposition but it's very

10    informative.  It's 2012 U.S. Dist. LEXIS 100490, and it

11    starts on page 50 of our slide deck.  And they say, and I'll

12    read from the court's opinion:

13         Defendant reiterates the argument, advanced in its

14    motion to dismiss, that the defendants -- I'm sorry -- the

15    plaintiffs cannot not bring an infringement claim premised

16    on the copying of the plaintiffs' instruction manuals

17    because, although the manuals are works derivative of

18    plaintiffs' registered textbooks, the manual are themselves

19    not registered.

20         That's what they're saying here, they're saying we

21    can't bring a case premised on the copying of the submission

22    that Mr. Gordon gave to DreamWorks because, although that

23    submission is a derivative, it's based on what Mr. Gordon

24    has filed in the Copyright Office, the manuals themselves,

25    the submission that Mr. Gordon sent to DreamWorks, we don't

1    have a copy of that to say this is registered.

2         The court continues:

3         Defendant misapprehends the nature of plaintiffs'

4    claim.  Plaintiffs are not alleging that defendant violated

5    their copyright in the unregistered instruction manual;

6    rather, they allege that by copying the instruction manual,

7    defendant infringed plaintiffs' copyright in the textbook --

8    the underlying work for which plaintiffs possess a valid

9    registration.

10        Same thing here.  We're saying that *Kung Fu Panda*

11   infringes our registration of the 1990s work, the 2000 work,

12   the 2008 work.

13        The court continues, "Where an unregistered

14   derivative work incorporates protected elements of a

15   registered original work, a plaintiff can state an

16   infringement claim based on the unauthorized reproduction of

17   those protected elements through copying of the derivative

18   work."

19        And then it cites a case called *Well-Made Toy* which

20   is an Eastern District of New York case.  And it quotes what

21   that court says, "Where the preexisting work is registered,

22   but the derivative work is not, a suit for infringement may

23   be maintained as to any protected element contained in the

24   registered preexisting work, but not as to any elements

25   original to the unregistered derivative work."

1           All of that says you don't have to have a copy of

2     that derivative work of what Mr. Gordon sent to DreamWorks

3     if your claim of infringement is based on stuff you

4     registered in the Copyright Office.  And that's exactly what

5     we did here.

6           If you think, Your Honor, about what the defendants

7     are trying to have the Court believe, and this is on slide

8     43, imagine this scenario.  A band records a song.  Later

9     the band plays a live version of that song at a concert

10    with -- cleaned up a little bit around the edges.  And there

11    is another band in the audience at that live performance.

12          Then weeks later that other band, we'll call them

13    band two, releases an album and has a copy of that song that

14    they heard live performed, has a copy of that on their

15    album.  Band one will then register with the Copyright

16    Office that recording that they made in the very first

17    outset, they will register that recording with the Copyright

18    Office and say, okay, your recording infringes our

19    recording.

20          Now, they don't have the live performance that they

21    played when the second band heard them play it.  They don't

22    have to.  They're comparing what the band, the second band

23    put out to what they registered in the Copyright Office.

24          The same situation, a writer writes a script to a

25    movie and then the writer sent a slightly revised version of

1    that script, edited a little bit, to a publishing company.

2    The publishing company then produces a play based on that

3    script that he sent to them.  The writer can register the

4    original script, the first one, and then file copyright suit

5    against the publishing company even though he doesn't have

6    what he sent the publishing company, even though that varied

7    slightly, because what the publishing company put out as

8    their play is copied from that original work which is

9    copyrighted.  That's the exact same situation here.

10         Mr. Gordon has copyrighted his original work.  He

11   sent something very similar to it to Mr. Katzenberg.  They

12   came out with *Kung Fu Panda*.  Mr. Gordon is now entitled to

13   say *Kung Fu Panda* infringes my original copyrighted work.

14   In fact, that's what Mr. Gordon has to say because it's the

15   original work that is copyrighted.

16         Everything he is doing is exactly what the case law

17   necessarily requires.

18              **THE COURT:**  That is the *Book of P.U.*, is that

19   it?

