UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAYME GORDON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:11-10255-JLT |
| | * | |
| DREAMWORKS ANIMATION | * | |
| SKG, INC., DREAMWORKS | * | |
| ANIMATION LLC, and PARAMOUNT | * | |
| PICTURES CORP., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM

March 28, 2013

TAURO, J.

I.    Introduction

In 2008, Defendants DreamWorks Animation SKG, Inc. and DreamWorks Animation

LLC (together "DreamWorks"), in collaboration with Defendant Paramount Pictures Corp.,

(collectively "Defendants") released the movie Kung Fu Panda, a wildly successful animated film

featuring a giant panda who becomes a kung fu warrior.  Plaintiff Jayme Gordon, an artist, claims

to have created the film's main characters in the late 1980s and early 1990s.  He brings this suit

against Defendants for copyright infringement, contributory copyright infringement, and vicarious

copyright infringement.

Before the court are Defendants' Motion to Dismiss on Grounds of Spoliation [#117] and

Motion for Summary Judgment [#99].  For the reasons set forth below, Defendants' Motion to

Dismiss on Grounds of Spoliation [#117] is ALLOWED IN PART AND DENIED IN PART.

1

Defendants' Motion for Summary Judgment [#99] is DENIED.

II.      Background

    A.      Factual Background[1]

During the 1980s and 1990s, Gordon worked as an artist, developing sketches for dozens of characters.  Over the course of a decade, he registered hundreds of pages of drawings, ideas, and story sketches with the U.S. Copyright Office.[2]  In the early 1990s, he developed two panda characters, a giant Panda known as "Kidd Panda" and a red panda known as "Redd Panda," who together constituted "Panda Power."[3]  Written reference to "Panda Power" first appears in Gordon's 1993 copyright registration.[4]  Gordon registered more material relating to Kidd and Redd in 2000, when he created a website to promote his material.[5]  These materials included promotional pictures of "Kidd Panda" and "Redd Panda," along with personality sketches, a story outline, and an animated series theme song.[6]  At this time, Gordon described Kidd Panda as "[s]erious yet fun loving," a "big brother to Red" [sic] with a "sweet-tooth for bamboo."[7]  He

-------

[1] The basic facts are set forth here in the light most favorable to Gordon as supported by the record.  See De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).  Additional relevant facts are included in the discussions of the motion to dismiss for spoliation and the motion for summery judgment.

[2] See generally Grossman Aff. Exs. B- F [#107].

[3] Gordon Dep. 83:9-85:12.

[4] Grossman Aff. Ex. F.  Gordon's 1992 Copyright Registration contains a passing reference to "Red Panda." Grossman Aff. Ex. F.

[5] See Grossman Aff. Ex. I, at JG 000107-000118; Gordon Dep. 196:10-203:22; Koro Dep. 24:18-21.

[6] See Grossman Aff. Ex. I, at JG 000107-000118.

[7] Grossman Aff. Ex. I, at JG 000108.

2

described Redd Panda as an immature "prankster" who often needed "to be saved by Kid."[8]  But

these descriptions did not represent fixed character traits in Gordon's mind.  Rather, the story and

characters evolved over time, changing personalities as they developed.[9]

In the 1990s, Gordon began submitting artwork to animation studios.  He sent his early

materials to the Walt Disney Company ("Disney") in 1989 and 1990.  During the 1980s-1990s,

Jeffrey Katzenberg worked at Disney as head of the motion picture and feature animation

divisions.[10]  He left Disney in 1994 to co-found DreamWorks LLC, where he oversees all of

DreamWorks Animation's animated movies.[11]

Disney rejected all of Gordon's submissions.[12]  Per company policy, Disney did not accept

unsolicited materials unless sent through a "bona fide literary agent."[13]  Nevertheless, in 1992,

before Katzenberg left for DreamWorks, Gordon for a third time submitted his work to Disney.

His letter to Disney indicated that he included a work entitled "The Great Dinosaur War."[14]

Gordon remembers including other materials as well, specifically his "Kung Fu Panda Power

stuff" and a picture of the "Five Fists of Fury," the supporting cast of characters to Redd and

---

[8] Grossman Aff. Ex. I, at JG 000109.

[9] Gordon Dep. 200:1-201:19.

[10] Katzenberg Aff. ¶ 2 [#108].