20          **MR. DENNING:**  Well, so there are actually

21   three buckets.  Certainly the early 1990s stuff, the stuff

22   he registered in 2011.  And, in fact, there is testimony

23   from Mr. Gordon that that's, those drawings or very, you

24   know, photocopies or cleaned up versions of those early

25   1990s drawings, the stuff from, you know, from this book

1    (indicating), that's what he sent to Mr. Katzenberg when he

2    sent the submission in 1999.

3          At slide 41 of our presentation there is the

4    testimony from Mr. Gordon when he was deposed the first of

5    the three times.  They said, "What was in the Panda property

6    that you sent to him," meaning Mr. Katzenberg?

7          He said, "Relative to pandas or other stuff?"

8          He said, "Relative to pandas."

9          Mr. Gordon said, Well, it would have been the

10   outline, it would have been that sketch -- and by "that

11   sketch" the record is clear he means the one of the two

12   pandas standing next to each other.  We call it 1064

13   (indicating), this sketch.

14         Mr. Gordon said he sent a photocopy of that sketch,

15   the one with the earth.  And you saw that before, the two

16   pandas standing in front of the globe.  "Because I was

17   pushing the environmental thing, with the Five Fists," so

18   there is five, you know, the mantis and tiger and the snake.

19         "And then one with Kidd and Redd with like a bamboo

20   stick."

21         So those are the things, that's the evidence in

22   this case of what Mr. Gordon sent to Mr. Katzenberg.

23         There is a case -- and this is cited in our brief.

24   It's in this circuit, District of Maine from July 31, 2008.

25   It's called *Lugosch versus James Avery Craftsman*.  And it

1    relates to jewelry and a particular design of a heart-shaped

2    jewelry called "a mother's love heart-shaped jewelry."

3         And in that case the court plainly said that the

4    plaintiff does not have to be able to show exactly what the

5    plaintiff sent to the defendant.  The court says, and I'll

6    read this, this is from *18 and *19 of that opinion.

7         "The defendant asserts that the plaintiff does not

8    remember what she sent to Popple to the defendant, that she

9    did not retain a copy of that material, and that she does

10   not have any evidence that the mailings were received or

11   seen by any of the defendant's employees."

12        Well, here in our case Mr. Gordon does remember

13   what he sent to DreamWorks.  He doesn't have a copy of the

14   material, just like the plaintiff here, but we do have

15   evidence that the material was received by DreamWorks.  So

16   we have two of the three things that were missed in *Lugosch*.

17        Nevertheless, in *Lugosch* that was good enough.  The

18   court said, "The plaintiff responds that the fact that

19   something is mailed creates an inference that it was

20   received and, thus, establishes a genuine issue of material

21   fact on the question of access."  And then it says, "Under

22   binding First Circuit precedent, I conclude that the

23   plaintiff has produced sufficient evidence to meet the

24   access prong of the applicable test without consideration of

25   the other types of evidence she proffers for this purpose."

1          She did not have the original of what she sent to

2     the defendant.  She didn't even remember what she sent to

3     the defendant in this case.  But the court said under

4     binding First Circuit precedent the plaintiff has produced

5     sufficient evidence.

6               **THE COURT:**  Has that case been appealed?

7               **MR. DENNING:**  It was adopted by the District

8     Court so the original opinion is 2008 U.S. Dist. LEXIS

9     58238.  It was adopted 2008 U.S. Dist. LEXIS 80706.  And I

10    don't believe it has been appealed, at least on that point,

11    Your Honor.

12              **THE COURT:**  All right.  Go ahead.

13              **MR. DENNING:**  Okay.  Now, so that's what -- so

14    what Mr. Gordon sent in 1999, you know, was the stuff that

15    he created back in the early 1990s and that he registered in

16    2011.

17         Separate from that the defendants say, all right,

18    well, let's talk about the *Book of P.U.*  And the *Book of*

19    *P.U.* is a "reconstruction," and that's a technical term in

20    these copyright cases, a "reconstruction" and you did it

21    only after you saw the trailer for *Kung Fu Panda* so we have

22    to set that aside.