[11] Katzenberg Aff. ¶¶ 4-5.

[12] Gordon Dep. 231:22-235:18.

[13] Gordon Dep. 231:22-232:10, 234:2-235:18.

[14] Gordon Dep. 249:18-250:4.

Kidd Panda that includes a snake, crane, mantis, tiger, and monkey.[15] He did not save a copy of

the materials sent to Disney.[16] On October 12, 1999, Gordon mailed another letter to Disney.[17]

The letter promoted the launch of Gordon's new website, which he created to introduce licensing

and production companies to his characters.[18]

Gordon also sent materials to DreamWorks. In 1999, he sent a "binder" to CEO

Katzenberg. The binder contained his "Kung Fu Panda Power."[19] Gordon did not retain a

complete copy of the binder of materials sent to Katzenberg.[20] At the time, however, he had a

standard repertoire of submissions, and he would make copies by hand of sketches he particularly

liked.[21] He submitted the same redrawn images over and over.[22] DreamWorks Animation's

records indicate that it received a "letter" from Gordon on October 14, 1999, which it processed

as a "business proposal."[23] Its Department of Business and Legal Affairs sent Gordon a rejection

---

[15] Gordon Dep. 256:23-258:20. Gordon alleges that DreamWorks modeled its "Furious Five" companions to its panda heros on Gordon's Five Fists of Fury. See Am. Compl. ¶30, 40-41. There is no evidence in the website or registrations that the Five Fists existed before 2000. Gordon Dep. 258:17-20.

[16] Gordon Dep. 256:11-22.

[17] Gordon Dep. 701:16-704:7; Grossman Aff. Ex. H.

[18] Grossman Aff. Ex. H.

[19] Gordon Dep. 329:16-22. Gordon used the terms "Panda Power" and "Kung Fu Panda Power" interchangeably. Gordon Dep. 83:20-85:12.

[20] Gordon Dep. 318:20-23, 324:12-23.

[21] Gordon Dep. 321:9-13, 461:21-462:4.

[22] Gordon Dep. 321:9-13.

[23] Gonzales Aff. ¶¶ 6-8, Exs. A, B [#106].

letter the next day.[24]  Ordinarily, the Department returned unsolicited materials to the sender

unopened and unread.[25]  But the Department did not return any materials to Gordon with his

rejection letter.[26]

Additionally, Gordon sent materials to Andrew Blumsack, an employee of the live action

division of DreamWorks SKG.[27]  In an unexpected coincidence, Gordon met Blumsack's sister

while on vacation and followed up by sending Blumsack a sampling of his materials, including

"Kung Fu Panda Power."[28]  Gordon does not have an exact copy of the materials sent to

Blumsack,[29] and Blumsack does not recall ever receiving a package addressed to him personally

while he worked at DreamWorks.[30]

As alluded to earlier, in 2000, Gordon created a website to feature his characters and

promote them to the licensing community.[31]  He enlisted the assistance of graphic designer Diane

Koro.[32]  Gordon brought Koro binders of his materials, and under his supervision, she put the

---

[24] Gonzales Aff. ¶ 7; Gordon Dep. 322:24-323:3.

[25] Gonzales Aff. ¶¶ 5, 7.

[26] Gonzales Aff. ¶¶ 7-8.

[27] Gordon Dep. 318:9-320:7; Blumsack Aff. ¶ 1 [#104].

[28] Gordon Dep. 316:24-320:7.

[29] Gordon Dep. 324:12-23.

[30] Blumsack Aff. ¶ 5.

[31] Koro Dep. 24:18-26:17.

[32] Koro Dep. 24:14-25:10.

images and stories on the website.[33]   The website, which Koro helped Gordon copyright,[34] included the "Mighty Three" rhinoceros,[35] "Fortune Cookie" the duck,[36] and "Panda Power."[37]

In February or March of 2008, Gordon saw a promotional trailer for <u>Kung Fu Panda</u> while watching a DVD of <u>Shrek the Third</u>.[38]   Gordon wanted to make sure that he preserved all of his "Panda Power" materials in the U.S. Copyright Office before the movie's release.[39]   He took all of his preexisting "Panda Power" materials and compiled them into a book entitled "Book of P.U."[40] After completing the "Book of P.U.", he shredded all of the preexisting materials.[41]   Gordon then registered the "Book of P.U." with the U.S. Copyright Office.  The registration became effective June 4, 2008,[42] two days before the release of <u>Kung Fu Panda</u>.[43]   Gordon initially represented to the U.S. Copyright Office that he completed the material in his 2008 registration in 1999.[44]   With

---

[33] Koro Dep. 33:1-34:9.