23         Now, the first thing to notice, this reconstruction

24    argument does not and cannot apply to the 1990s artwork, the

25    early stuff, the stuff that's in this pad (indicating)

1    because Mr. Gordon clearly created that well before he saw,

2    a decade and a half before he saw the *Kung Fu Panda* trailer

3    so you cannot dismiss this and defendants cannot dismiss

4    this as being a reconstruction.  It's clearly not.  It came

5    15 years before.

6         But they say, well, the *Book of P.U.*, because he

7    assembled that after he saw the trailer, that is a

8    reconstruction.  So let's talk about the *Book of P.U.*

9    Actually if you look at the cases, it's not a reconstruction

10   if the plaintiff is looking at the original when they put

11   together the package or the copyright registration after

12   they see the infringing art.

13        So in the *Torres-Negron* -- and this is on slide 56

14   of my presentation.  And counsel referenced this case.  It's

15   out of the First Circuit, *Torres-Negron versus J&N Records*.

16   Here is what the court said, this is quoting from the

17   opinion.  "The district court held that 'a copy that is

18   simply created or reconstructed from memory without directly

19   referring to the original, known as a 'reconstruction,' does

20   not comply with the deposit requirements of the Copyright

21   Act,' and found that Torres' deposits constitute

22   impermissible reconstructions."

23        The key language is "without directly referring to

24   the original."

25        Here it's clearly the case that when Mr. Gordon was

1   putting together the *Book of P.U.* he was looking at the

2   original material or at least photocopies of the original

3   materials.

4          Now, counsel for plaintiff (sic) said, well, how

5   could he have been -- this was in Mr. Partello's garage.

6   You know, as the record is replete, Mr. Gordon made lots of

7   photocopies of these things to send to people.  He had

8   photocopies around and you can't look at the *Book of P.U.*

9   and this 1990s artwork and say he did one without the other.

10  The artwork throughout is very, very similar.  So he was

11  looking at the original material when he made the *Book of*

12  *P.U.*  It's, therefore, not a reconstruction.

13         There are more cases on this point, the *Coles v.*

14  *Wonder* case which is a Sixth Circuit case.  But, again, they

15  say, "In the case before us, had Coles been able to

16  establish that he made the 1990 recording after listening to

17  an audio copy of his 1982 rendition of *For Your Love*, he

18  could have met the deposit requirement and his copyrighted

19  work would be valid from the date listed on his application.

20  Likewise, had he made his 1990 recording after reviewing a

21  tear sheet or a written summary that dated from 1982, he

22  could have satisfied the deposit requirement.  Like the

23  plaintiff in *Kodadek*, however, Coles did not refer to the

24  original work in producing the recording of *For Your Love*

25  that he then deposited with his copyright application.

1  Thus, the 1990 recording must be viewed as a reconstruction

2  only, not a copy, and therefore he could not receive a valid

3  copyright registration in the 1982 version of the song."

4       Again, without reference to the original.

5       I'll cite only one more case to you and that's

6  because it's the one that defendants referred to.  It's the

7  *Kodadek versus MTV*.  It's a Ninth Circuit case from 1998.

8  It has the same law.

9       "Once a bona fide copy is made in this manner,

10  subsequent copies can be made by directly referring to that

11  copy.  For example, a photocopy or other electronic means of

12  reproduction of an original drawing could suffice.

13  Similarly, an accurate trace of an original drawing could

14  suffice.  In fact, a meticulous freehand redrawing of an

15  original, made while the artist referred directly to the

16  original, could suffice."

17       And really that's what the *Book of P.U.* is.  It's a

18  photocopy, it's an accurate trace, it's a meticulous

19  freehand of what existed before.  So that's why it's fair to

20  look at the *Book of P.U.* and say, okay, that is something

21  that we can compare to *Kung Fu Panda* to see whether they

22  infringe.

23       All right.  So those are the three buckets.  The

24  argument that Mr. Gordon didn't keep an exact copy is

25  misrepresenting the case law.  All we have to do is compare

1     the copyright registrations to what DreamWorks came up with.