[34] Koro Dep. 31:9-32:6.

[35] Grossman Aff. Ex. I, at JG 000644-JG 000646.

[36] Grossman Aff. Ex. I, at JG 000797, JG 000805.

[37] Grossman Aff. Ex. I, at JG 000106-JG 000118.

[38] Gordon Dep. 337:22-338:17.

[39] Gordon Dep. 362:20-363:1; 363:13-23.

[40] Gordon Dep. 338:21-339:1.

[41] Gordon Dep. 340:5-16, 343:4-345:4, 348:1-349:10, 361:13-367:7, 471:8-472:1, 473:13-479:1, 487:19-489:5.

[42] Grossman Aff. Ex. L.

[43] Grossman Aff. ¶ 17.

[44] Grossman Aff. Ex. L.

counsel's help, he filed a correction stating that "[c]onstituent parts of the work were completed by 1999; author engaged in acts of authorship through 2008."[45]     In 2009, Gordon's friend and former colleague, Kenneth Partello, uncovered some of Gordon's early sketches in his home.[46] Gordon and Partello had an art-themed store at a mall in the early 1990s, and Partello inadvertently took some of Gordon's sketches home with him.[47]  The sketches stayed in Partello's possession from approximately 1994 through 2009, when he uncovered them in a locker in his garage and a drawer in his desk.[48]  Gordon did not have access to either location.[49]  Gordon registered these uncovered sketches with the U.S. Copyright Office in 2011.[50]  He also found additional sketches in his own apartment after the release of Kung Fu Panda, which he registered separately with the U.S. Copyright Office in 2011.[51]

     B.    Procedural History

     Gordon filed his original complaint on February 16, 2011, and an amended complaint in April 2011. Defendants answered, and a series of discovery skirmishes ensued. On June 4, 2012, Defendants moved for summary judgment. That same day, they also filed a motion to dismiss for spoliation of evidence. On June 16th, Defendants moved to file additional, newly-discovered

---

[45] McCallion Aff. Ex. J, at JG 001647 - JG 001648 [#136].

[46] Partello Dep. 208:15-16, 216:4-217:9, Feb. 6, 2012; McCallion Aff. Ex. M, at JG 1059-1097.

[47] Partello Dep. 218:17-219:7, 224:6-14, Feb. 6, 2012.

[48] Partello Dep. 208:15-24, 216:4-217:3, 218:24-219:11, Feb. 6, 2012.

[49] Partello Dep. 107:9-12, Feb. 7, 2012.

[50] McCallion Aff. Ex. M.

[51] Gordon Dep. 480:14-18; Grossman Aff. ¶ 128; McCallion Aff. Ex. L.

evidence of spoliation. Gordon opposed all three motions. This court allowed Defendants' motion to file additional evidence of spoliation on August 16, 2012. The court now turns to Defendants' motion to dismiss and motion for summary judgment.

III.   <u>Discussion</u>

   A.   <u>Defendants' Motion to Dismiss for Spoliation of Evidence</u> [#117]

Defendants argue that this court should dismiss Gordon's claims because he deliberately destroyed all preexisting materials used to compile his 2008 copyright registration. They focus primarily on Gordon's testimony that, after creating the "Book of P.U.," he shredded all related preexisting artwork and discarded or lost all electronic equipment utilized. Defendants also point to Gordon's inconsistent representations regarding the number of computers and email addresses he possesses; an email to a potential witness supposedly instructing that individual to delete all relevant emails; and more-recently discovered evidence that Gordon used commercial deletion software to permanently remove relevant files from his computers while a motion to compel production of those computers was pending before this court.

      i.   Act of Spoliation

As both parties acknowledge, spoliation is the "intentional, negligent, or malicious destruction of relevant evidence."[52] The court must first determine whether an act of destruction occurred. This requires finding four elements: 1) an act of destruction; 2) discoverability of the evidence; 3) intent to destroy the evidence; and 4) occurrence of the act after commencement of litigation or, if before, at a time when the party was on notice that the evidence might be relevant