2              That leads us to the second of their arguments

3     though which was the access argument.  They claim that

4     Mr. Gordon has not shown or cannot show apparently that

5     DreamWorks had access to Mr. Gordon's materials.  This is

6     undoubtedly a factual inquiry for the jury.  What

7     Mr. Katzenberg did with the submission that Mr. Gordon

8     sent --

9              **THE COURT:**  You have already argued this about

10    his assistant.

11             **MR. DENNING:**  I haven't but I'll go through

12    more quickly if --

13             **THE COURT:**  No, it was familiar to me.  I

14    mean, Katzenberg says I never opened up the mail unless it

15    came to my house and then we have an assistant there who

16    then will open it up.  If it seemed to be business like

17    instead of the law department, otherwise, we sent it

18    someplace else.

19             **MR. DENNING:**  And that's what the defendants

20    said.  In actuality --

21             **THE COURT:**  All right.  I thought that you

22    said that.

23             **MR. DENNING:**  That's not exactly what

24    Mr. Katzenberg said in his deposition and I have a slide to

25    show you what Mr. Katzenberg said.

1          **THE COURT:**  Go right ahead.

2          **MR. DENNING:**  First of all, though, there is a

3    legal doctrine that says if the artwork are strikingly

4    similar, not just substantially similar but strikingly

5    similar, there is a presumption of access.  A presumption.

6    If they look so much alike that you're like, wow, those

7    things are strikingly similar, then there is a presumption

8    that there was access.

9          I submit to you that if you look at slide 60 in our

10   presentation which is the one I have up on the screen

11   comparing Mr. Gordon's artwork on the left in pencil sketch

12   and the pandas from *Kung Fu Panda* on the right, I submit

13   that's a striking similarity, enough to lead the Court to

14   say there is a presumption of access here on behalf of

15   DreamWorks.

16         Now, setting presumption aside, let's actually look

17   at what we know.  We know that over the years Mr. Gordon

18   repeatedly sent his artwork and stories to studios.  It's

19   not as if this were an isolated case.  He did it repeatedly

20   sending various drawings to studios, he did it all the time,

21   and maintains a file of the letters he gets back from these

22   people.  That's, in fact, how we know that DreamWorks sent a

23   letter back to Mr. Gordon, because Mr. Gordon kept it.

24   DreamWorks didn't.  Even though their policy says they're

25   supposed to, DreamWorks never produced a copy of that letter

1   in this litigation because they say they don't have it.

2   That's interesting in and of itself.

3           Let's see what Mr. Gordon said in his deposition.

4   And here at slide 62 he was asked, "Mr. Gordon, you claim

5   one of the things you sent to Mr. Katzenberg was copies,

6   Xerox copies, of one of those images in Exhibit 53 -- 52,

7   correct?"

8           And that's the image that we showed you earlier,

9   this 1064 (indicating) image of the two pandas.  The one

10  that was actually in the slide on substantial similarities.

11          Mr. Gordon said, I sent a photocopy of this to

12  Mr. Katzenberg.  And there it is, we see it, the outline at

13  the top on slide 63 shows the 1064, that's the document

14  number.  And the question and the answer, "Either a

15  redrawing of the same thing with the same structure and

16  everything or a copy of it.

17          "And that's because you like it?

18          "I liked it."

19          That was a favorite drawing of Mr. Gordon's and he

20  sent it to Mr. Katzenberg and, among other companies, from

21  time to time.  That's the drawing we're talking about in

22  slide 64.

23          They challenged him.  They said, "So it's perfectly

24  possible that what you think you sent to DreamWorks was a

25  version of this that you had redrawn?"

1          He said, and this is slide 65, "No, I -- to

2     DreamWorks?  No, I'm pretty comfortable with that being the

3     original, because I probably -- you know, I probably made

4     10, 20 copies of it, maybe more.  I liked that one."

5          So Mr. Gordon is very comfortable that this is the

6     one he sent to Mr. Katzenberg.

7          Then his testimony continued.  What else did you

8     send?  Well, I sent a portfolio that included the "Panda

9     Power" property.  And they said, Okay.  Well, what's the

10    "Panda Power" property?  And this is where he said, Well,

11    that would be the outline.  It would have been that sketch.