---

[52] <u>Townsend v. Am. Insulated Panel Co., Inc.</u>, 174 F.R.D. 1, 4 (D. Mass. 1997).

to potential litigation.[53] The court must also consider prejudice to the moving party, although the

prejudice inquiry tends to overlap with the determination of the appropriate sanction.[54]

      While he disputes the characterization of his actions, Gordon does not seriously deny that

he intentionally destroyed discoverable evidence. Indeed, his repeated deposition answers clearly

confirm this. For example:

> Q:    [I]n 2008 you created the Book of P.U. supposedly on preexisting
> materials and then destroyed all the preexisting materials; is that correct?
>
> A:    Yes, shredded them.
>
> Q:    Why did you shred them?
>
> A:    I make a practice to shred everything. If I make a new book, I shred the old
> stuff.[55]

In addition to shredding the paper materials, Gordon's testimony also makes clear that he

discarded all of the electronic equipment used to create the "Book of P.U." Gordon threw out

several computers and lost a thumb drive that may have contained documents or files relating to

the "Book of P.U."[56] His testimony leaves little room for doubt that he intentionally destroyed the

preexisting materials. Whether he acted in bad faith or simply as part of his artistic process does

not render the destruction any less intentional, though it may affect the appropriate sanction.[57]

---

[53] McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 154 (D. Mass. 1997); Citizens for Consume v. Abbott Labs., No. 01-12257-PBS, 2007 WL 7293758, at *5 (D. Mass. Mar. 26, 2007).

[54] McGuire, 174 F.R.D. at 154; see Citizens for Consume, 2007 WL 7293758, at *5.

[55] Gordon Dep. 362:12-19.

[56] Gordon Dep. 365:4-21, 366:11-367:7.

[57] See Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998).

Any trace of the materials used to create Gordon's "Book of P.U." has disappeared.

The parties' dispute centers not on this destruction, but rather on whether Gordon shredded the materials at a time when he had a duty to preserve them. The duty to preserve evidence arises when "litigation is reasonably anticipated."[58] Determining exactly when this duty arises poses a unique challenge where the defendant accuses the plaintiff of destroying evidence because the plaintiff controls the timetable for commencing litigation. If the court construes the duty too narrowly, "as a matter of policy, . . . any plaintiff [could] freely destroy whatever evidence it chose and then file a claim without fear of sanction."[59]

The court concludes that Gordon acted while under a duty to preserve relevant evidence. Gordon cannot rely solely on his own statement that, at the time he saw the Kung Fu Panda trailer in early 2008, he did not contemplate subsequent litigation.[60] Gordon testified that he saw the trailer, which contained his artwork and characters, and immediately set about to "preserve" his work with the Copyright Office before the film's release. Filing a registration with the Copyright Office is a statutory prerequisite to a copyright infringement suit,[61] and a certificate of copyright serves as prima facie that the registrant independently created the work.[62] Gordon's decision to

---

[58] Velez v. Marriott PR Mgmt., Inc., 590 F. Supp. 2d 235, 258 (D.P.R. 2008).

[59] Citizens for Consume, 2007 WL 7293758, at *8.

[60] Gordon Dep. 363:13-23.

[61] 17 U.S.C. § 411(a).

[62] Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 345 (1991); Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005).

"preserve" his work thus provided him with a significant litigation advantage.[63] Furthermore,

Gordon acknowledged that he contacted his current attorneys in 2008,  possibly even before filing

the 2008 copyright registration.[64] Under these circumstances, Gordon could reasonably anticipate

litigation at the time he destroyed the artistic materials.

ii.    Appropriate Sanction

Having concluded that Gordon committed an act of spoliation, this court must determine

the appropriate sanction. Spoliation sanctions serve "to rectify any prejudice the non-offending

party may have suffered as a result of the loss of evidence and to deter any future conduct,

particularly deliberate conduct, leading to such loss of evidence."[65] The court considers five

factors: "1) whether the defendant was prejudiced as a result of [the destruction of evidence]; 2)

whether the prejudice can be cured; 3) the practical importance of the evidence; 4) whether the

plaintiff was in good faith or bad faith; and 5) the potential for abuse if the evidence is not

excluded."[66] The primary considerations are the prejudice to the non-spoliating party and the

degree of fault of the offending party.[67] The court must strive to tailor the sanction to the

---

[63] Cf. McGuire v. Acufex Microsurgical. Inc., 175 F.R.D. 149, 153 (D. Mass. 1997) (holding that defendant had a duty to preserve evidence where "[f]iling charges before the MCAD is a statutory prerequisite to federal discrimination litigation").