12    It would have been the one with the earth.  It would have

13    been the Five Fists.  It would have been the one with Redd

14    and Kidd and a bamboo stick.

15         And here we go, here we see, this is the drawing

16    (indicating) of Kidd and Redd in front of the earth, the

17    environmental thing.  Here's (indicating) the one with the

18    five, the Furious Five, the different animals, the kung fu

19    fighting animals.

20         Here's (indicating) the one with -- here is one,

21    there are several but here is one of Redd and Kidd with the

22    bamboo stick.  So, you know, evidence regarding access is a

23    factual inquiry.  This is what the jury is going to hear.

24    They're going to judge Mr. Gordon's credibility when he said

25    this is what I sent them.  Here are the drawings.  This

1     isn't an issue for summary judgment.  This is an issue for

2     the jury to decide on credibility.

3          But it's not just Mr. Gordon's credibility, it's a

4     question of DreamWorks' credibility.  This (indicating) is a

5     copy of DreamWorks' answer in this case.  And if we look at

6     paragraph 60, you know, you've heard counsel for DreamWorks

7     say we only received a letter.  We didn't get a submission

8     or a package from Mr. Gordon, we got only a letter.  Well,

9     in fact, in their answer to this case they admitted,

10    "Defendants admit that DreamWorks Animation received an

11    unsolicited submission in 1999 and returned that submission

12    to Mr. Gordon uncopied."

13         That's not what they say now.  Now they say

14    submission, we never got a submission.  All we got was a

15    letter and we didn't return the letter to Mr. Gordon.  It's

16    the direct opposite of what they said in their signed

17    pleading in this case.  That's a credibility dispute for the

18    jury to determine.

19         What about Mr. Katzenberg?  This is from

20    Mr. Katzenberg's testimony.  And the question was, "So it

21    will be opened, and either you, if you're the one that's

22    opening it, or your assistant, someone will read enough to

23    know that it's an unsolicited submission, if I understand

24    you correctly?"

25         He said, "Yes."

1          "QUESTION:  And then what happens is that

2     submission gets put back into the envelope," and he

3     interrupts and says, "Well, that's what I've always done."

4          So Mr. Katzenberg is saying he reviews these

5     submissions.  He doesn't say when I'm in the office.  He

6     doesn't say when I'm only at home.  He just said that's what

7     I've always done.  I look at it, I open it up, I look at it

8     and see what it is.

9          But now let's look and see what the DreamWorks'

10    record system shows.  This is directly from DreamWorks'

11    computer system, it's their database that shows what mail

12    comes in, what mail goes out.  This is Jayme (sic) Gonzales'

13    document that counsel for DreamWorks was talking about but

14    didn't show you.

15         I have blown up in the upper right, you see it's a

16    submission to Jeffrey Katzenberg.  It's got the date of

17    October 14, 1999 and after that it says "idea."  Idea.

18    Mr. Gonzales typed in "idea."  Why?  Because Mr. Gordon was

19    sending Mr. Katzenberg an idea.

20         If we continue, we see the name, they think it's

21    Ms. Jayme Gordon but we see Mr. Gordon's name.  And then in

22    the next slide, slide 75, if we look in the upper right-hand

23    corner, it says, "Returned?"  And the box is checked yes.

24    What would be returned?  Well, a submission, a package,

25    something that's sent in, which they now say no, we didn't

1    get.  Well, then why would you check the box that says

2    "returned"?  Because Mr. Gordon sent you something and

3    you're supposed to return it.

4            In fact, they didn't return it.  In fact,

5    Mr. Gordon got a letter from them but he did not receive his

6    original submission back, even though they checked the box

7    that says yes, we're going to return it.  And, in fact, they

8    typed the date returned, October 15, 1999.

9            Now, they say no, we didn't, we never got anything

10   to return.  Well, that's not what their document database

11   says.

12           In the next slide, slide 76, we see that

13   Mr. Gonzales checked box No. 8 which means, okay, form

14   letter eight.  They're supposed to respond to this

15   submission with form letter eight.  And we got access to all

16   these materials from DreamWorks.