[64] Gordon Dep. 380:7-382:8.

[65] Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998).

[66] Townsend v. Am. Insulated Panel Co., Inc., 174 F.R.D. 1, 4 (D. Mass. 1997) (alteration in original) (quoting Mayes v. Black & Decker, 931 F. Supp. 80, 83 (D.N.H. 1996)).

[67] Collazo-Santiago, 149 F.3d at 29.

circumstances of the spoliation,[68] bearing in mind that dismissal "is usually considered appropriate only when a party maliciously destroys relevant evidence for the sole purpose of preventing an adverse party from examining it."[69]

Under the circumstances of this case, the court concludes that the appropriate spoliation sanction is exclusion of Gordon's 2008 copyright registration from evidence. Defendants face tremendous prejudice without the opportunity to examine the materials that led to the creation of the "Book of P.U." Because Gordon acknowledges that the actual copyrighted "Book of P.U." was created after he saw the <u>Kung Fu Panda</u> trailer, his infringement claims depend largely on his ability to prove that he created panda characters substantially similar to Defendants' characters before he saw the trailer.[70] Although Gordon claims that the "Book of P.U." provides a kind of historical record as to everything that existed before its creation,[71] he acknowledged in his deposition that he made potentially significant changes to the materials after viewing the movie trailer. He stated that he "quite possibly could have" added the words "kung fu" to drawings that previously did not include those words.[72] He also indicated that he does "all kinds of stuff . . . take heads off, cut them off, move them around, whatever I want."[73] These types of changes -  small-

---

[68] <u>See</u> <u>Sacramona v. Bridgestone/Firestone, Inc.</u>, 106 F.3d 444, 448 (1st Cir. 1997).

[69] <u>Vazquez-Corales v. Sea-Land Serv., Inc.</u>, 172 F.R.D. 10, 13 (D.P.R. 1997).

[70] <u>See</u> <u>Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 345 (1991); <u>Johnson v. Gordon</u>, 409 F.3d 12, 17 (1st Cir. 2005).

[71] Gordon Dep. 373:1-2.

[72] Gordon Dep. 371:24-372:5.

[73] Gordon Dep. 372:7-9; <u>see generally</u> Gordon Dep. 371-377.

scale additions or subtractions - could make all the difference to Defendants' ability to refute

Gordon's claims of substantial similarity. Without the preexisting materials, Defendants have no

meaningful way to impeach the legitimacy of the "Book of P.U." or probe Gordon as to how

viewing the movie trailer influenced his creative process.[74] Excluding Gordon's 2008 copyright

registration removes this significant risk of prejudice.

The court declines Defendants' invitation to dismiss the case. The court does not share

Defendants' certainty that Gordon acted in bad faith in misidentifying the number of email

addresses and computers he possessed or running software that may or may not have deleted

computer files. And it can glean little of Gordon's alleged wholesale effort to destroy relevant

communications from an email, signed "Luke aka Jabba The Hut," stating that "the furry Ewok is

forever blocked."[75] This evidence is not sufficiently clear to justify the harsh and disfavored

sanction of dismissal.[76] Exclusion of a key piece of Gordon's evidence adequately rectifies the

prejudice to Defendants and accounts for Gordon's culpability.

B.      Legal Standard for Defendants' Motion for Summary Judgment

To prevail on a motion for summary judgment, the moving party must show that "there is

no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a

---

[74] See Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 96 (1st Cir. 1999).

[75] Grossman Spoliation Aff. Ex. M [#120].

[76] Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998).