17           On slide 77 is form letter eight.  You can see at

18   the top it says "letter 8 -- business proposal."  And the

19   second sentence of form letter eight says, "Although we

20   appreciate your interest, we must return your materials to

21   you unread."

22           So Mr. Gonzales looks at the package that gets sent

23   to him.  He says this is an idea.  He says I'm going to

24   return this, I'm going to return it on the 15th and we

25   should use this letter that says we must return your

1    materials to you unread.

2          All right.  So what does Mr. Gordon actually get?

3    Slide 78 shows the letter that he got.  "Although we

4    appreciate your interest, our company policy strictly

5    prohibits our consideration of any unsolicited material.  We

6    generate our projects internally, and therefore we must

7    decline your request to submit your proposed project."

8          It's very different language than what they're

9    supposed to send back in form eight.  And most critically it

10   does not say we are returning your materials to you unread.

11   Why this inconsistency?  Why do the records say one thing,

12   their witnesses say one thing in cross-examination and now

13   they're saying a totally different story here?  That's a

14   fact question the jury has to determine.

15         We submit it's because they have a copy of Jayme

16   Gordon's material and they looked at it and they kept it;

17   but that's a fact question for the jury to determine.  It's

18   wholly improper for that to be decided on summary judgment.

19         All right.  The third argument that they make, and

20   it's the same story here, independent creation.  DreamWorks

21   is asking for this Court to determine as a matter of law

22   without any, without giving the issue to a jury, that

23   DreamWorks independently created *Kung Fu Panda*.

24         This (indicating) is the section from *Nimmer on*

25   *Copyright*, the leading treatise on this area of the law, and

1          it couldn't be any clearer.

2                  It says, "Independent Creation.  To negate copying,

3          a defendant can allege independent creation.  No matter how

4          credible such a claim is, and even absent any contrary

5          evidence, even without any evidence to the contrary, a court

6          should not grant defendant summary judgment on that basis."

7                  Now, I know this is a treatise and it's not First

8          Circuit authority but it's pretty informative that the

9          leading treatise on copyright law says courts should not

10         grant summary judgment on this basis.

11                 "To the extent that defendant denies that copying

12         and maintains independent creation, a factual issue arises,

13         which it is for trial to resolve."

14                 And that's all we're saying here, this is an issue

15         that should be decided by the jury.

16                 It's not just the treatise.  We also put this

17         *Clonus* case and you'll recognize the defendant in this case,

18         it's DreamWorks.  They were in a state copyright case in the

19         Southern District of New York in 2006.  They moved for

20         summary judgment based on independent creation.  And the

21         court in that case, the Southern District of New York, said,

22         "The strength of a defendant's 'independent creation'

23         defense is 'a question for the fact finder,'" and they

24         denied DreamWorks motion because, quote, "independent

25         creation is a question of fact, and should be reserved for

1    the jury."

2         So I could stop there and say, okay, issue of fact,

3    we don't even need to argue it; but there are so many

4    reasons why a jury should hear it in this particular case.

5    If we look at slide 83 among them, it's a very simple

6    graphic, a timeline, showing when did this supposed

7    independent creation start on behalf of DreamWorks.

8         December 9, 1999.  When did they receive

9    Mr. Gordon's submission?  October 14, 1999.  A month and a

10   half after they get Mr. Gordon's submission is the first

11   time you see anything in DreamWorks' documents talking about

12   a movie about pandas.  Mr. Katzenberg's testimony is over

13   the holiday season in 1999 I read a book and came up with

14   this great idea let's make a movie about pandas.

15        We submit he came up with that idea because he got

16   Mr. Gordon's submission in October of 1999.  That's the

17   issue for the jury to determine.

18        We looked at the documents, and these are in the

19   following slides, but you see December 1999 they talk about

20   the giant panda for the first time.  Mr. Katzenberg reading

21   the book.