13

matter of law."[77] In deciding the motion, "a court is not authorized to make findings of fact."[78] The court must examine the record "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."[79]

If the moving party does not have the burden of proof at trial, that party may demonstrate that the evidence is insufficient to support the nonmoving party's case.[80] The nonmovant must then proffer evidence of some genuine issue of material fact to forestall summary judgment. "Genuine issues of material fact are not the stuff of an opposing party's dreams."[81] Rather, the nonmovant must offer "definite, competent evidence."[82]

### C.    Defendants' Motion for Summary Judgment

Copyright infringement requires proof of two elements. First, a plaintiff must establish ownership of a valid copyright.[83] Second, the plaintiff must establish that the alleged infringer copied the protected work.[84] This second element requires a further two-part inquiry: " '(a) that the defendant actually copied the work as a factual matter,' and '(b) that the defendant's copying

---

[77] Fed. R. Civ. P. 56(a); see Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 41 (1st Cir. 2011) (citing Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008)).

[78] Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 113 (D. Mass. 1999).

[79] De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

[80] Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case.").

[81] Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

[82] Id.

[83] Mag Jewelry Co., Inc. v. Cherokee, Inc., 496 F.3d 108, 114 (1st Cir. 2007).

[84] Id.

of the copyrighted material was so extensive that it rendered the infringing and copyrighted works "substantially similar." ' "[85] The plaintiff bears the burden of proof on each element.[86] In this case, as in most cases, Gordon does not have direct evidence of copying by Defendants. Thus, to prove that Defendants copied his materials, Gordon must show that "(1) the defendant[s] 'enjoyed access to the copyrighted work,' and so had the opportunity to copy the work, and (2) 'a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying.' "[87]

Against this legal backdrop, Defendants raise four arguments. None carries the day.

First, Defendants argue that because Gordon cannot produce an exact copy of the materials he allegedly sent to DreamWorks, his claims for copyright infringement cannot proceed. This is incorrect. The "substantial similarity" inquiry requires a comparison between the content of the copyright registration and the allegedly infringing work.[88] Thus, a plaintiff must produce the content of the copyright registration allegedly infringed.[89] Gordon has done this. He has provided as evidence the contents of both his 2011 registrations and his 2000 registration.[90] He need not

---

[85] Airframe Sys., Inc. v. L-3 Commc'ns, Corp., 658 F.3d 100, 105 (1st Cir. 2011) (quoting Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 58 (1st Cir. 2009)).

[86] Mag Jewelry Co., Inc. 496 F.3d at 114.

[87] T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 111 (1st Cir. 2006) (quoting Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005)).

[88] Airframe Sys., Inc. 658 F.3d at 106.

[89] Id. (indicating that before the comparison to determine substantial similarity can occur, "the plaintiff must necessarily establish the content of the copyrighted work that it contends was infringed.").

[90] See McCallion Aff. Exs. H-I, L-M.

provide the exact materials submitted to Dreamworks. Thus, Defendants are not entitled to summary judgment on this ground.

Second, Defendants assert that Gordon has failed to provide any evidence of access by anyone at DreamWorks to his art. Proving access requires a plaintiff to "produce evidence from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work."[91] This opportunity must exist before the defendant created the allegedly infringing work, and "[e]vidence that only creates a 'bare possibility' that the defendant had access is not sufficient to create a factual issue as to copying."[92]

Genuine issues of fact remain on the issue of access. Both parties focus on Gordon's 1999 submission to DreamWorks. Gordon testified that he sent a portfolio, including his "Panda Power" materials, to Katzenberg at DreamWorks in October 1999.[93] DreamWorks's records indicate receipt of a submission from Gordon.[94] Gordon regularly submitted unsolicited portfolios to studios,[95] but DreamWorks's records indicate that Gordon submitted a "business proposal."[96] Although DreamWorks's policy required prompt return of unsolicited materials with a rejection

---

[91] Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996); Mag Jewelry Co., Inc., 496 F.3d at 117.

[92] Grubb, 88 F.3d at 3-4 (quoting Jason v. Fonda, 526 F. Supp. 774, 777 (C.D. Cal. 1981)).

[93] Gordon Dep. 329:12-22, 470:7-471:22.

[94] McCallion Aff. Ex. Q.

[95] Gordon Dep. 256:11-260:20, 271:18-272:13, 286:22-289:13.

[96] McCallion Aff. Exs. Q-R.

letter,[97] Gordon received only a letter, which made no mention of his submissions.[98]

Furthermore, Katzenberg appears to have provided conflicting testimony regarding his procedures for handling unsolicited submissions. At his initial deposition, he indicated that he sometimes opened submissions and skimmed the opening paragraphs before concluding they were unsolicited materials and forwarding them to the legal department.[99] Later he maintained that he never opened unsolicited submissions at his office but sometimes opened them if they came to his home.[100] All of these discrepancies must be resolved by the trier of fact, and summary judgment is therefore inappropriate.