22        Here's a meeting in slide 87 from January of 2000,

23   the next month, where Mr. Katzenberg raises this idea.  He

24   says, well, "As good as those little white seals are, these

25   guys, the pandas, are just as amazing."  And he starts

1      pushing the idea of making a movie about pandas.

2             They say, well, all right, but Mr. Katzenberg

3      wasn't the guy who made this movie.  There is other creative

4      people who made this movie.  As our briefing sets forth and

5      as our response to their statement of undisputed facts

6      points out, Mr. Katzenberg was intimately involved in every

7      aspect of making *Kung Fu Panda,* right down to, remember, one

8      of the "Furious Five" is a praying mantis, right down to the

9      color of the eyelids on the praying mantis.  Mr. Katzenberg

10     was saying that's too green, make that less green.  That's

11     how involved he was in every aspect.  And it's document

12     after document after document showing Mr. Katzenberg's

13     involvement in *Kung Fu Panda*.  He steered the direction of

14     this movie because of his review of Mr. Gordon's submission.

15            So independent creation, an issue for the jury, has

16     to be determined by the jury.  Your Honor, I won't say, I

17     won't spend much time on substantial similarity because

18     defendants only gave it a few words.  I will argue that

19     defendants have submitted an expert declaration on this

20     point.  I think the law is very clear that the determination

21     of substantial similarity comes from the perspective of an

22     ordinary observer.

23            And in case after case courts have said unless this

24     is an extremely technical area like source code that a lay

25     juror isn't going to be able to look at and understand,

1    unless it's one of those areas, expert testimony shouldn't

2    be allowed.

3            Clearly in this case where you're comparing artwork

4    and stories, expert testimony clearly has no place.

5    Substantial similarity should be taken from the perspective

6    of the ordinary observer.  And I think based on the artwork

7    and everything that the Court has seen, there is certainly a

8    material issue of fact on that regard and granting summary

9    judgment taking that out of the jury's hand would be

10   inappropriate in this case.

11           I'll stop there unless the Court has any questions

12   that you'd like me to address.

13           **THE COURT:**  No questions.  You have given me

14   an abundance of material to consider.

15           **MR. DENNING:**  Thank you, Your Honor.

16           **THE COURT:**  Do you have anything else you want

17   to add?

18           **MR. ZAVIN:**  Yes, if I may ask the Court's

19   indulgence for just a minute or two, Your Honor?

20           **THE COURT:**  Let's keep it to that now.

21           **MR. ZAVIN:**  Okay, I will try.

22           Your Honor, on *Airframe* I will rest with the Court

23   reading the case.  It does not support what the plaintiff

24   says.  And I would point out, and I'd like to read just a

25   couple of sentences from a California decision where the

1    same thing was done.  They tried to compare later work with

2    an infringing work claiming that that was similar to the

3    earlier work.  And the language of the court -- this is

4    *Oscar Systems versus Club Spray* (ph.)  The language of the

5    Court, "The plaintiff has not pointed to any authority that

6    supports what he's attempting to do here, to register and

7    sue on a version of a software program that was created

8    after the version that defendants allegedly copied by

9    belatedly characterizing the registered work as a derivative

10   of an earlier work.  Perhaps the court will recognize that

11   claim of derivative work by registering derivative work of

12   an earlier work that was created before the alleged

13   infringement.  The registration requirement serves as part

14   of an evidentiary function and to protect against fraud."

15       Your Honor, if *Airframe* said what the plaintiff

16   said it did, I could literally right now run to the

17   Copyright Office with something that looked like *Gone With*

18   *the Wind*, register it in 2012, claim that it was based on

19   preexisting work and say I want the jury to compare the film

20   *Gone With the Wind* to my 2012 registration.

21       That is exactly what they're doing here.  They're

22   saying they want to compare the infringing, allegedly

23   infringing work with the later registration.  *Airframe*

24   doesn't support that.  No case does.

25       This was not a reconstruction which Mr. Gordon

1    created in 2008 by looking at the original.  He testified he

2    didn't have those drawings available to him that plaintiff

3    has shown to the Court.  And, as Your Honor will remember

4    from this morning, he intentionally destroyed everything

5    else.