Third, Defendants argue that Gordon cannot prove substantial similarity as a matter of law. "The substantial similarity inquiry 'entails proof that the copying was so extensive that it rendered the works so similar that the later work represented a wrongful appropriation of expression.' "[101] This inquiry focuses on the protectible elements of the plaintiff's work.[102] Substantial similarity is measured from the perspective of the "ordinary observer" and asks whether "a reasonable, ordinary observer, upon examination of the two works, would 'conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.' "[103]

---

[97] Gonzales Aff. ¶ 3.

[98] McCallion Aff. Ex. T.

[99] Katzenberg Dep. 22:21-25:11.

[100] Katzenberg Dep. 400:1-21; Katzenberg Aff. ¶ 6.

[101] T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 112 (1st Cir. 2006) (quoting Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005)).

[102] Id.

[103] Id. (quoting Johnson, 409 F.3d at 18).

Summary judgment on this prong of the infringement test is "unusual."[104] A court may grant summary judgment only if "a rational factfinder, correctly applying the pertinent legal standards, would be compelled to conclude that no substantial similarity exists between the copyrighted work and the allegedly infringing work.' "[105]

This court concludes that Gordon's infringement claims fall within the large category of cases in which summary judgment based on substantial similarity is inappropriate. Gordon's 2000 and 2011 copyright registrations provide evidence of similarities between the overall works and the two main panda characters that would allow rational jurors to reach differing conclusions.[106] Thus, Defendants are not entitled to summary judgment on this ground.

Finally, Defendants claim that the court should allow summary judgment because the undisputed evidence establishes that DreamWorks independently created Kung Fu Panda. They rely on the First Circuit's decision in Grubb v. KMS Patriots, L.P.[107] for the proposition that this court can grant summary judgment on the grounds of independent creation.

Defendants are correct that independent creation is a complete defense to an infringement claim.[108] Even if a plaintiff establishes both access to the protected work and substantial similarity, "the trier of fact may nonetheless find no copying if the defendant shows independent creation."[109]

---

[104] Id.

[105] Id. (quoting Johnson, 409 F.3d at 18).

[106] See McCallion Aff. Exs. H-I, L-M.

[107] Grubb v. KMS Patriots, L.P., 88 F.3d 1 (1st Cir. 1996).

[108] See id. at 6.

[109] Id. at 3.

18

But Defendants' further reliance on <u>Grubb</u> is misplaced. In that case, the defendant's artist provided computer-generated time sheets specifying exactly when he had created the allegedly infringing art.[110] The parties stipulated that no one could backdate the software program that generated the time sheets.[111] Critically, the time sheets indicated that the artist created the allegedly infringing work before the plaintiff claimed even to have sent his own work to the defendant. Under these circumstances, the court found summary judgment appropriate.

This case presents a very different scenario. Gordon claims to have sent his "Panda Power" materials to DreamWorks *before* the studio commenced work on the film. The trier of fact must decide whether DreamWorks subsequently independently developed the film or whether Gordon's submissions influenced the process.[112] Summary judgment is not appropriate.

IV.    <u>Conclusion</u>

For these reasons, Defendants <u>Motion to Dismiss on Grounds of Spoliation</u> [#117] is ALLOWED IN PART. Defendants' <u>Motion for Summary Judgment</u> [#99] is DENIED.

IT IS SO ORDERED.

/s/ Joseph L. Tauro
United States District Judge

---

[110] <u>Id.</u> at 2.

[111] <u>Grubb v. Nat'l Football League Props., Inc.</u>, 901 F. Supp. 36, 39 (D. Mass. 1995), <u>aff'd sub nom.</u> <u>Grubb v. KMS Patriots, L.P.</u>, 88 F.3d 1 (1st Cir. 1996).

[112] <u>See</u> <u>Grubb</u>, 88 F.3d at 3; <u>see also</u> <u>Repp v. Webber</u>, 132 F.3d 882, 891 (2d Cir. 1997) ("Whether the evidence of independent creation here is sufficient to rebut the prima facie case established in this action is a question for the factfinder, whatever the contours of the burden of establishing the defense.").