6           There is no evidence of much of what is in his 2008

7    registration.  None of the stories, nothing.  He destroyed

8    them, if they ever existed, and we submit that they didn't

9    exist.

10          *Kodadek* said a bona fide copy is an exact or

11   virtually exact copy.  And in terms of Mr. Gordon's

12   testimony as to what he sent to Mr. Katzenberg, "QUESTION:

13   Mr. Gordon, I want to be very clear, I'm not talking about

14   derivative versions.  When I say 'exact copies,' I mean

15   Xerox copies of these pages unchanged.  Now the question is

16   I believe you previously testified that you don't know to

17   whom you sent exact copies of these pages; is that correct?

18          "ANSWER:  I wouldn't say that.  I'm not -- I'm kind

19   of confused by what you're saying.  Exact copies, redrawn

20   copies?

21          "QUESTION:  No, exact copies, Xerox copies.

22          "ANSWER:  I can't say the exact copies.

23          "QUESTION:  You don't know who you sent exact

24   copies to; is that correct?

25          "ANSWER:  The exact copies I can't say for sure."

He doesn't know what he sent to Mr. Katzenberg.  He
can't create an issue of fact by suddenly putting in one
part of his testimony and saying, oh, I know and then he
testifies under oath he doesn't know who he sent these to,
if anybody.  That's -- what is the jury supposed to compare?
The exact copies?  Something he now thinks are exact copies?
Something he created in 2008?

The testimony on access, plaintiff's counsel is
very good, Your Honor.  I will give them full marks.  They
have come up with some speculative theory about how
DreamWorks' system fell down because they pointed at a
computer that said you should have sent this form or this is
the form.  What they completely ignored is all of the
testimony as to what those forms mean.  They've made it up,
how DreamWorks' system works.

There is an affidavit by Jessie Gonzalez explaining
exactly what happened on those forms.  That these are
templates.  That they're not exact.  That he then varies
them depending on the situation.  And it's exactly what he
did here.  There is no contradiction.  DreamWorks didn't get
anything and it was sent back exactly as DreamWorks' policy
says it should and there is no evidence to the contrary.

There is no fact, genuine factual dispute, just
plaintiff's counsel's theory and that's all.

And, finally, on independent creation, contrary to

1    David Nimmer, who I have great respect for, I know, David --

2    Mr. Nimmer is wrong as to whether independent creation

3    constitutes grounds for summary judgment and the First

4    Circuit has made that clear.

5          In the *Patriots* case the First Circuit, one of the

6    grounds for dismissal of the case was the evidence of

7    independent creation.  That's the law in the First Circuit.

8    It's not what David Nimmer thinks the law should be.  And by

9    the way, that Nimmer quote says that's what he thinks it

10   should be, not what the law is.

11         Thank you, Your Honor.

12         **THE COURT:**  Thank you, everybody.  I will do

13   the best I can with all this material.  Thank you.

14         **MR. DENNING:**  Thank you, Your Honor.

15         If I may inquire one second about a trial date in

16   this case?  We had originally had one set and we released it

17   because of this hearing.

18         **THE COURT:**  My employer is not here.

19         (Laughter.)

20         **THE COURT:**  I am not sure where she is but she

21   is not here so we will have to do that through her.

22         **MR. DENNING:**  Okay.

23         **THE COURT:**  All right.

24         **MR. MADERA:**  Your Honor, we were wondering,

25   could we at least provide our dates of availability so that

1     you could consider that --

2                    THE COURT:  To her.

3                    MR. DENNING:  Okay.

4                    THE COURT:  Call her.

5                    MR. DENNING:  We'll do that, Your Honor.

6                    MR. MADERA:  Okay.

7                    THE COURT:  Zita Lovett, she is the one that

8     does all the booking.

9                    MR. MADERA:  We'll do that.

10                    THE COURT:  Please.  If I did it, you would

11    have to do it over again anyway.

12                    MR. MADERA:  We'll do it that way.

13                    MR. DENNING:  Thank you, Your Honor.

14

15              (WHEREUPON, the proceedings were recessed at 3:50

16              p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

**DATE: November 27, 2012**